```
March 18, 2008    TG
08cv1578
Judge SHADUR
Magistrate Judge SCHENKIER
```

# EXHIBIT 2

ADR

E-FILING

1
2
3
4

ALAN HIMMELFARB (State Bar # 90480)
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

5
6
7
8
9

JAY EDELSON (pro hac vice pending)
MYLES MCGUIRE (pro hac vice pending)
ETHAN PRESTON (pro hac vice pending)
KAMBEREDELSON, LLC
53 West Jackson Boulevard
Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370

Filed

OCT 2 2 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

10

ATTORNEYS FOR PLAINTIFF

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

13
14
15
16
17
18
19
20
21

LINDSEY ABRAMS, individually and on
behalf of a class of similarly situated
individuals,

          Plaintiff,

v.

FACEBOOK, INC., a Delaware corporation,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. **C07  05378**
**PVT**

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

DEMAND FOR JURY TRIAL

**CLASS ACTION**

**BY FAX**

22
23
24
25
26
27
28

**CLASS ACTION COMPLAINT**

    Plaintiff Lindsey Abrams brings this class action complaint against defendant
Facebook, Inc. ("Facebook") to stop defendant's practice of transmitting or permitting to be
transmitted unauthorized text messages to the wireless devices of consumers nationwide, and
to obtain redress for all persons injured by its conduct.  For her class action complaint,

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1    Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and

2    experiences, and, as to all other matters, upon information and belief, including investigation

3    conducted by her attorneys.

4                             **NATURE OF THE CASE**

5        1.      In an on-going effort to attract users to its website, Facebook, a self-described

6    "social utility" that has gained popularity by linking students and other groups through its

7    website, engaged in a mobile marketing service called "Facebook Mobile." Through

8    Facebook Mobile, members can, with a few clicks of the computer mouse, send text

9    messages -- often containing adult content -- to the mobile phone numbers associated with

10    other members.

11        2.      However, through either intentional design or gross negligence, Facebook's

12    system has a significant flaw: the system sends text messages to the cell phone numbers

13    entered by a particular member, without regard to whether that member actually still uses

14    that cell phone number. Because cell phone numbers are reassigned to new users after the

15    previous user closes her or her account, Facebook's flaw has resulted in the transmission of

16    thousands of unauthorized text messages to the wireless phones of consumers across the

17    nation.

18        3.      Facebook's system has created a number of significant problems. First,

19    individuals' privacy rights are being compromised. New cell phone users are now being

20    assailed with invitations to parties by people they do not know, requests to be designated a

21    "friend" on Facebook's website, and other often obscure and graphic messages. These

22    messages can come during all times of the day or night and, because the senders are often

23    hard to identify, can be seen as intimidating or unsettling.

24        4.      This issue is all the more pronounced because children are among those who

25    receive phone numbers previously associated with Facebook's members. As such, adults

26

27

28

1    seeking sexual encounters or other types of adult activities end up inadvertently text

2    messaging young children.

3        5.      Additionally, recipients of these text messages often have to pay to receive

4    these text messages, even though they are completely unauthorized and unwelcome.

5    In order to redress these injuries, Abrams, on behalf of herself and a nationwide class, brings

6    suit under the California Computer Crime Law, Cal. Pen. Code § 502, California's Unfair

7    Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the common law and seeks

8    an immediate injunction against Facebook.

9                                   **PARTIES**

10       6.      Plaintiff Lindsey Abrams is a mother of a young child.  She is a citizen of

11   Indiana.

12       7.      Defendant Facebook, Inc. is a self-described social networking company

13   located in California. It is a Delaware company with its principal place of business in

14   California, and it conducts business throughout the United States.

15                                  **JURISDICTION**
                               **VENUE AND JURISDICTION**
16

17       8.      This Court has subject matter jurisdiction over this action pursuant to 28

18   U.S.C. § 1332.  The aggregate claims of plaintiffs and the proposed class members exceed

     the sum or value of $5,000,000.00.
19

20       9.      This Court also has personal jurisdiction over defendants because (a) a

21   substantial portion of the wrongdoing alleged in this complaint took place in this state, (b)

     defendant Facebook Inc.'s principle place of business is located in this state, and (c)
22

23   defendant is authorized to do business here, has sufficient minimum contacts with this state,

24   and/or otherwise intentionally avails itself of the markets in this state through the promotion,

25   marketing and sale of its products in this state, to render the exercise of jurisdiction by this

     Court permissible under traditional notions of fair play and substantial justice.
26
         10.     Venue is proper in this District under 28 U.S.C. §1391(b) and (c).  A
27
     substantial portion of the events and conduct giving rise to the violations of law complained
28

---

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

3

of herein occurred in this District, defendant Facebook Inc.'s principle executive offices and headquarters are located in this District at 156 University Avenue, Palo Alto, CA 94301.

## INTRADISTRICT ASSIGNMENT

11.     Intra district assignment to the San Jose Division is proper because the principal offices of defendant Facebook Inc, is located in Santa Clara County.

## THE CONDUCT COMPLAINED OF

12.     In recent years, as social-networking has grown increasingly popular on the internet, many companies in the social-networking industry have released mobile versions of their service ("Mobile Service") which involve the transmission of user-created content in the form of text messages to fellow users exclusively through their wireless devices.

13.     In or about April 2006, Defendant Facebook and its partner cellular telephone carriers ("carriers") jointly released a "Mobile Service" for Facebook's users called Facebook Mobile.

14.     Defendant's Mobile Service employs technology known as Short Message Services ("SMS"), which is a content delivery system that allows owners of wireless devices, such as cell phones, to send and receive short text messages, usually limited to 160 or so characters.

15.     Defendant's Mobile Service works primarily by converting messages posted by users on the Facebook website into commercial SMS text messages which are then automatically transmitted to the wireless devices of other Facebook users.

16.     In order to obtain the necessary technical expertise and billing relationships required to operate its Mobile Service, Facebook, by itself or through its agents, partnered with traditional cellular telephone carriers.

17.     Facebook and/or its partners profit from the Mobile Service by charging the recipient a fee for the transmission of each item of wireless content. Such fee varies in amounts but ranges around $0.15 that the recipient must pay for the receipt of each text

1  message sent by Facebook. Recipients are charged such fee even if they did not consent to

2  receive such text messages.

3        18.    As a part of their normal business practice, Facebook's carrier partners

4  routinely reissue (or "recycle") wireless phone numbers assigned to the wireless devices of

5  former customers to new customers who open new cellular telephone accounts. Because it

6  and its partners would lose valuable revenue, Facebook has knowingly permitted its system

7  to operate in a way so as to ensure that unauthorized content is transmitted to the wireless

8  devices of consumers who have received a wireless device encumbered with Facebook

9  Mobile.

10        19.    The instant lawsuit flows from what happens when Facebook cooperates with

11  its wireless carrier partners when a wireless number of a Facebook user is recycled to a non-

12  Facebook user, resulting in Facebook's transmission of unauthorized content to the wireless

13  devices of consumers nationwide.

14        20.    Wireless phone number recycling is a serious problem that is not limited to a

15  small group of customers. Indeed, it has been a well known and recurring problem that

16  companies at all levels within the wireless industry have conveniently ignored to their benefit

17  for several years. According to publicly available information from the Federal

18  Communications Commission, millions of cell phone numbers were recycled in 2006 alone.

19        21.    As a consequence, due in part to its vast user base (in excess of 34 million),

20  Facebook has transmitted mass amounts of unauthorized content to the nation's cellular

21  telephone consumers since instituting its Mobile Service in 2006.

22        22.    If Facebook wanted this practice to stop, it could do so immediately by

23  instituting a regular communication policy with its carrier partners to ensure that the wireless

24  numbers Facebook has on file for its users stay current and have not been recycled by its

25  carrier partners to a new cellular telephone consumer who has not consented to receive

26  Facebook content.

27

28

23. On information and belief, Facebook transmits tens of thousands, if not hundreds of thousands, of text messages to consumers' wireless devices throughout the nation every day.

24. Beginning in or about April, 2006, and continuing through to the present, Facebook and/or its authorized partners, agents, vendors, or contractors, knowingly and intentionally accessed and charged the wireless devices of consumers nationwide without authorization, including the repeated delivery of and charging for unauthorized content to the cellular telephone owned by Plaintiff.

25. On or about November 26, 2006, Plaintiff Lindsey Abrams opened a new wireless telephone account with Verizon Wireless, a Facebook Mobile carrier partner. At that time, Plaintiff was assigned wireless phone number which, it was later determined, was encumbered with Facebook's Mobile Service.

26. Beginning shortly after opening her cell phone account and continuing through February 2007, Plaintiff's cell phone received approximately 20 unauthorized text messages from Facebook.

27. The "from" field of such transmissions contained only the following cryptic term: "32665," which was later confirmed to belong to Facebook's Mobile Service. The bodies of a sampling of those text messages read as follows:

    a. "Jacob [last name redacted] (Purdue) wrote on your wall: Hey not much , , just the same ol SH** [expletive redacted in part] yeah you haven't poked me in a whole! lol . . . what are you up to?"

    b. "Lauren [last name redacted] wrote on your wall: well i see, u want to teach me? Reply to msg Lauren back."

    c. "Zeph [last name redacted] has requested to add you as a friend. Reply 'a' to add, or 'info' to get profile."

d. "Facebook msg from Damon [last name redacted] (Indianapolis, IN) Subj; re: hey hey you..well just haven't talked to u in like awhile...thought i'd drop in a...('n' for next)"

28.    At no time did Plaintiff consent to receive such text messages from Facebook.

29.    Plaintiff's cellular service provider, Verizon Wireless, a partner in Defendant's Mobile Service, charged Abrams $0.10 for each such Facebook transmission, causing her wireless phone account to slip into arrears, thereby requiring Plaintiff to deposit additional funds with Verizon Wireless in order to prevent deactivation of her cell phone service. When Plaintiff asked a Verizon representative how she could stop the receipt of such Facebook transmissions, Verizon informed Plaintiff that her only option was to deactivate all text message functionality on her phone. Because Plaintiff did not want to lose the ability to send and receive text messages that she authorized, she declined to discontinue such part of her cell phone service.

30.    Facebook knowingly accessed and obtained information from Plaintiff's wireless device through its transmission of such unauthorized content.

31.    Upon information and belief, the unauthorized content transmitted to Plaintiff's wireless device was one of thousands delivered to the wireless devices of persons around the United States, in the same fashion and by the same means as those received by Plaintiff.

**Damage Caused by Defendant's Unlawful Conduct**

32.    In addition to the fees discussed above and other related fees assessed by carriers, Facebook's text message content causes wireless devices to slow down, takes up bandwidth over a wireless connection, uses up the memory of the device, and frustrates cell phone users. The unauthorized text messages decrease productivity by requiring that hours be spent on figuring out how to stop the content from being placed on one's wireless device and how to get the content off one's cell phone. The cumulative impact of not only multiple

1  unwanted text messages, but also the threat of their continued receipt, impedes the use of

2  wireless devices.

3       33.    More significantly, Facebook's misconduct invades the privacy rights of

4  potentially hundreds of thousands of people. Such persons are receiving unwanted text

5  messages at all times of the day and night. As experienced by Ms. Abrams, these text

6  messages can contain adult or graphic language or requests for intimate encounters.

7       34.    This problem is all the more serious because, as Facebook knows, many of the

8  recipients of these graphic text messages are young children. Receiving solicitations to

9  "teach me," reminders that the sender has not been "poked" in awhile, invitations to college

10 parties, or requests to be added to the sender's list of "friends," can be both frightening and

11 dangerous.

12                          **CLASS ALLEGATIONS**

13

14      35.    Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal

15 Rules of Civil Procedure, on behalf of herself and a class defined as follows:

16              a.   All persons or entities residing in the United States

17                   who, at any time since April 2006, received a text

                     message on their mobile telephone through Facebook

18                   Mobile, who did not authorize Facebook Mobile to

19                   send messages to their telephone number.

20 Excluded from the class are defendant, any entity in which defendant has a controlling

21 interest or which has a controlling interest in defendant, and defendant's legal

22 representatives, predecessors, successors, assigns, and employees. Also excluded from the

23 class are the judge and staff to whom this case is assigned, and any member of the judge's

24 immediate family.

25      36.    Plaintiff reserves the right to revise this definition of the class based on facts

26 she learns during discovery.

27      37.    Plaintiff is a member of the class that she seeks to represent. Members of the

28

class can be identified using defendant's records of Facebook Mobile services and other information that is kept by defendant in the usual course of business and/or in the control of defendant. Class members can also be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by defendant.

38.  **Numerosity**: Class members are so numerous that their individual joinder is impracticable. It is estimated that the Class consists of thousands of members. The precise number of class members is unknown to plaintiff, but it is clear that the number greatly exceeds the number to make joinder impossible.

39.  **Existence and predominance of common questions**: Common questions of law and fact predominate over the questions affecting only individual class members. Some of the common legal and factual questions include:

a.  Whether defendant profits from Facebook Mobile messages sent to mobile telephones;

b.  Whether defendant knew or should have known that the Facebook Mobile messages were being sent to mobile telephone users who had not authorized such messages;

c.  Whether Defendant's conduct described herein violates Cal. Pen. Code § 502(c)(3), California's Computer Crime Law.

d.  Whether Defendant has unjustly received money belonging to Plaintiff and the Class and whether under principles of equity and good conscience, it should not be permitted to retain it;

e.  Whether Defendant's conduct described herein amounted to trespass to chattels on behalf of Plaintiff and the Class;

f.  Whether Defendant's conduct described herein violates California Cal. Bus. & Prof. Code § 17200, California's Unfair Competition Law; and

g.  The nature and extent of damages and other remedies to which the conduct of defendant entitles the class members.

40.  Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison to the numerous common questions that dominate.

41.  The injuries sustained by the class members flow, in each instance, from a common nucleus of operative facts. In each case defendant caused or permitted unauthorized text messages to be delivered to the telephone of a user who did not authorize receipt of such services.

42.  The class members have been damaged by defendant's' misconduct. Class members must pay for receipt of text messages, even messages they do not want.

43.  **Typicality**:  Plaintiff's claims are typical of the claims of the other proposed class members. Plaintiff obtained a telephone capable receiving text messages. Plaintiff released her telephone number to those persons to whom she provided authorization to send her text messages. She did not authorize Facebook Mobile to send, either from itself or from its members, any text messages to her telephone. To the extent that text messages were received on her telephone by Facebook and/or any of it members via its Facebook Mobile service, such messages were unauthorized, and a violation of the rights of plaintiff.

44.  **Adequacy**:  Plaintiff will fairly and adequately protect the interests of the class. Plaintiff is familiar with the basic facts that form the bases of the proposed class members' claims. Plaintiff's interests do not conflict with the interests of the other class members that she seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the class members.

45.  **Superiority**:  The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the proposed class members.

The relief sought per individual member of the class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of defendants. Furthermore, it would be virtually impossible for the class members to seek redress on an individual basis. Even if the class members themselves could afford such individual litigation, the court system could not.

46.     Individual litigation of the legal and factual issues raised by the conduct of defendant would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

47.     Given the similar nature of the class members' claims and the absence of material differences in the state statutes and common laws upon which the class members' claims are based, a nationwide class will be easily managed by the Court and the parties.

48.     The court may be requested to also incorporate subclasses of Plaintiffs, defendants, or both, in the interest of justice and judicial economy.

49.     In the alternative, the class may be certified because:

   a.  the prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudication with respect to individual class members which would establish incompatible standards of conduct by defendant;

   b.  the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

   c.  defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

1

## FIRST CAUSE OF ACTION

2

### (California Computer Crime Law

3

### Cal. Pen. Code § 502)

4

50.    Abrams incorporates by reference the foregoing allegations.

5

51.    The cellular phones used and owned by Abrams and the other class members

6 are sophisticated electronic devices which are programmable and capable of being used in

7 conjunction with external files, and contain many (if not most) of the same capabilities and

8 equipment as traditional desktop computers (as well as cellular radio signal processing

9 technology). These cellular phones are computer systems under the definition of Cal. Pen.

10 Code § 502(b)(5).

11

52.    The delivery of SMS messages to cellular phones is performed according to

12 industry standards (specifically, the Short Message Service standard). The technical protocols

13 of these standards requires that transmission of mobile content to a cellular phone (and the

14 subsequent billing of that account) is not complete until the cellular phone transmits a

15 confirmation signal. Thus, the unauthorized charges to recycled phone numbers attributable

16 to Facebook Mobile require interactivity and access to the cellular phones of Plaintiff and the

17 other class members. SMS messages contain brief communications from other SMS users,

18 and are data under the definition of Cal. Pen. Code § 502(b)(6).

19

53.    The receipt of SMS messages to cellular phones consumes computer services

20 as defined by Cal. Pen. Code § 502(b)(4), including computer time, data processing, and

21 storage capacity. Moreover, Abrams and the other class members frequently must pay for the

22 receipt of SMS messages, whether those messages are authorized or not. If the unauthorized

23 charges to recycled phone numbers attributable to Facebook Mobile are not eventually paid,

24 Verizon Wireless (and any other cellular carrier) would discontinue all services (including

25 cellular service) to the affected cellular accounts.

26

27

28

1    54.    Through the conduct alleged above, Defendant is involved in the transmission

2    of SMS messages to the cellular phones of Plaintiff and the other class members. Through

3    this conduct, Defendant violates Cal. Pen. Code § 502(c)(3) by knowingly and without

4    permission using or causing to be used computer services and violates Cal. Pen. Code §

5    502(c)(4) by knowingly accessing the cellular phones of Plaintiff and the class members and

6    without permission adds data to those phones.

7    55.    Plaintiff and the other class members own the cellular phones affected by

8    Defendant's violation of Cal. Pen. Code § 502 and are damaged by those violations. If the

9    unauthorized charges to recycled phone numbers attributable to Facebook Mobile are not

10   eventually paid, cellular carriers will discontinue all services (including cellular service) to

11   the affected cellular telephone accounts. Thus, these charges require class members to pay

12   more to their cellular carrier to maintain their cellular service.

13   56.    Plaintiff, on her own behalf and behalf of the other class members, seeks

14   compensatory damages in an amount to be determined at trial and injunctive relief or other

15   equitable relief (including an accounting, and disgorgement of fees obtained while these

16   violations were ongoing), as well as reasonable attorney's fees, against Defendant under Cal.

17   Pen. Code § 502(e).

18                              **SECOND CAUSE OF ACTION**

19              **(Violation of California's Unfair Competition Law ("UCL"),**

20                       **Cal. Bus. & Prof. Code § 17200)**

21   57.    Abrams incorporates by reference the foregoing allegations.

22   58.    Defendant's communications to the cellular carriers falsely state that Plaintiff

23   and the other class members have approved, authorized, and/or consented to charges for

24   mobile content services, and are deceptive and unfair.

25   59.    Further, these communications are unlawful because they violate Cal. Pen.

26   Code § 502(c)(3) and (4).

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
13

60.    Further, these communications are unlawful because they violate the Electronic Funds Transfer Act with respect to pre-paid cellular accounts. Pre-paid cellular accounts are credits against future charges through a cellular carrier, are established primarily for personal, family, or household purposes. 12 C.F.R. § 205.2(b)(1). Cellular carriers which offer pre-paid accounts are "financial institutions" under the EFTA, because they directly or indirectly hold an account belonging to the class members. 12 C.F.R. § 205.2(i). The SMS messages sent through Facebook Mobile are initiated when Facebook users post messages on the Facebook website and are initiated by computer; when the SMS messages are sent, funds corresponding to the charges for these SMS messages are transferred from the pre-paid cellular accounts. The transfer of these funds is an electronic fund transfer under the definition in 12 C.F.R. § 205.3(b). As the electronic fund transfers are set to occur whenever Facebook users post messages, they were purportedly authorized to recur at substantially regular intervals, and are preauthorized electronic fund transfers under the definition in 12 C.F.R. § 205.2(k). Facebook violates 15 U.S.C. § 1693e(a) and 12 C.F.R. § 205.2(b) when it initiates the transfer of funds through Facebook Mobile without the written authorization of Plaintiff and the other class members.

61.    The acts alleged above are unlawful, unfair or fraudulent business acts or practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

62.    These UCL violations have damaged the Plaintiff and other class members by causing them to pay falsely inflated cellular service bills to their cellular carriers, as well as the lost time required to sort, read, discard and attempt to prevent future charges for unwanted mobile content services, and lost storage space, connectivity, and computing resources on the cellular phones.

63.    Plaintiff, on her own behalf and behalf of the other class members, seeks an order enjoining Defendant's unfair competition alleged herein, and restitution of property

1    gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well

2    as interest and attorney's fees and costs pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

3

4                              **THIRD CAUSE OF ACTION**

5                                  **(Unjust Enrichment)**

6           64.    Plaintiff incorporates by reference the foregoing allegations.

7           65.    A benefit has been conferred upon Defendant by Plaintiff and the Class. On

8    information and belief, Defendant, directly or indirectly, has received and retains money

9    belonging to Plaintiff and the Class resulting from its causing them to be billed for

10   unauthorized content charges, and in particular, its practice of systematically, repeatedly and

11   without authorization, causing Plaintiff and the Class of wireless handset owners to be billed

12   by Defendant's wireless carriers partners for mobile content services authorized to be

13   purchased by the previous subscriber assigned such telephone numbers.

14          66.    Defendant appreciates or has knowledge of said benefit.

15          67.    Under principles of equity and good conscience, Defendant should not be

16   permitted to retain the money belonging to Plaintiff and the Class which Defendant has

17   unjustly received as a result of its actions.

18                              **FOURTH CAUSE OF ACTION**

19                                 **(Trespass to Chattels)**

20          68.    Plaintiff incorporates by reference the foregoing allegations.

21          69.    At all relevant times, Defendant and/or their agents intentionally and without

22   consent, gained access to Plaintiff's wireless handset and the handsets of the class, used

23   Plaintiff's wireless handset and the handsets of the class, occupied memory of these handsets,

24   and/or dispossessed Plaintiff and the members of class of unencumbered access to their

25   wireless handsets.

26

27

28

                   **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

70.    In so doing, Defendant intentionally intermeddled with, damaged, and deprived Plaintiff and the class of their wireless handsets, or a portion thereof.

WHEREFORE, Plaintiff Lindsey Abrams, on behalf of herself and the Class, prays for the following relief:

1.    An order certifying the Class as defined above:

2.    An injunction requiring Defendant to cease all unauthorized wireless activities and restraining Defendant from altering, erasing, changing, deleting, destroying or otherwise removing or disposing of any documents, records, databases, computer systems and the like currently in its possession or control or in the possession or control of its agents and contractors which are used or useful in identifying all persons, corporations or other entities to whom Defendant has transmitted its text messages;

3.    An award of actual and/or statutory damages;

4.    Reasonable attorney's fees and costs; and

5.    Such further and other relief the Court deems appropriate.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated:  October 22, 2007

By: _____
Alan Himmelfarb
KAMBEREDELSON, LLC
One of the Attorneys for Lindsey
Abrams, individually and on behalf of a
class of similarly situated individuals

ALAN HIMMELFARB (State Bar # 90480)
KAMBEREDELSON, LLC
2757 Leonis Blvd
Vernon, California 90058-2304
Telephone: (323) 585-8696

JAY EDELSON (pro hac vice pending)

1    MYLES MCGUIRE (pro hac vice pending)
     ETHAN PRESTON (pro hac vice pending)
2    KAMBEREDELSON, LLC
     53 West Jackson Boulevard
3    Suite 1530
     Chicago, Illinois 60604
4    Telephone: (312) 589-6370

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
17