## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL CRISSWELL, individually and on behalf of a class of similarly situated individuals, | ) ) ) | No. 08 CV 01578 |
| Plaintiff, | ) ) | Judge Milton I. Shadur |
| vs. | ) ) | Magistrate Judge Sidney I. Schenkier |
| MYSPACE, INC., a Delaware corporation, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM IN OPPOSITION TO MOTION TO REMAND

Defendant MySpace, Inc., respectfully submits this Memorandum in Opposition to Plaintiff's Motion to Remand. The Court should deny plaintiff Michael Crisswell's Motion to Remand for any of the following three independent reasons: (1) MySpace satisfied its burden for removal based on the Class Action Fairness Act ("CAFA"), and Crisswell did not even attempt to show the absence of jurisdiction to a "legal certainty"; (2) the federal CAN-SPAM Act completely preempts Crisswell's claims; and (3) Crisswell's Motion to Remand was untimely.

**I.    MySpace Made a Good Faith Estimate of the Amount in Controversy, and Crisswell Failed to Show the Absence of Jurisdiction to a Legal Certainty**

**A.    Amount in Controversy Removal Standards**

Challenging only the amount in controversy component of CAFA jurisdiction, Crisswell is correct that MySpace — as the removing party — bears the initial burden of showing by a preponderance of the evidence that the amount-in-controversy requirement for removal is met. *See, e.g., Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006); *Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006). But as the *Oshana* court recognized: "That is easier said than done when the plaintiff, the master of the complaint, does not want to be in federal court and provides little information about the value of [his] claims." *Oshana*, 472 F.3d at 511. In light of this conundrum, "a *good-faith estimate of the stakes is acceptable* if it is

plausible and supported by a preponderance of the evidence." *Id.* (citing *Rubel v. Pfizer, Inc.*, 361 F.3d 1016, 1020 (7th Cir. 2004)) (emphasis added).[1]

Once the defendant satisfies its initial burden, "the plaintiff can defeat jurisdiction only if 'it appears *to a legal certainty* that the claim is really for less than the jurisdictional amount.'" *Oshana*, 472 F.3d at 511 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)) (emphasis added); *Meridian*, 441 F.3d at 542.

### B.    MySpace Satisfied its Burden, but Crisswell Did Not Satisfy His

In its Notice of Removal, MySpace highlighted that Crisswell alleged: "[D]ue in part to its vast user base (*in excess of 100 million users*), MySpace has transmitted *mass amounts* of unauthorized mobile content *to the nation's cellular telephone consumers*."  (Notice of Removal ¶ 17 (citing Compl. ¶ 17) (emphasis added).)  Crisswell also alleged that each message cost about 15 cents and that he alone had received well over 100 of these messages during a three-month period.  (*Id.* ¶ 17 (citing Compl. ¶¶ 14, 21).)  If each of the more than 100 million alleged MySpace users received (or sent) just one alleged unauthorized text message, the amount in controversy would exceed $15 million.  (*Id.*)  And if Crisswell indeed typified these more than 100 million alleged MySpace users and/or a potentially larger universe of recipients of text messages from these users (in other words, any person with a cell phone in the United States), then the amount in controversy would exceed $1.5 billion.[2]

---

[1]    The Seventh Circuit is fairly permissive in its assessment of whether a removing party has met its initial burden, accepting not only a good-faith estimate, but also state court interrogatories and requests to admit; calculation from a complaint's allegations; reference to informal estimates by the plaintiff or settlement demands; and/or affidavits establishing the cost of compliance with the plaintiff's demands. *Meridian*, 441 F. 3d at 541-42 (citations omitted).  Moreover, this "list is not exclusive; any given proponent of federal jurisdiction may find a better way to establish what the controversy between the parties amounts to, and this demonstration may be made from either side's viewpoint (what a judgment would be worth to the plaintiff, or what compliance with an injunction would cost the defendant)." *Id.* at 542 (citing *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 610 (7th Cir. 1997)).

The Fourth Circuit, meanwhile, has held that a removing party need only satisfy the notice pleading requirements of Fed. R. Civ. P. 8.  *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008).

[2]    Numerous decisions have upheld removal under CAFA based on a good-faith estimate similar to MySpace's.  *See, e.g., Walker v. Casey's General Stores, Inc.*, 2008 WL 239137, *1-2 (C.D. Ill. Jan. 28, 2008); *Missouri Franchise Dev. Sys., LLC v. McCord*, 2007 WL 1308808, *2-3 (S.D. Ill. May 3, 2007);

These calculations are based solely on alleged cost of receipt of the messages. On behalf of the putative nationwide class, however, Crisswell seeks far more, including attorney's fees; advertising revenue and related earnings; damages related to alleged deprivation of cell phone use; damages for alleged intrusion upon seclusion; damages for alleged acts of unfair competition; injunctive relief; an accounting; and punitive damages.[3] (Notice of Removal ¶ 19 (citing Compl. ¶¶ 38, 42, 46, 54, 58); Compl. at Prayer for Relief, 11-12.) Additionally, MySpace's math is based on a three-month period for Crisswell, but other members of the putative class may have messages spanning a longer period of time, possibly increasing any potential judgment against MySpace.

Crisswell suggests that MySpace has engaged in a "throw-away argument buried in a footnote" by directing the Court's attention to the Facebook Complaint filed by Crisswell's lawyers in the Northern District of California. (Remand Memo 4 n.2.) The Facebook Complaint alleges an amount in controversy in excess of $5 million. (Notice of Removal 6 n.1 (citing Facebook Complaint ¶ 8).) Given the similarities between Facebook and MySpace (both social networking Web sites) and based on a comparison between the two complaints, MySpace's argument is not a "throw-away."

Crisswell claims "[t]his is a different case involving a different plaintiff, a different defendant, and a different set of allegations." (Remand Memo 4 n.2.) Crisswell is correct on the first two points but wrong on the third. The allegations are virtually identical in substance (but for counts unique to Illinois and California law). (*Compare* MySpace Complaint and Facebook

---

*Epstein v. Target Corp.*, 2007 WL 551552, *2-4 (N.D. Ill. Feb. 15, 2007); *Buller v. Owner Operator Indep. Driver Risk Retention Group, Inc.*, 461 F. Supp. 2d 757, 760-63 (S.D. Ill. 2006); *Fiore v. First American Title Ins. Co.*, 2005 WL 3434074, *3 (S.D. Ill. Dec. 13, 2005); *Frederico v. Home Depot*, 507 F.3d 188, 198-99 (3d Cir. 2007)..

[3]     *See The Home Depot, Inc. v. Rickher*, 2006 WL 1727749, *2 (7th Cir. 2006) (reversing district court's remand and finding CAFA amount in controversy satisfied based in part on cost of injunctive relief to defendant); *Oshana*, 472 F.3d at 512 (attorney's fees and punitive damages are considered in determining removal amount in controversy); *Frederico*, 507 F.3d at 199 (attorney's fees and punitive damages are considered in determining amount in controversy under CAFA).

Complaint (attached to Notice of Removal as Exhibits 1 & 2).)  For instance, the following table

compares the introduction and first numbered paragraphs of each complaint:

| MySpace Complaint | Facebook Complaint |
|---|---|
| Introduction: Plaintiff Michael Crisswell brings this class action complaint against Defendant MySpace, Inc. ("MySpace") to stop defendants' practice of transmitting unauthorized text messages to the wireless devices of consumers nationwide, and to obtain redress for all persons injured by its conduct. | Introduction: Plaintiff Lindsay Abrams brings this class action complaint against defendant Facebook, Inc. ("Facebook") to stop defendant's practice of transmitting or permitting to be transmitted unauthorized text messages to the wireless devices of consumers nationwide, and to obtain redress for all persons injured by its conduct. |
| Paragraph 1: In an on-going effort to attract users to its website, MySpace, a social networking company that has gained popularity by linking students and other groups through its website, engaged in a mobile marketing service.  Through this service, members can, with a few clicks of the computer mouse, have MySpace send text messages to the cellular telephones of virtually any person, irrespective of whether such person has consented to receive such messages. | Paragraph 1: In an on-going effort to attract users to its website, Facebook, a self-described "social utility" that has gained popularity by linking students and other groups through its website, engaged in a mobile marketing service called "Facebook Mobile."  Through Facebook Mobile, members can, with a few clicks of the computer mouse, send text messages — often containing adult content — to the mobile phone numbers associated with other members. |

By no means do the similarities end here.  In fact, the only substantive differences

between the complaints that are material to removal are that (1) the time period in the Facebook

class definition is limited to April 2006 onward (Facebook Compl. ¶ 35), but the MySpace class

definition has no time limit (MySpace Compl. ¶ 24); (2) the Facebook Complaint alleges more

than 34 million users (Facebook Compl. ¶ 21), but the MySpace Complaint alleges more than

100 million users (MySpace Compl. ¶ 17); (3) the Facebook Complaint alleges that the named

plaintiff received 20 unauthorized text messages (Facebook Compl. ¶ 26), but the MySpace

Complaint alleges that the named plaintiff received well over 100 unauthorized text messages

(MySpace Compl. ¶ 21); and (4) the Facebook Complaint alleges 10 cents per message

(Facebook Compl. ¶ 29), but the MySpace Complaint alleges 15 cents per message (MySpace

Compl. ¶ 14).  Based on the foregoing, if the Facebook Complaint involved more than $5 million

in controversy, as Plaintiff's counsel alleged in that case, then certainly the MySpace case

(involving an unlimited class time period, three times as many users, more than five times as many unauthorized text messages allegedly received by the named plaintiff, and 5 cents more per message) also involves more than $5 million in controversy.[4]

The Application for Attorney's Fees recently filed by Crisswell's attorneys in the Facebook case further supports removal in the MySpace case. (Fee Application attached as Exhibit A.) In the Facebook case, the parties settled pursuant to a limited discovery and fee submission protocol. (Exhibit B.) According to the Fee Application:

> •[T]he settlement's injunctive feature will — using the most conservative analysis available — save recipients of Facebook Mobile text messages over $20.1 million dollars [sic] during the settlement period. (Fee Application at p. i.)

> •In consideration of these significant benefits, Plaintiff Abrams respectfully requests attorneys' fees in the amount of $5,033,000. (*Id.*)

> •[T]he settlement's value is the product of the number of text messages sent by Facebook during the minimal settlement term, multiplied by the number of recipients who opt-out during the term and the cost to each recipient of receiving text messages. (Fee Application at p. 6.)

> •Following the mathematical model, a reasonable range of settlement benefits to users and non-users equals between $25,967,094 and $57,234,736. (*Id.* at 11.)

> •The benefits achieved by this settlement could be much greater, of course, eventually hitting north of the $70 million mark. (*Id.* at 12.)

---

[4]    Crisswell argues that he does not "allege that every MySpace member is a MySpace Mobile user, let alone that each MySpace Mobile user received an unauthorized text message," but he carefully avoids alleging how many members are MySpace Mobile users or how many received unwanted messages. (Remand Memo 3.) Moreover, Crisswell's contention has no bearing on the applicable CAFA threshold. Assuming *arguendo* that only 1 percent of MySpace members are MySpace Mobile users, and those users received only the same number of messages as Criswell during a limited three-month span, the alleged damages under Crisswell's own calculation would exceed $15 million. This $15 million does not, of course, take into account the additional costs of injunctive relief, attorneys' fees, and ancillary damages sought in the Complaint. More importantly, a comparison of the MySpace and Facebook complaints leads to the inescapable conclusion that the MySpace case must involve a greater amount in controversy than the Facebook case given the differences (as alleged by Plaintiff's counsel) in size of user base, class definition time period, text message cost, and numbers of messages allegedly received by the class representatives.

If these are the figures in the Facebook case, then the amount in controversy in the MySpace case must exceed $5 million for removal purposes.

Notably, the Complaint against MySpace does not even address amount in controversy. *See, e.g., Fiore v. First American Title Ins. Co*., 2005 WL 3434074, *2 (S.D. Ill. Dec. 13, 2005) (noting that plaintiff had not capped class recovery at $5 million and upholding removal based on CAFA). And Crisswell has not stipulated that the amount in controversy will not exceed $5 million. *Oshana*, 432 F.3d at 511 ("If [Plaintiff] really wanted to prevent removal, she should have stipulated to damages not exceeding the $75,000 jurisdictional limit."); *Epstein*, 2007 WL 551552 at *2 ("When a Plaintiff does not stipulate that damages be below the jurisdictional amount, an inference arises that the plaintiff believes her claim to be worth more than the jurisdictional amount.") (citation omitted).

Given the allegations in the Complaint, the admissions by Plaintiff's counsel that the Facebook case involves far more than $5 million in controversy, and the fact that Plaintiff's counsel has been very careful to avoid stipulating to an amount in controversy of $5 million or less in this case, MySpace has satisfied its burden of making a good faith estimate of the amount in controversy for CAFA jurisdiction.[5] Because Crisswell has made no attempt to show the absence of jurisdiction to a legal certainty, the Court should deny the Motion to Remand.

---

[5] It appears that at some point in the not too distant past, Plaintiff's counsel's strategy regarding alleging CAFA jurisdiction changed, as reflected not only by the Facebook and MySpace complaints, but also by allegations of amounts in controversy exceeding $5 million in other similar text-messaging lawsuits filed by Plaintiff's counsel in other jurisdictions. (*See* Complaint at ¶ 7, *Thielen v. Buongiorno USA, Inc*., United States District Court for the Western District of Michigan, Southern Division (05-0016) (Jan. 6, 2006) (Exhibit C); Complaint at ¶ 6, *Bradbury v. T-Mobile USA, Inc*., United States District Court for the Northern District of California (06-6567) (Oct. 20, 2006) (Exhibit D); Complaint at ¶ 10, *Satterfield v. Simon & Schuster*, United States District Court for the Northern District of California (06-2893) (May 3, 2006) (Exhibit E).) Although MySpace is left only to speculate about why the strategy changed, the analysis offered by MySpace reveals that regardless, Crisswell has engaged in artful pleading in an attempt to avoid federal court.

II.    **Crisswell's Claims Are Completely Preempted by the CAN-SPAM Act**[6]

A.    **Complete Preemption Standards**

A plaintiff is the master of his complaint under the "well-pleaded complaint rule," but when the complaint, fairly read, states a federal question, the defendant may remove. *See, e.g., Bastien v. AT&T Wireless Serv., Inc.*, 205 F.3d 983, 986 (7th Cir. 2000) (citations omitted). Although federal preemption normally would constitute a defense to a state law action, there are instances in which Congress has so completely preempted a particular area that "no room remains for any state regulation and the complaint would be 'necessarily federal in character.'" *Id.* at 986 (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987)). "In that situation, removal is proper despite the well-pleaded complaint rule."[7]  *Id.*

B.    **With the CAN-SPAM Act, Congress Intended to Create a "Federal Regime" and "Regulation on a Federal Basis" of Claims Relating to Consent and Opt Out Procedures for Commercial Electronic Mail Messages**

In passing the CAN-SPAM Act, Congress sought to protect consumers from the annoyance of spam while addressing the unfairness of imposing a state-by-state patchwork of inconsistent laws on entities that transmitted commercial electronic mail messages across state lines.  Congress recognized that hodge-podge regulation by the states was ineffective and that a national standard for consent to and opting out of such messages, accompanied by national enforcement, was necessary.  As the July 16, 2003 Senate report says:

---

[6]    Based on MySpace's research of published decisions, this Court may be the first to have the opportunity to rule on the completely preemptive force of the CAN-SPAM Act.  The absence of CAN-SPAM Act complete preemption case law should not be surprising given the fact that the Act became effective January 1, 2004.  *See* 15 U.S.C. § 7701, *et seq*.

[7]    As the complete preemption doctrine has evolved, the U.S. Supreme Court has expanded the areas in which complete preemption applies, and the lower federal courts have extended the realm of complete preemption even further.  *See, e.g.*, 14B Fed. Prac. & Proc. Juris. 3d § 3722.1 (discussing Supreme Court application of complete preemption with respect to Labor Management Relations Act, Employee Retirement Income Security Act, National Bank Act, and certain tribal claims and collecting at note 27 cases from lower federal courts in which complete preemption has been found in numerous additional contexts).

. . . The legislation would supersede State and local statutes, regulations, and rules that expressly regulate the use of e-mail to send commercial messages except for statutes, regulations, or rules that target fraud or deception in such e-mail. Thus, a State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted. Given the inherently interstate nature of e-mail communications, the Committee believes that this bill's creation of one national standard is a proper exercise of the Congress's power to regulate interstate commerce that is essential to resolving the significant harms from spam faced by American consumers, organizations, and businesses throughout the United States.

S. Rep. 108-102, at 2365 (July 16, 2003).

Indeed, the legislative history leading up to passage of the CAN-SPAM Act is replete with both Senate and House expressions of intent that the CAN-SPAM Act completely preempts as to consent and opt out procedures. The July 16, 2003 Senate Report refers to "creating a *Federal statutory regime*" and notes that "[u]nder the legislation, enforcement would be undertaken by the FTC and, in some cases, industry-specific regulatory authorities." *Id.* at 2353 (emphasis added). The Report further notes that "there is a substantial governmental interest in regulating commercial email *on a Federal basis*." *Id.* at 2358 (emphasis added). Statements by the House are consistent. *See, e.g.*, 149 Cong. Rec. H12186-02, *H12193 (2003).

**C.    The Statutory Language Manifests Congress's Intent to Completely Preempt State Regulation of Consent and Opt Out Procedures for Commercial Electronic Mail Messages**

Consistent with its expressed intent, Congress adopted statutory language making clear that the CAN-SPAM Act created a uniform national regime for consent and opt out procedures for unauthorized commercial electronic mail messages, thereby occupying the field of regulation.[8] For instance, the statutory findings and policy state:

---

[8]    There can be no doubt that the CAN-SPAM Act applies to "unwanted mobile service commercial messages" such as those alleged here. The Act includes a section titled "Application to wireless." 15 U.S.C. § 7712. In that section, the Federal Communications Commission ("FCC") is directed to adopt regulations addressing consent, opting out, and compliance. *Id.* at § 7712(b). Pursuant to that mandate, the FCC did adopt such regulations, which provide a comprehensive regulatory regime to address unwanted mobile service commercial messages. 47 C.F.R. § 64.3100.

Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, *but these statutes impose different standards and requirements*. As a result, they *do not appear to have been successful* in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, *it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply*.

15 U.S.C. § 7701(a)(11) (emphasis added).

On the basis of the findings in subsection (a) of this section, the Congress determines that . . . there is a substantial government interest in *regulation of commercial electronic mail on a nationwide basis*. . . .

15 U.S.C. § 7701(b)(1) (emphasis added).

To promote this goal of uniformity, Congress provided a broad preemptive mandate:

This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

15 U.S.C. § 7707(b)(1). The use of the word "supersedes" exhibits a broad preemptive force as to all regulation of electronic mail to send commercial messages, with a very limited carve-out for rules related to falsity or deception.

The CAN-SPAM Act savings clause preserves state claims not specific to "electronic mail, including State trespass, contract, or tort law; or . . . other State laws to the extent those laws relate to acts of fraud or computer crime." 15 U.S.C. § 7707(b)(2). The savings clause is silent on situations in which a plaintiff asserts facts that are specific to "electronic mail to send commercial messages" but cloaks what is truly a CAN-SPAM Act claim (related to whether a plaintiff consented to or was offered an opportunity to opt out of commercial electronic mail messages) in various state statutory and tort monikers. Congress's clearly expressed objective to occupy the field, however, demonstrates that the CAN-SPAM Act provides the exclusive regulatory scheme for redress of any claim arising solely out of unwanted receipt of "electronic mail to send commercial messages."

**D.**    **The Reasoning in *Bastien* Provides Further Support for Complete Preemption**

The Seventh Circuit has recognized that where, as here, Congress intends to enact the exclusive regulatory regime for a category of conduct, complete preemption is appropriate. In *Bastien v. AT&T Wireless Serv., Inc.*, 205 F.3d 983 (7th Cir. 2000)*,* the court found complete preemption under the Federal Communications Act ("FCA") of the plaintiff's breach of contract and consumer fraud claims. Plaintiff Bastien generally asserted that AT&T sold service while lacking the infrastructure to support it. The court found the claims completely preempted despite the relatively narrow preemptive language of the FCA (particularly in comparison to the language of the CAN-SPAM Act). *Bastien*, 205 F.3d at 985-90. The FCA preemption clause provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." *Id.* at 987 (quoting 47 U.S.C. § 332(c)(3)(A)). The FCA savings clause provides, "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." *Id.* (quoting 47 U.S.C. § 414).

While the Seventh Circuit acknowledged that the savings clause, read literally, would eliminate any preemptive effect whatsoever, the court reasoned that such a result would be nonsensical given the Act's clear purpose to regulate mobile telephone service providers. *Id.* at 987. The FCA created separate spheres of authority, the court reasoned, with claims sounding in fraud and deceit permissible in state courts but claims involving provision of mobile services (*e.g.* market entry and reasonableness of rates) the exclusive province of federal courts. *Id.* at 988-89.

With respect to the CAN-SPAM Act, Congress similarly established two spheres — with claims involving falsity, deceit, fraud, or computer crime and claims not specific to commercial electronic mail messages permissible in state courts but claims specific to commercial electronic

mail messages (particularly consent and opt-out procedures) the exclusive province of federal courts.  15 U.S.C. § 7707(b); *supra* pp. 7-10.[9]

### E.    The CAN-SPAM Act Exclusively Regulates Crisswell's Claims

As the *Bastien* court recognized, complete federal preemption is appropriate where a plaintiff's state law claims center on conduct that Congress has reserved as the exclusive province of federal law.  Crisswell cannot escape through artful pleading CAN-SPAM Act complete preemption where his claims exclusively concern the alleged sending of unauthorized commercial electronic mail messages.  "A plaintiff may not frame his action under state law and omit federal questions that are essential to recovery."  *Burda v. M. Ecker Co.*, 954 F.2d 434, 438 (7th Cir. 1992) (citations omitted).  Courts may "look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded his suit so as to couch a federal claim in terms of state law."  *Id.*

Crisswell brings his suit allegedly to "stop defendant's practice of transmitting unauthorized text messages."  (Compl. at Introduction.)  Crisswell further alleges that MySpace transmits such messages "without regard to whether the recipient wants to receive text

---

[9]    Crisswell might argue that complete preemption cannot apply because the CAN-SPAM Act would leave him without a remedy.  *See, e.g., Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002).  But the U.S. Supreme Court has made clear that a federal remedy is not a prerequisite to complete preemption.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 391 n.4 (1987) (affirming finding of complete preemption despite argument that plaintiff would be left without remedy); *see also Lister v. Stark*, 890 F.2d 941, 946 (7th Cir. 1989) ("While our holding here will leave Lister without a remedy, the availability of a federal remedy is not a prerequisite for federal preemption.  The Supreme Court has specifically rejected such an argument.") (citations omitted), *cert. denied*, 498 U.S. 1011 (1990); *In re Miles*, 430 F.3d 1083, 1091-92 (9th Cir. 2005) ("[C]omplete preemption is appropriate here, despite Appellants' argument that if they do not have standing to recover damages under §303(i), their causes of action cannot 'arise under' title 11. . . .  It is for Congress to decide what penalties are appropriate for use in connection with the bankruptcy process, when those penalties shall be utilized, and who may benefit from them.").  Moreover, the *Rogers* court emphasized that the civil remedy can be very limited and complete preemption can still apply.  *Id.* (citations omitted).  For instance, when a statute provides an administrative adjudication process, it provides enough of a civil remedy for complete preemption to apply.  *See Kuntz v. Ill. Cent. R.R. Co.*, 469 F. Supp. 2d 586, 592 (S.D. Ill. 2007) (citing *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 260-62 (8th Cir. 1996)).  There are such civil remedies under the CAN-SPAM Act, including the ability for individuals to submit complaints to the FTC.  15 U.S.C. § 7706; FTC Consumer Complaint Form, https://rn.ftc.gov/pls/dod/wsolcq$.startup?Z_ORG_CODE=PU01 (last visited May 27, 2008).

messages" and while refusing "to tell recipients how to opt-out of receiving future text messages." (*Id.* at ¶ 1.) And Crisswell asserts that these messages are "commercial." (*Id.* at ¶ 12.) The *sole wrong* alleged in Crisswell's complaint is that MySpace is transmitting commercial electronic email messages without the consent of recipients and without providing a mechanism to opt out of such messages. This is precisely the sort of conduct that the CAN-SPAM Act regulates. *See, e.g.*, 15 U.S.C. § 7712; 47 C.F.R. § 64.3100.

With respect to the CAN-SPAM Act's carve-out from preemption at 15 U.S.C. § 7707(b)(1), Crisswell alleges no facts establishing falsity or deception. In fact, the two sample messages Crisswell provides refer specifically to MySpace. (Compl. ¶ 21.) The CAN-SPAM Act's savings clause also does not apply because Crisswell has not alleged any wrong beyond that addressed exclusively by the Act, namely the sending of unauthorized commercial electronic mail messages.

By raising no argument to the contrary, Crisswell tacitly acknowledges that his common law counts are preempted. (*See generally* Remand Memo.) With respect to the state statutory counts, Crisswell contorts the law to argue that those claims survive the CAN-SPAM Act's preemptive force. For instance, Crisswell asserts a claim under the Computer Crime Prevention Law ("CCPL"), arguing that text messages are "programs" that harm a computer. (Compl. ¶ 51.) But a "program" is defined by the CCPL as "a series of coded instructions or statements in a form acceptable to a computer which causes the computer to process data and supply the results of the data processing." 720 ILCS 5/16D-2(b). A text message is, if anything under the CCPL, "data," separately defined by the CCPL as "a representation of information, knowledge, facts, concepts or instructions, . . . which is prepared in a formalized manner and is stored or processed in or transmitted by a computer. Data . . . may be in any form including but not limited to printouts, magnetic or optical storage media, punch cards or data stored internally in the memory of a computer." 720 ILCS 5/16D-2(b). Despite his reference to "programs," Crisswell actually concedes that text messages are data, alleging that cellular phones "accept, process, store, retrieve and output *data*" and referring repeatedly to "*unauthorized mobile content*." (*See, e.g.*,

Compl. ¶¶ 50-53 (emphasis added).) Because 720 ILCS 5/16D-3(a)(4) (involving insertion of programs) does not give rise to a claim for transmission of data, Crisswell's artful pleading attempt to avoid CAN-SPAM Act preemption is unavailing.[10]

Crisswell's arguments regarding the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") are similarly flawed. (Remand Memo 6-7.) In support of the ICFA claim, Crisswell asserts no facts separate from those involving the transmission of commercial electronic email messages without consent or opt out procedures. (*See* Compl. at Count V.) Nor does he explain how MySpace's alleged conduct was either fraudulent or deceptive. Instead, Crisswell merely adopts by reference in the ICFA count the allegation that MySpace transmitted spam without consent or an opt-out procedure — the very core of CAN-SPAM Act regulation.

Whether the CAN-SPAM Act supports removal jurisdiction may be a question of first impression. But in artful pleading scenarios such as this, numerous federal courts have found that, at a minimum, ordinary preemption applies.[11] Given the expressions of complete

---

[10]     If any sections under the CCPL did apply, they would be 720 ILCS 16D-3(a)(5) and (b)(4) because they deal specifically with "unsolicited bulk electronic mail." 720 ILCS 16D-3(a)(5) and (b)(4). Crisswell, however, has not invoked these sections, presumably because they are limited to instances involving falsity or forgery in transmission or routing information, which Crisswell has not alleged. (*See generally* Complaint.)

[11]     *See Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1093-94 (N.D. Cal. 2007) (finding California statute addressing email preempted); *Kleffman v. Vonage Holdings Corp.*, 2007 WL 1518650, *3-4 (C.D. Cal. May 23, 2007) (finding California statute addressing email preempted); *Gordon v. Virtumundo, Inc.*, 2007 U.S. Dist. LEXIS 35544, *34-40 (D. Wash. May 15, 2007) (holding that (1) even though Washington Commercial Electronic Mail Act regulated falsity, CAN-SPAM Act preempted that act because plaintiff's claims did not allege falsity and that (2) state consumer protection act claim was similarly preempted because harm alleged was that under email claim); *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 353-56 (4th Cir. 2006) (holding that (1) even though Oklahoma statute regulated falsity in emails, CAN-SPAM Act preempted because alleged misrepresentations were immaterial, and that (2) state consumer protection act claim was similarly preempted because harm alleged was that under email claim); *see also ASIS Internet Serv. v. Optin Global, Inc.*, 2008 WL 1902217, *19 (N.D. Cal. April 29, 2008) (citing *Kleffman*, 2007 WL 1518650).

All three cases cited by Crisswell in footnote 3 of the Remand Memo finding the absence of ordinary preemption are easily distinguishable. (Remand Memo 5 n.3.) *Free Speech Coalition* involved allegations of computer crime. *Free Speech Coalition, Inc. v. Shurtleff*, 2007 WL 922247, *1-2 (D. Utah May 23, 2007). There are no factual allegations of criminal conduct in this case. *See generally* Complaint. *Impulse Marketing* involved statutory language regarding domain name spoofing and false or misleading subject lines, which are not alleged in this case. *Gordon v. Impulse Marketing Group, Inc.*, 375 F. Supp. 2d 1040, 1045 (E.D. Wash. 2005); *see generally* Complaint. Moreover, *Impulse Marketing*

preemptive intent in the CAN-SPAM Act statutory language and legislative history, the rationale of *Bastien* (which applies with equal, if not greater, force here), and the nature of Crisswell's allegations, a finding of complete preemption (supporting removal jurisdiction) is warranted here.

## III.    Crisswell's Motion to Remand Was Untimely

According to 28 U.S.C. § 1447(c), "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."  In the section of his brief addressing CAFA, Crisswell has not argued that the Court lacks subject matter jurisdiction.  (Remand Memo 3-4.) Rather, Crisswell has argued only that MySpace failed to properly allege a basis for removal. (*Id.*)

In an analogous situation, the Fourth Circuit found that the district court's *sua sponte* remand did not qualify as a finding of "lack of subject matter jurisdiction" under 28 U.S.C. §1447(c).  *Ellenburg*, 519 F.3d at 197-98.  The Fourth Circuit reasoned:

> The [district] court stated that "the removing party ha[d] not presented a *sufficient factual basis* for the Court to make an informed decision" as to the amount in controversy. . . .  We conclude accordingly that the district court's remand order was not based on finding of a lack of subject matter jurisdiction but rather on the procedural insufficiency of the Notice of Removal.  In the absence of the plaintiff's timely filed motion raising the procedural deficiency, the order fell outside the scope of § 1447(c). . . .

*Ellenburg*, 519 F.3d at 197-98 (emphasis in original).

As did the district court in *Ellenburg*, Crisswell has merely asserted with respect to CAFA that the removing party (MySpace) failed to allege a sufficient factual basis for removal. Under the *Ellenburg* analysis, Crisswell was required to make this procedural argument within

---

involved no analysis of the underlying claims and was limited by a later more robust Washington federal court CAN-SPAM Act preemption finding addressing the exact same state statute and email marketing. *Gordon v. Virtumundo, Inc.*, 2007 WL 1459395, *12 (W.D. Wash. May 15, 2007).  Finally, *Beyond Systems* involved domain name spoofing and false or misleading subject lines, which, again, are not alleged here (as already noted, the sample email language offered by Crisswell specifically identifies MySpace).  *Beyond Sys., Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523, 537-38 (D. Md. 2006); *see also* Complaint at ¶ 21.

30 days of the filing of the Notice of Removal.  MySpace filed and served the Notice of Removal on March 18, 2008.  (*See* Notice of Removal.)  But Crisswell did not file his Motion to Remand until April 25, 2008, which was 37 days after the filing of the Notice of Removal and thus was untimely.  Crisswell's waiver of this argument provides another basis for the Court's retention of jurisdiction over this case.

## IV.    Conclusion

For any of the foregoing three reasons, the Court should deny Crisswell's Motion to Remand.


Dated:  May 27, 2008                                Respectfully submitted,
                                                                      MYSPACE, INC.
                                                                      By:   /s/ David R. Geerdes
                                                                                One of its attorneys

Blaine C. Kimrey (ARDC # 6279625)
David R. Geerdes (ARDC # 6289557)
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
233 South Wacker Drive
Chicago, Illinois  60606
(312) 876-8000

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 27, 2008, I electronically filed the foregoing

MEMORANDUM IN OPPOSITION TO MOTION TO REMAND with the Clerk of the Court

using the CM/ECF system which will send notification of such filing to registered parties.


   /s/ David R. Geerdes
David R. Geerdes
Attorney for defendant MySpace, Inc.

# EXHIBIT A

1
2
3
4

ALAN HIMMELFARB (S # 90480)
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696
ahimmelfarb@kamberedelson.com

5
6
7
8
9

JAY EDELSON (*pro hac vice* pending)
MYLES MCGUIRE (*pro hac vice* pending)
KAMBEREDELSON, LLC
53 West Jackson Boulevard
Suite 550
Chicago, Illinois 60604
Telephone: (312) 589-6370
jedelson@kamberedelson.com
mmcguire@kamberedelson.com

10

[Add'l Counsel On Signature Page]

11

Attorneys for Plaintiff
LINDSEY ABRAMS

12

13

# UNITED STATES DISTRICT COURT

14

## NORTHERN DISTRICT OF CALIFORNIA—SAN JOSE DIVISION

15

16
17

LINDSEY ABRAMS, individually and on
behalf of a class of similarly situated
individuals,

18

Plaintiff,

19

v.

20

FACEBOOK, INC., a Delaware corporation,

21

Defendant.

Case No. C 07-05378 PVT

**PLAINTIFF'S APPLICATION FOR
ATTORNEYS' FEES PURSUANT TO
STIPULATED ENTRY OF JUDGMENT OF
DISMISSAL**

Hearing Date: July 11, 2008
Time: 9:00 AM

22

23

## PLAINITFF'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO
## STIPULATED ENTRY OF JUDGMENT OF DISMISSAL

24
25
26
27
28

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that Lindsey Abrams ("Ms. Abrams") will move the Court for an award of Attorneys' Fees Pursuant to Stipulated Entry of Judgment of Dismissal in the above referenced proceedings on July 11, 2008, at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, San Jose, CA 95113, in Courtroom 3, 5th Floor, before the Honorable Jeremy Fogel.

Ms. Abrams respectfully requests this Court grant her attorneys' fees pursuant to the terms of the settlement reached by the parties as a result of face-to-face and telephonic negotiations between their attorneys. The agreement provides that fees should be awarded based on the benefits conveyed generally by the settlement. As explained below, the settlement's injunctive feature will—using the most conservative analysis available—save recipients of Facebook Mobile text messages over $20.1 million dollars during the settlement period. In consideration of these significant benefits, Plaintiff Abrams respectfully requests attorneys' fees in the amount of $5,033,000.

# TABLE OF CONTENTS

INTRODUCTION ..... 1

I.    BACKGROUND FACTS ..... 2

    A.    Understanding Facebook ..... 2

    B.    The Flaws in Facebook Mobile ..... 3

    C.    The Settlement Terms ..... 4

II.   COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE SETTLEMENT ..... 6

    A.    Total Number of Text Messages = 7.8 billion – 11.4 billion ..... 7

    B.    The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58% ..... 8

        1.    *Recycled Numbers = 100% of 1% - 100% of 2.6%* ..... 8

        2.    *General Opt-Out Rate = 1.98%* ..... 8

    C.    The Cost Per Text Message = $.10 - $.15 ..... 10

    D.    Reductions Based on Legacy Opt-Outs and Costs of Opting Out ..... 10

    E.    The Total Range of Benefits = $25 million to $57 million ..... 11

III.  THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES ..... 12

IV.   FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES ..... 15

CONCLUSION ..... 17

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

# TABLE OF AUTHORITIES

**Cases**

### United States Supreme Court

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,*
    532 U.S. 598 (2001) ................................................................................. 14

*City of Burlington v. Dague,*
    505 U.S. 557 (1992) ............................................................................ 14, 15

### Ninth Circuit Court of Appeals

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .................................................................. 12

*In re Washington Public Power Supply System Securities Litigation,*
    19 F.3d 1291, 1302 (9th Cir. 1994) .......................................................... 14

*Jeff D. v. Andrus,*
    899 F.2d 753, 759 (9th Cir. 1989) ............................................................ 13

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................ 12, 14, 15

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.,*
    962 F.2d 853, 856 (9th Cir. 1992) ............................................................ 13

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043, 1047 (9th Cir. 2002) ........................................................ 12

### Other Circuit Courts of Appeal

*Florin v. Nationsbank of Georgia, N.A.,*
    34 F.3d 560 (7th Cir. 1993) ..................................................................... 14

### United States District Courts

*Daynard v. MRRM, P.A.,*
    335 F. Supp. 2d 156 (D.Mass., 2004) ....................................................... 13

*Fulmore v. Home Depot U.S.A., Inc.,*
    No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) ...... 14

*In re Sears Retiree Group Life Ins. Litig.,*
    No. 97 C 7453, 2002 WL 475180 (N.D. Ill. March 27, 2002) ....................... 15

iii

**California State Courts**

*Chavez v. Netflix, Inc.,*
     Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal. App. 1st Dist.) ....... 12, 13

*Lealao v. Beneficial California, Inc.,*
     82 Cal. App. 4th 19, 45 (1st Dist. 2000) ................................................. 13, 15

**Other State Courts**

*Brown v. Drillers, Inc.,*
     630 So. 2d 741, 748 (La.1994) ..................................................................... 13

*Gardner v. City of Columbia Police Dep't,*
     216 S.C. 219, 57 S.E. 2d 308 (S.C. 1950) ................................................... 13

*Royer Homes of Miss., Inc. v. Chandeleur Homes,*
     857 So.2d 748, 752-53 (Miss. 2003) ........................................................... 13

*Schuster v. Baskin,*
     354 Mass. 137, 140-41, 236 N.E. 2d 205 (Mass. 1968) ............................... 13

**Statutes**

Telephone Consumer Protection Act, 47 U.S.C. § 227 ........................................... 15

Bus. & Prof. § 6146 ............................................................................................... 13

**Supreme Court Rules**

Federal Rule of Civil Procedure 23(e) ....................................................................... 1

**INTRODUCTION**

Lindsey Abrams brought this case to stop the 6th most-trafficked website in the world, Facebook, Inc. d/b/a Facebook.com ("Facebook"),[1] from bombarding the cellular telephones owned by her and numerous others like her[2] with costly, unauthorized text messages.  Abrams did not initially know the unauthorized text messages had come from Facebook—she was neither a member of Facebook Mobile when she received the messages, nor did the messages clearly disclose their Facebook origin.[3]  (Compl. ¶ 27).  With the assistance of counsel,[4] Abrams learned of Facebook's involvement, filed suit that brought unprecedented claims, and engaged in in-person and telephonic negotiations between her attorneys and Facebook's in-house and outside lawyers.

The result is a strong injunctive settlement that will fundamentally alter how Facebook transmits the *billions* of text messages it will send out over the next 27 months (i.e. the timeframe corresponding to the agreed-upon injunctive relief).[5]  (Stip. Entry of J. ¶ 5).  By clearly identifying that these text messages come from Facebook and providing recipients with an easy way to avoid receiving unwanted messages in the future, consumers will save tens of millions of dollars in unauthorized cellular telephone charges.

---

[1] According to Facebook, the website "is a social utility that helps people communicate more efficiently with their friends, family and coworkers…through the social graph, the digital mapping of people's real-world social connections. http://www.facebook.com/press/info.php ?factsheet (last visited April 22, 2008).

[2] Although this was brought as a class action, it was settled on an injunctive basis only pursuant to Fed.R.Civ.P. 23(e).

[3] Facebook disputes, errorneously, that the text messages it sent failed to conspicuously identify their Facebook connection.  (Answer to Interrogs. 7).

[4] The firm resume of KamberEdelson LLC is attached as Ex. A.

[5] After this time period, Facebook must use commercially reasonable methods to ensure that consumers can opt out of the receipt of future text messages so long as Facebook provides mobile telephone messages in substantially the same manner as it currently does.  To discontinue the injunctive relief altogether, Facebook bears the burden of demonstrating that "material subsequent events, development or occurrences have transpired which can be shown…to reasonably obviate the need therefor."  (Stip. Entry of J. ¶ 5).

The settlement also calls for attorneys' fees to Abrams' counsel. Facebook has specifically agreed that in the event this Court is called upon to decide the fee amount, the determination will be "based *not solely* on the relief obtained for the plaintiff, but *also on the benefits conveyed more generally through this settlement*." (Stip. Entry of J. ¶ 6) (emphasis added). In light of the substantial relief achieved both on behalf of members of Facebook and the cellular telephone-owning public generally, Abrams respectfully requests $5,033,000 in attorneys' fees, reflecting 25% of the most conservative valuation of the settlement benefits.

## I.    BACKGROUND FACTS

### A.    Understanding Facebook

Facebook is an Internet success story with few peers. Started in 2003 in a university dorm room, Facebook experienced rapid growth since its inception and stands today as one of only a handful of multi-billion dollar corporations at the vanguard of the Internet. Initially comprised primarily of college students and young people, today Facebook's membership attracts persons of all ages and walks of life. With more than 70 million active users, the Facebook website "enables companies and engineers to…gain access to millions of users…[and] [m]ore than 50 percent of Facebook users return to the site each day, providing unparalleled distribution potential…." http://www.facebook.com/press/info.php?factsheet (last visited April 22, 2008).

At issue here is one of Facebook's most prominent applications, Facebook Mobile, which allows users to send and receive short-message-service (SMS) messages, also known as text messages, to users' mobile devices (cellular telephones, personal digital assistants, etc.). (*See* Declaration of R. Snyder, ¶ 4, a true and accurate copy of which is attached as Ex. B).[6] To

---

[6] Mr. Snyder is an independent mobile telecommunications technology consultant with 24 years of experience and is an expert in the field of mobile and cellular telecommunications. He spent seven years developing standards within the American National Standards Institute's (ANSI) subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

receive these text messages, a Facebook member registers her cellular telephone number into her Facebook profile. (Snyder Decl. ¶¶ 4-5). The member's Facebook "friends" can then log onto the website, visit the member's profile page, and send text messages to the member's mobile telephone device. (Snyder Decl. ¶ 5). Importantly, the Facebook member associated with sending the text message need not even know the cellular telephone number of the intended text message recipient to send the text message; rather, all that is required is access to the recipient's Facebook profile page. (Snyder Decl. ¶¶ 4-5). Approximately 14 million text messages were sent to mobile phones via Facebook Mobile in January 2007; the number of text messages sent has since followed a trajectory of exponential growth, climbing to 59.9 million messages monthly by January 2008. (*See* Facebook's Answers to Interrogatories, 2(c), a true and accurate copy of which is attached as Ex. C; Snyder Decl. ¶ 8).

**B.    The Flaws in Facebook Mobile**

The first major problem with Facebook Mobile is that not everyone who receives text messages sent through the application has authorized the transmission. (Snyder Decl. ¶ 7). For Abrams, the issue began when she received a "recycled" telephone number [7] from her wireless service provider. (Compl. ¶ 19). The number's prior owner had registered the number with Facebook Mobile, but no one, including Facebook's wireless carrier partners, disclosed this to Abrams. (Compl. ¶ 20). Facebook users then went onto Facebook to send the prior owner text messages, which instead went to Abrams because she was the number's current owner. (Compl. ¶¶ 19-25). Because Abrams was never a member of Facebook Mobile, and the messages were

---

documents. Most notably, Mr. Snyder co-founded m-Qube, Inc., a leading billing and processing company, or "aggregator," in the mobile content industry. (Snyder Decl. ¶¶ 1-3)

[7] A recycled number is one that was previously used by a prior customer of the wireless carrier (*i.e.* AT&T, Verizon Wireless, Sprint, Alltel etc.). When the customer canceled his or her service with the carrier, the carrier re-assigned the number to a new customer. (Compl. ¶¶ 19-20). Prior to re-assigning the number, however, the carriers failed to clean the number, or remove from it any text message services, such as Facebook Mobile, for which the number had been registered. (Compl. ¶¶ 19-20).

unclear as to their Facebook connection, she knew of no method by which she could prevent these text messages—for which she was required to pay (and in fact paid) $.10 each—from being sent to her phone.  (Compl. ¶¶ 27-29).

Facebook was aware of the extent of this "recycling" problem, even as it profited from this practice.  Prior to this lawsuit, Facebook had implemented a program with AT&T and Verizon whereby the carriers would provide Facebook with notices of telephone numbers that had been deactivated.  (Answer to Interrogs., 6).  AT&T provided deactivation notices starting in May 2006, but "in late 2006, a technical problem arose, and AT&T stopped sending such notices." (Answer to Interrogs., 6).  AT&T resumed providing notice in "October/November 2007." (Answer to Interrogs., 6).  Verizon eventually began sending such notices in November 2007.[8] (Answer to Interrogs., 6).  Facebook, however, did not require any other wireless service providers, which collectively service approximately 50 percent of all U.S. cellular telephone customers, to apprise it of deactivations.  (Answer to Interrogs., 6).

Another major problem afflicting Facebook Mobile is that it fails to provide meaningful opt-out instructions on a regular basis to text message recipients, even to those who had at one time authorized Facebook Mobile.  As Facebook's own discovery responses attest, some Facebook Mobile users do not remain members indefinitely and elect to discontinue their receipt of Facebook text messages altogether.[9]  Numerous reasons contribute to this dynamic, such as the per instance cost of each text message, the inability to filter desirable text messages from undesirable, and the emergence of unwanted mobile advertisements.  (Snyder Decl. ¶ 14-16).

## C.    The Settlement Terms

The settlement agreement combats the unwanted text message problem in three critical

---

[8] As a point of reference, Abrams filed the instant case October 22, 2007.

[9] Approximately 3.2% of Facebook Mobile users have elected to opt-out prior to the Settlement Agreement.  (Frankenfeld Exp. Rep., 3).

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

ways.  (Snyder Decl. ¶ 6).  First, it requires Facebook to brand each text message sent out as

originating from "Facebook."  This will notify non-members such as Abrams of the origin of the

text messages so they can contact Facebook simply and effectively to stop the problem.  (Stip

Entry of J. ¶ 1).  Second, Facebook will now include specific opt-out instructions in the body of

every 15th text message sent to a particular telephone number.  Recipients will be able to avoid

future text messages by replying to the message with the word "Off."  (Stip. Entry of J. ¶ 1).

Third, Facebook will implement improved notification procedures with the wireless carriers

sufficient to maintain accurate and updated telephone number deactivation and recycling logs.

(Stip. Entry of J. ¶ 3).  Accordingly, the settlement enables recipients to avoid receiving

these unwanted text messages and incurring related service fees imposed by their wireless

carriers.  (Snyder Decl. ¶¶ 6-7).

Additionally, the settlement provides that Facebook will pay for Plaintiff's attorneys' fees

and a reasonable award to Ms. Abrams.  By agreement, the parties specifically contracted as to

how attorneys' fees are to be determined and, if necessary, the parameters for Court

determination:

> Facebook agrees that plaintiff's counsel is entitled to a reasonable award of
> attorneys' fees and expenses in an amount to be determined by the parties, or
> failing such an agreement, by the Court.  *Facebook agrees that any such*
> *determination by the Court will be based not solely on the relief obtained for the*
> *plaintiff, but also on the benefits conveyed more generally through this settlement.*
> *Facebook further agrees that plaintiff shall be entitled to reasonable, limited*
> *discovery on this issue, including information relating to (a) the number of text*
> *messages Facebook sends out on a daily basis, (b) the number of text messages*
> *sent to previously to recycled numbers, and (c) the steps Facebook did or did not*
> *previously take to ensure that text messages were not sent to people who did not*
> *want them.* The parties have agreed that plaintiff's counsel shall submit to the
> Court in the Action an application in support of an award to plaintiff's counsel of
> fees and costs, and that an evidentiary hearing (on such terms as the Court
> determines are appropriate) shall be held in respect thereto (at a time to be set by
> the Court) and further that, in connection therewith, Facebook shall be entitled to
> object to or otherwise contest the amounts to be awarded plaintiff's counsel via
> written submissions and briefs and orally at the hearing on such application.  The
> parties state further that it is their collective intention to expedite the process of

conducting the forgoing evidentiary hearing and enabling the necessary judicial determinations. Facebook agrees not appeal the District's Court's final Order with respect to such application and to pay any amounts awarded thereby within thirty (30) calendar days of the entry of the final order thereon.

(Stip. Entry of J. ¶ 6) (emphasis added). Upon such a determination, Facebook agreed to pay the amount awarded within 30 days. (Stip. Entry of J. ¶ 6). Further, Facebook has explicitly waived any right to appeal. (Stip. Entry of J. ¶ 6). Since executing the Stipulated Order, Facebook has refused to seek a private determination of the amount of the attorneys' fees, which has necessitated Plaintiff's submission of this application pursuant to Paragraph 6 of the Stipulated order of Judgment. Plaintiff respectfully requests that this Court honor the parties' intent—as embodied in the agreement—and award reasonable fees based on the value of the benefits conveyed through the settlement.

## II. COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE SETTLEMENT

At its most basic, the settlement is designed to spare cellular telephone owners of the inconvenience and cost associated with receiving unauthorized text messages from Facebook. The actual value to all potential recipients is calculated through intuitive yet straightforward math. To that end, the settlement's value is the product of the number of text messages sent by Facebook during the minimal settlement term, multiplied by the number of the recipients who opt-out during the term and the cost to each recipient of receiving text messages.

Of course, prudent arithmetic dictates the subtraction of amounts for which the settlement cannot take credit. For example, each individual who opts out may incur charges for the 15 text messages received from Facebook, plus an additional message the user must send to stop the text messages. This money is properly excluded from being considered part of the settlement's benefits. Additionally, a range of 2,000–4,000 users had deactivated monthly from Facebook Mobile prior to the start of the settlement's corrective measures. (Answer to Interrogs., 3).

1    Neither Abrams nor her counsel may claim the benefit of these "legacy opt-outs."

2        In equation form, then, the General Settlement Benefits appear as follows:

3    **GSB = [total # of texts x opt-out rate x cost per text] – [legacy opt-outs + cost of opting out]**

4    Each of these variables, and the expert opinions that support them, are explained below.

5

6    **A.    Total Number of Text Messages = 7.8 billion – 11.4 billion**

7        Facebook transmits a massive number of text messages, and, as explained in the

8    declaration of industry expert Randall Synder, the number is growing rapidly.  During the

9    calendar year from January 2007 to January 2008, Facebook Mobile experienced an average

10   month-to-month growth rate in text message volume of 12.9%, which resulted in Facebook

11   sending 59.9 million text messages in the month of January 2008 alone.  (Answer to Interrogs. 2;

12   Snyder Decl. ¶ 8).  Mr. Snyder cautiously predicts more modest growth going forward, however,

13   due to "the waning novelty of the Facebook Mobile application among users as well as a natural

14   anticipated decline in ongoing growth rates."  (Snyder Decl. ¶ 9).  Also, a further rate reduction is

15   necessary in light of the fact that settlement will result in members opting-out of Facebook

16   Mobile.  (Snyder Decl. ¶ 11).  Thus, Mr. Snyder surmises, "a conservative monthly growth rate

17   through mid-year 2010 in the range of 9% to 11% is reasonable."  (Snyder Decl. ¶ 9).

18

19       Mr. Snyder further cautions that the effects of the settlement are unlikely to be realized in

20   the initial weeks following implementation.  Though Facebook is required to send opt-out

21   instructions and identification notices for a period of 27 months, the corrective action must first

22   be allowed to permeate the Facebook Mobile user base.  (Snyder Decl. ¶ 10).   Therefore, Mr.

23   Snyder projects that this will require approximately 3 month's time, meaning the relevant period

24   is limited conservatively to the final 24 months.  (Snyder Decl. ¶ 10).  Mr. Snyder calculated the

25   approximate number of text messages that will be sent by Facebook during that period at 9% and

26   11% monthly growth respectively.  (Snyder Decl. ¶ 9).  Projecting 9% growth amounts to 21

27

28

**PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT**

million users sending a total of approximately 7.8 billion text messages through Facebook Mobile during the restricted injunctive period. (Snyder Decl. ¶ 9). For 11% growth, the total reaches 11.4 billion text messages from approximately 36 million users. (Snyder Decl. ¶ 9).

**B.      The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58%**

Prior to the settlement, users wishing to discontinue the text messages were required to log onto the Facebook website and cumbersomely navigate their way to a link that would shut-off the application. Non-users encountered more obstacles.[10] Presenting clearer notice and instructions to all recipients will result in a materially greater opt-out rate. (Snyder Decl. ¶ 7). Two rates are at play: recycled numbers and general opt-outs.

**1.      *Recycled Numbers = 100% of 1% - 100% of 2.6%***

First, for people like Ms. Abrams who never signed up for Facebook Mobile in the first place, it is reasonable to conclude an opt-out rate of 100%—the only messages they receive are intended for other people, and it is costing them money. There is no reason to suspect they will elect to continue to receive these text messages in the future. (Snyder Decl. ¶ 7). Based on figures provided by the Federal Communications Commission ("FCC"), Mr. Snyder calculates that between 1–2.6% of all cellular telephone numbers in the United States, including those registered on Facebook Mobile, are recycled monthly. (Snyder Decl. ¶ 7).

**2.      *General Opt-Out Rate = 1.98%***

The settlement also benefits all recipients of Facebook text messages generally by informing them how to opt-out. The general opt-out rate for recipients of Facebook text messages will be 2%. (Snyder Decl. ¶ 15).

---

[10] Facebook has indicated in its interrogatory responses that prior to the settlement, it recognized terms such as "STOP" or "END" and that it would honor such responsive texts sent by recipients of Facebook texts by ceasing to send messages. (Answer to Interrogs., 6). While this could potentially be true, it was of little value given that Facebook provided no effective notice to text message recipients that it accepted such requests.

Given the relative youth of text messaging as a viable communications medium, Mr.

Snyder bases his opinion on the opt-out rates for email, where research has shown that

approximately 2% of email subscribers will opt-out of receiving future emails when provided the

chance to do so. (Snyder Decl. ¶ 15). Mr. Snyder explains conceptually that the opt-out rate for

text messaging is likely to far exceed that of email for a variety of reasons. (Snyder Decl. ¶ 15).

First, people take notice of their unwanted text messages. Whereas email is free to receive, most

text message recipients are charged on average between $.10 to $.15 per message. (Snyder Decl.

¶ 15). Also, email applications have spam filters, "junk email" programs, and other devices

designed to quarantine unwanted email communications. (Snyder Decl. ¶ 15). Consequently, one

would expect that if presented the opportunity, recipients of unwanted text messages would opt-

out with far greater frequency than recipients of emails. (Snyder Decl. ¶ 15).

Nevertheless, and again erring on the conservative side, Snyder does not speculate just

how much greater the text message opt-out rate will be over email. Using email rates then as both

a floor and ceiling, Mr. Snyder's 2% rate is a cautious projection of the percent of Facebook

Mobile members who will elect to discontinue the service as a result of the settlement.

This aspect of the equation requires one additional step. The rates for recycled numbers

and general opt-outs cannot simply be added together. Rather, the 2% general opt-out rate may

only apply to the 99% of messages that remain after subtracting out the 1% from the recycled

number recipients. Adjusting for this overlap results in a general opt-out rate of 1.98%.[11] (See

"Expert Report of D. Frankenfeld, 2, a true and accurate copy of which is attached as Ex

---

[11] Accounting for the overlap if the higher opt-out rate for recycled numbers (2.6%) were used
would result in a general opt-out rate of 1.948%. As this Application adopts the lowest opt-out
rate for recycled numbers (1%), however, the general opt-out rate to be used going forward with
the analysis will be 1.98%.

D).[12]  Accordingly, adding this adjusted rate for general opt-outs to the range for recycled opt-outs results in a total opt-out range of 2.98%–4.58% for all text messages.

**C.    The Cost Per Text Message = $.10 - $.15**

Recipients incur charges from their respective wireless service providers, frequently on a per text message basis.  (Snyder Decl. ¶ 12).  "AT&T Mobility, Verizon Wireless, Sprint Nextel and T-Mobile, the four largest domestic wireless carriers by market share, all charge individual text message fees of $0.15 per message, according to their respective websites, and such amount may increase over the Settlement Period."  (Snyder Decl. ¶ 12).  Ms. Abrams was charged $.10 per text message.  (Snyder Decl. ¶ 10; *see also* Compl. ¶¶ 27-29).  Accordingly, Mr. Snyder opines that for the settlement period, "an average fee of between $0.10 and $0.15 per text message both sent and received is reasonable."  (Snyder Decl. ¶ 12).

Revisiting our equation then, the first half ranges look like this:

**GSB = [7.8 billion x .0298 x .10] – [legacy opt-outs + cost of opting out]** on the low end to

**GSB = [11.4 billion x .0458 x .15] – [legacy opt-outs + cost of opting out]** on the high end.

**D.    Reductions Based on Legacy Opt-Outs and Costs of Opting Out**

Plaintiff cannot take credit for all the money that is going to be saved based on opt-outs over the settlement period.  First, and as noted previously, 2,000–4,000 Facebook Mobile members deactivated the service monthly prior to the start of the settlement.  (Answer to Interrogs. 3).  Economist Donald L. Frankenfeld calculated the extent of the issue and found the legacy opt-out rate was approximately 3%.  This translates into recipients opting out each month who the settlement cannot champion.  (Frankenfeld Exp. Rep. App. 1-9).

The second issue addresses the reality that the opt-out instructions are not sent to text message recipients until the 15th message, and a recipient must text "OFF" in a reply message to

---

[12]  Mr. Frankenfeld is a forensic economist and financial expert, with a specific expertise in computer modeling of economic damages.  (Frankenfeld Exp. Rep., 1).

**PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT**

Facebook (16 total messages). These costs to recipients who opt out should not be considered in the general benefits. At \$.10 per message, this results in \$1.60 per recipient who opts out, or \$1,590,677 (at 9% growth) or \$2,695,131 (at 11% growth) being subtracted from the total settlement benefits. (Frankenfeld Exp. Rep. App. 1 and 7). At \$.15 per message, \$2.40 for every person who opts out, or \$2,386,015 (at 9% growth) or \$4,042,697 (at 11% growth) total should be subtracted. (Frankenfeld Exp. Rep. App. 3 and 9).

Indeed, many individuals will opt-out prior to the 15th message. Non-members will likely learn of the opt-out instructions through news reports, word of mouth, or other means. Facebook users could post messages that would instantly reach wider audiences on the website itself. Ms. Abrams, by her counsel and experts, declines to speculate as to the impact of these realities and instead adheres to the common sense notion that a recipient should have to incur no more than \$1.60–\$2.40 to effectively opt-out of Facebook Mobile and achieve the settlement's benefits.

Subtracting these values, the equation presents a range of benefits from:

**GSB = [7.8 billion x .0298 x .10] – [3.2% + (\$1.60 to \$2.40)]** on the low end to

**GSB = [11.4 billion x .0458 x .15] – [3.2% + (\$1.60 to \$2.40)]** on the high end.

**E.    The Total Range of Benefits = \$25 million to \$57 million**

Mr. Frankenfeld has provided exhaustive spreadsheets detailing the potential ranges if different combinations of each variable are used. (*See* Frankenfeld Exp. Rep. App. 1-9). Following the mathematical model, a reasonable range of settlement benefits to users and non-users equals between \$25,967,094 and \$57,234,736. Broken down, the ranges produced equal:

| Call Value | | Snyder Low | Snyder Middle | Snyder Upper |
|---|---|---|---|---|
| ↦ | | \$0.100 | \$0.125 | \$0.150 |
| Growth | 9.0% | \$25,967,094 | \$32,458,867 | \$38,950,641 |
| | 10.0% | \$31,457,205 | \$39,321,506 | \$47,185,808 |
| | 11.0% | \$38,156,491 | \$47,695,613 | \$57,234,736 |

(Frankenfeld Exp. Rep., 4). These results take the mid-range value of each chart in Mr. Frankenfeld's appendix and show that the settlement will provide recipients of unwanted Facebook Mobile messages with substantial relief—ultimately saving them millions of dollars in unauthorized text messaging fees.

With respect to which figure most accurately depicts the settlement benefits, the mid-range point reasonably takes into account each of the different variables in the equation. The benefits achieved by this settlement could be much greater, of course, eventually hitting north of the $70 million mark. (Frankenfeld Exp. Rep. App. 9). In the final analysis, however, Plaintiff is prepared to limit her projection to the low end figure, representing a bare minimum of the actual anticipated relief to message recipients. This number presumes the shortest injunctive period (24 months), the slowest growth rate (9%), the lowest opt-out rates (2.98%), and the lowest per message value ($.10, a full 33% lower than the amounts currently being charged by the major wireless carriers). Accordingly, Plaintiff respectfully submits the general settlement benefits conferred by the parties agreement equals no less than $20,134,762, as reflected in the first page of Mr. Frankenfeld's appendix.

## III.    THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES

Having calculated the general benefits, the question remains as to what represents an appropriate fee award.[13] In class action cases, courts have recognized a benchmark fee award of 25%. *See Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir. 2002), *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998). California law further recognizes contingency fees in the marketplace provide a range of 20–40%. *See e.g.*, *Chavez v. Netflix, Inc.*, Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal.

---

[13] The Court's determination of "reasonableness" arises from the terms of the settlement agreement, and, unlike class actions, not from any legal imperative. However, Abrams believes class action and personal injury decisions provide relevant guidance as to percentages of value found to be reasonable and reflective of the marketplace.

App. 1st Dist.) (discussing marketplace fee ranges and their applicability when determining proper fee percentages based on value of settlement); *see also Lealao v. Beneficial California, Inc.* 82 Cal. App. 4th 19, 45 (1st Dist. 2000) (considering the amount of the proposed award and the monetizeable value of the class benefits to estimate what the market would pay for comparable litigation services rendered pursuant to a fee agreement); *see also* Bus. & Prof. § 6146 (setting contingency fee percentages in medical malpractice cases).

As a result, a reasonable fee from the low-end of the range would be $5,033,690.50 (25% of $20,134,762). This figure represents 12.8% of the mid-range ($39,321,506)[14] and a mere 8.79% of the high-end projection ($57,234,736).[15] Taking the mid-point range, 25% would have equaled a fee award of $9,830,376.50 and $14,308,684.00 for the high-end. Again, in keeping with the spirit of this application's cautious temperament, Abrams limits her request to the bottom figure, despite the expert's opinion that the mid-range presents a more accurate assessment of the benefits.

To be sure, the parties specifically bargained for a settlement of the attorneys' fees issue to be based broadly on the relief afforded through the settlement. It is well settled that "[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (*quoting Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989)).[16] Parties have flexibility in negotiating settlement agreements, "including

---

[14] To be clear, $39,321,506 is the mid-point for 10% growth at $.125 per message. (Frankenfeld Exp. Rep. App. 5).

[15] $57,234,736 is the mid-point for 11% growth at $.15 per message. (Frankenfeld Exp. Rep. App. 9).

[16] Sister jurisdictions agree that settlements are subject to ordinary contract interpretation. *See, e.g., Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La.1994); *Schuster v. Baskin*, 236 N.E. 2d 205 (Mass. 1968); *Royer Homes of Miss., Inc. v. Chandeleur Homes*, 857 So.2d 748, 752-53 (Miss. 2003); *Gardner v. City of Columbia Police Dep't*, 57 S.E. 2d 308 (S.C. 1950). *Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156 (D.Mass. 2004).

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

the attorneys' fee provisions." *Staton*, 327 F.3d at 972 n. 22 (describing potential models for class action settlements on common-fund and statutory fee-shifting principles)[17] (*relying in part on Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1993)).

This is true even when other legal principles would apply if not for the settlement terms. For example, in *Florin* the parties agreed to settle an ERISA case through the creation of a common fund, and that attorneys' fees for class counsel would be paid out of the fund itself. 34 F.3d at 562. Since the ERISA statute contained a fee-shifting provision, however, the district court denied class counsel a multiplier under the holding of *City of Burlington v. Dague*, 505 U.S. 557 (1992) (prohibiting multipliers in cases with federal fee-shifting statutes). 34 F.3d at 564-65. On appeal, the Seventh Circuit honored the intent of the parties and found that because the settlement was made on a common fund basis, *Dague* did not apply despite the fact it otherwise would have acted to bar a multiplier. *Id.*

Likewise, the court in *Fulmore v. Home Depot U.S.A., Inc.*, awarded fees under settlement provisions where the lawsuit had triggered a defendant's voluntary change in business practices. No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) (Slip. Op.). Although the Supreme Court had abolished the use of such a "catalyst theory" in federal fee-shifting cases in the case of *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598 (2001), the *Fulmore* court reasoned:

---

[17] This matter, however, should not be confused with a class action common fund—because there is only injunctive relief, counsel's interests are not antagonistic to those of the class members (no increase in the fee amount will result in a corresponding reduction of relief to the class). *See In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1302 (9th Cir. 1994) (in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage). Rather, the parties here agreed to apply understood legal principles so as to help them, and if necessary this Court, calculate the fee award, and this calculation is wholly independent of the relief afforded to recipients of unwanted Facebook Mobile text messages.

In this case, ultimately, the court is being called upon to apply and enforce the intentions of the parties, as expressed in their agreements. Those agreements not only allow for the possibility of a fee award, notwithstanding the rule under *Buckhannon* and its progeny, but go further and clearly indicate that a fee award in a reasonable amount was anticipated and would be appropriate.

2007 WL 2746882 at *2; *see also In re Sears Retiree Group Life Ins. Litig.*, No. 97 C 7453, 2002 WL 475180 (N.D. Ill. March 27, 2002) (applying common fund principles instead of lodestar where provision of settlement agreement for fees stated Sears could not argue for lodestar or application of *Dague*). Accordingly, honoring the intent of the instant parties requires a fee based on a percentage of the benefits generally conveyed by the settlement.

## IV.   FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES

Courts may consider injunctive relief's value to individuals where the value of the injunctive relief may be accurately ascertained or monetized. *Lealao*, 82 Cal. App. 4th at 45; *see also Staton*, 327 F.3d at 974 (the relief must be more tangible than a redress of a general social grievance).[18] If its discovery responses are any indication, Facebook is likely to argue that the settlement benefits here are too speculative for valuation. Facebook objected when asked to provide an estimate of the value of the settlement benefits on the grounds that the term "benefits" is "vague, ambiguous and unintelligible," that the interrogatory calls for the opinions of attorneys in violation of work product, and for "speculation" and "hypothetical opinion." (Answer to Interrogs., 12). This is not true. Putting aside the fact that Facebook's position suggests it willingly agreed to settlement language it found ambiguous so as to frustrate the intentions of the parties, the settlement itself helps define what is meant by "benefits." The agreement calls for discovery on this issue in the form of "*(a) the number of text messages Facebook sends out on a*

---

[18] The settlement protects message recipients from intrusions into their telephone devices, a privacy concern reflected in statues such as the Telephone Consumer Protection Act, 47 U.S.C. § 227. The settlement's redress of this social grievance is too speculative to quantify, however, rendering it properly excluded from the attorney's fees calculation.

1  *daily basis, (b) the number of text messages sent to previously recycled numbers, and (c) the steps*

2  *Facebook did or did not previously take to ensure that text messages were not sent to people who*

3  *did not want them.*" (Stip. Entry of J. ¶ 6) (emphasis added).  Accordingly, Facebook's sudden

4  lack of understanding does not reflect well on its intentions.

5

6        Finally, the expert opinions contained in the attached declarations show the valuation to be

7  both understandable and reasonable.  The math is neither complicated or beyond the point where

8  the benefits may be accurately ascertained.  These messages cost recipients money; they will save

9  money going forward.  While the exact dollar figure of the benefits is unavailable, such exactitude

10  is not required by the settlement agreement—the parties agreed on language that suggests a more

11  general valuation.  According to an industry expert and an economist, the settlement value is

12  between $25,967,094 and $57,234,736.  Abrams errs more cautiously than these monetizations

13  and uses the most conservatively generated figure, $20,134,762, to support a fee application of

14  $5,033,000.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Abrams and Facebook settled for injunctive relief that will save the recipients of Facebook Mobile text messages millions of dollars. Central to the bargain was the provision that requires—in the event the Court is to decide attorney's fees—that the calculation be based on the benefits conveyed generally by the settlement. Expert modeling of the relief has demonstrated that the monetizable settlement benefits range from $25,967,094 to $57,234,736. This is not speculation, but is rather the product of thoughtful and reasonable mathematics. Abrams, however, limits her request to 25% of the lowest figure in the lowest range, being $20,134,762. Given these substantial benefits, a fee award of $5,033,000 is reasonable and appropriate under the terms of the settlement.

Respectfully submitted,

KAMBEREDELSON, LLC
SCOTT A. KAMBER


/s/ Scott A. Kamber
Attorneys for Lindsey Abrams

Jay Edelson
Myles McGuire
Steven Lezell
KAMBEREDELSON, LLC
53 West Jackson Bvld., Suite 550
Chicago, Illinois 60604
(312) 589-6370

Scott A. Kamber
KAMBEREDELSON, LLC
11 Broadway, 22nd floor
New York, NY 10004
(212) 920-3072

Alan Himmelfarb
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
(323) 585-8696

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

**EXHIBIT A**

## KAMBEREDELSON, LLC – FIRM RESUME

In October of 2007, two nationally recognized plaintiffs' class action firms - Blim & Edelson, LLC and Kamber & Associates, LLC - merged to form KamberEdelson, LLC. With lawyers in New York, Los Angeles, and Chicago, KamberEdelson has a practice that is truly national in scope.

KamberEdelson focuses its practice on all types of plaintiffs-side class and mass actions, and has seven primary practice areas:

- Technology class actions;
- Privacy class actions;
- Securities class actions;
- Mass tort class and mass actions;
- Consumer class actions;
- Insurance class actions; and
- Antitrust cases

The firm's cases frequently involve important legal issues, and regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including on ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## OUR ATTORNEYS

**SCOTT A. KAMBER** is a founding member of KamberEdelson. Mr. Kamber has served as co-lead counsel in the In re Sony BMG CD Technologies litigation pending in the United States District Court for the Southern District of New York and In re Network Commerce Securities Litigation pending in the United States District Court for the Western District of Washington, in addition to serving in leadership roles in numerous private and class actions including suits on behalf of shareholders, consumers and private corporations in the United States and abroad.

Mr. Kamber has served as lead counsel and in other leadership roles for numerous class actions that have achieved significant results for the class, including: Wormley v. GeoCities (consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members); In re Starlink Growers (represented sub-class of farmers who grew Starlink in a consolidated settlement of federal class action valued in excess of $100 million); In re Loch Harris (derivative action that successfully obtained dissolution of corporation and distribution of assets to shareholders); In re Command Systems (securities class action in which participating shareholders recovered over 80% of their losses); and In re WebTV (consumer class

action for false advertising). In addition to these commercial litigations, Mr. Kamber has been involved in the efforts of African torture victims to bring their persecutors to justice under the Alien Tort Claims Act and has achieved significant decisions for his clients before the United States Court of Appeals for the Second Circuit and the Southern District of New York. One such result, Cabiri v. Ghana, 165 F.3d 193 (1999), is a leading Second Circuit case under the Foreign Sovereign Immunities Act.

Mr. Kamber graduated cum laude from University of California, Hastings College of the Law in 1991 where he was Order of the Coif, Articles Editor for Hastings Constitutional Law Quarterly and a member of the Moot Court Board. Mr. Kamber graduated with University and Departmental Honors from The Johns Hopkins University in 1986. Mr. Kamber has extensive courtroom experience and has tried over 15 cases to verdict. Prior to founding Kamber & Associates, LLC, Mr. Kamber represented both plaintiffs and defendants in a wide range of commercial litigation. Mr. Kamber is admitted to practice in the State of New York as well as the United States Supreme Court, the United States Court of Appeals for the Second Circuit and Eighth Circuit, and the United States District Courts for the Southern and Eastern Districts of New York. In addition, Mr. Kamber is well-versed in the procedures and practice of numerous arbitration forums, both domestic and international. Prior to practicing law, Mr. Kamber was a financial consultant.

**JAY EDELSON** is a founding member of KamberEdelson. He has served as lead counsel in over 40 class actions, resulting in hundreds of millions of dollars in relief for his clients. His class action cases have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to internet businesses, and the interpretation of numerous life insurance, health insurance, and other state statutes. In February of 2007, the Chicago Sun Times nicknamed Mr. Edelson the "Spam Slammer" after he secured the first settlement of a suit under the Telephone Consumer Protection Act for the alleged transmission of unsolicited text messages. Mr. Edelson has been involved in a number of high-profile "mass tort" class and mass actions, including ones against Menu Foods for selling contaminated pet food, Merck for its sale of the prescription pain drug, Vioxx, and suits involving damages arising from second hand smoke.

Mr. Edelson is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting. He has also appeared on dozens of television and radio programs to discuss his cases. In April of 2007, Mr. Edelson provided testimony to the Subcommittee on Agriculture Appropriations, Senate Committee on Appropriations, U.S. Senate Hearing on "Pet Food Contamination" in connection with one of the class action cases he is prosecuting. Mr. Edelson consults with the University of Chicago Medical Center and the Pritzker School of Medicine of internet and legal ethics issues. Mr. Edelson is a 1994 graduate of Brandeis University and a 1996 graduate of the University of Michigan Law School.

**ALAN HIMELFARB** is a member of KamberEdelson. Mr. Himmelfarb was admitted to the practice of law in California in July, 1979. At that time, at the age of 23, he was the youngest member of the California Bar. Within five years, he became managing attorney

of a law firm employing six attorneys and a support staff of ten. He specialized in complex litigation, contracts, high technology, foreign licensing, and foreign technology transfers, and practiced before both state and federal courts. In 1988, he took a position overseas as a foreign legal consultant in Asia. In this capacity, he acted as chief negotiator for international sales/service/technical transfer agreements, mediated cross-cultural (Asian--Western) business and governmental interests, evaluated international business/marketing strategies for multinational corporations, drafted and negotiated a full range of international transactional agreements for Korean, European and American corporations and businessmen and marketed legal services to Korean domestic market and international community. In 1992, Mr. Himmelfarb returned to Los Angeles in the capacity of a litigator, with an emphasis on plaintiff's work against banks and other financial institutions. He has been engaged in class action litigation since 1994.

**ETHAN PRESTION** is a member of KamberEdelson. Mr. Preston focuses on consumer technology, and concentrates his practice in antitrust/competition issues and information security issues. Mr. Preston has taken substantial leadership roles in numerous class action lawsuits. Mr. Preston is admitted to practice before the Northern District of Illinois, the District of New Mexico, and Illinois state courts. Mr. Preston is an inactive member of the New Mexico state bar. Mr. Preston has authored the following law review articles: Cross-Border Collaboration by Class Counsel in the U.S. and Ontario, 4 Canadian Class Action Rev. 164 (2007), The Global Rise of a Duty to Disclose Information Security Breaches, 22 J. Marshall J. Computer & Info. L. 457 (2004) (with Paul Turner), Computer Security Publications: Information Economics, Shifting Liability and the First Amendment, 24 Whittier L. Rev. 71 (2002) (with John Lofton), and The USA PATRIOT Act: New Adventures in American Extraterritoriality, 10 J. Fin. Crime 104 (2002). Mr. Preston has lectured on copyright issues at the University of Illinois at Chicago, and on comparative law on attorneys' fees and costs for the Center for International Legal Studies. Mr. Preston received his Bachelor of Arts degree with honors from the Plan II honors program at the University of Texas at Austin, and his J.D. with distinction from the Georgetown University Law Center in 2001.

**MYLES MCGUIRE** is a member of KamberEdelson. His practice concentrates, nearly exclusively, on consumer protection law and class actions. Mr. McGuire has taken leadership roles in many nationwide and multi-state class actions. His specific area of emphasis is on "new technology" class actions, including those involving electronic commerce, cellular telephony and wireless media, among others. Mr. McGuire graduated from Marquette University Law School in 2000 and is admitted to practice in Wisconsin and Illinois. He is a member of the National Association of Consumer Advocates and the Chicago Bar Association. Prior to working as a plaintiff's attorney, Mr. McGuire spent several years counseling high-tech companies.

**STEVEN W. TEPPLER** is Senior Counsel to KamberEdelson. Mr. Teppler concentrates his practice on data protection and information technology law, including electronic discovery, loss or destruction of information, authentication and admissibility issues uniquely inherent to computer generated information, including spoliation issues arising from unauthorized or illegal data manipulation or

alteration. He is the Co-Vice-Chair of the American Bar Association Information Security Committee as well as the Florida Bar's Professional Ethics Committee.

Mr. Teppler has authored over a dozen articles relating to information technology law and routinely presents his work at conferences. Mr. Teppler's recent publications include: Spoliation in the Digital Universe, The SciTech Lawyer, Science and Technology Law Section of the American Bar Association, Fall 2007; Life After Sarbanes-Oxley – The Merger of Information Security and Accountability (co-author), 45 Jurimetrics J. 379 (2005); Digital Signatures Are Not Enough (co-author), Information Systems Security Association, January 2006; *State of Connecticut v. Swinton*: A Discussion of the Basics of Digital Evidence Admissibility (co-author), Georgia Bar Newsletter Technology Law Section, Spring 2005; The Digital Signature Paradox (co-author), IETF Information Workshop (The West Point Workshop) June 2005; Observations on Electronic Service of Process in the South Carolina Court System, efiling Report, June 2005. Mr. Teppler is also a contributing author to an American Bar Association book working titled "Foundations of Digital Evidence" (publication expected March 2008).

Mr. Teppler graduated from the Benjamin N. Cordozo School of Law in 1980 after earning his B.A., summa cum laude, from the City College of New York in 1977. Mr. Teppler is admitted to the bars of New York, the District of Columbia and Florida.

**DANA B. RUBIN** is an associate at KamberEdelson focusing her practice on a wide range of class action issues. She graduated with honors from the University of Maryland, College Park in 1993. She received her J.D. in 1999 from Fordham University School of Law, where she was an Associate Editor on the Intellectual Property, Media & Entertainment Law Journal.

Prior to joining KamberEdelson, Ms. Rubin played a role in numerous private and class actions on behalf of shareholders and consumers. Ms. Rubin has also represented both plaintiffs and defendants in employment litigation and civil rights matters. Ms. Rubin is admitted in the State Courts of New York and the United States District Courts for the Southern and Eastern Districts of New York. She is a member of the New York State Bar Association.

**JENNIFER H. FELDSCHER** is an associate at KamberEdelson. Ms. Feldscher was previously a litigation associate at Lewis, Brisbois Bisgaard & Smith, LLP, where she concentrated her practice on all areas of complex commercial litigation.

Ms. Feldscher is a 2001 graduate of Georgetown University School of Law and a 1998 graduate of Brown University.

**STEVEN LEZELL** is an associate at KamberEdelson. Mr. Lezell has tried a number of bench trials, engaged in extensive motion practice from routine to complex, written appellate briefs, litigated class action matters and arbitrated cases.

Mr. Lezell received his J.D. at Chicago-Kent College of law with High Honors in 2005. Mr. Lezell received certificates in litigation and alternative dispute resolution and was awarded Order of the Coif. He was president of the Student Bar Association and Notes and Comments Editor for the Chicago Kent Law Review. Mr. Lezell also presented Chicago-Kent at the National Sports Law Moot Court Competition in New Orleans in 2004 and received the ABA-ALI Scholarship and Leadership Award, for best representing the combination of leadership and scholarship in his graduating class. Mr. Lezell also received the Lowell H. Jacobson Memorial Scholarship which is awarded every year to the strongest law student in the Seventh Circuit. Mr. Lezell received his B.A. in political science, with Distinction, from the University of Michigan in 2002.

**RYAN D. ANDREWS** is an associate at KamberEdelson, LLC. Prior to joining the firm, Mr. Andrews engaged in all aspects of the prosecution and defense of claims on behalf of individual and corporate clients, including motion practice, arbitration, mediation, trial to verdict, and appeals.

Mr. Andrews received his J.D. with high honors from the Chicago-Kent College of Law in 2005 and was named Order of the Coif. While in law school, Mr. Andrews was Notes & Comments Editor for the Chicago-Kent Law Review, a teaching assistant for both Property Law and Legal Writing courses, externed for the Hon. Joan B. Gottschall in the Northern District of Illinois, and earned CALI awards for the highest grade in five classes

Mr. Andrews graduated from the University of Michigan in 2002 earning his B.A., with distinction, in Political Science and Communications.

**STUART WESCHLER** is Of Counsel to KamberEdelson. The efforts of Mr. Wechsler in the area of securities litigation have received considerable judicial comment. U.S. District Court Judge Alvin K. Hellerstein commented in Doney v. Command Systems, (98 Civ. 3279), in an opinion dated August 10, 1999, "I don't think it needs my comment to note that, Mr. Wechsler, you are a senior and most respected and most competent member of the securities class action bar. I would take it as a given your hours are worth the rates that you charge and that the hours that you have put in reflect the efficiency with which you work." In a report dated May 23, 1977, in Bucher v. Shumway, 76 Civ. 2420 (S.D.N.Y.), United States Magistrate Leonard Bernikow stated that "Stuart Wechsler . . . is a leading expert in securities class action litigation." Mr. Wechsler also led the team of attorneys that successfully prosecuted the class action, Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), to a landmark decision in federal civil procedure. He was also the responsible partner in Van Gemert v. Boeing, one of the earliest actions maintained as a class action under the then newly amended Federal Rules of Civil Procedure and one of the very few securities class actions ever to go to trial and judgment. Moreover, Mr. Wechsler played an integral role in obtaining a landmark Supreme Court decision in an important phase of that action. See Boeing Co. v. Van Gemert, 444 U.S. 472 (1980).

Mr. Wechsler was admitted to the bar 1958, New York; Supreme Court; U.S. Court of Appeals, Second, Third and Fifth Circuits; U.S. District Court, District of Arizona; U.S. District Court, Western District of Michigan. Education: University of Pennsylvania

(B.S., 1953); Yale University (J.D., 1955). Editor: "Prosecuting and Defending Stockholder Suits," Practicing Law Institute, Nov., 1973. Author: "The Securities Acts Amendments of 1964," Stock Market Magazine, November, 1964; "Notice to Debenture Holders," The Review of Securities Regulation, April 15, 1976. Chairman: PLI Programs regarding class actions and stockholder suits, 1970-1977, "New Trends in Securities Litigation," 1977-79 and "Exemptions from Registration: Spinoffs-Shells and other Devices," 1970. Faculty Member, Columbia Law School Continuing Education Programs, 1979-1982. Chairman: Practicing Law Institute program, "Stockholder Suits and Class Actions," 1986; University of Virginia seminar, "Trial of a Securities Case," 1989. Lecturer, Panels on Securities Litigation and Class Actions, American Bar Association, 1975; ALI-ABA Study Course, Civil Rico Member, Board of Directors, Concert Artists Guild, 1982-1984. Member, Board of Editors, "Class Action Reports," 1977. Chairman, Securities Law Committee, Federal Bar Council, 1980-1985. Member, Committee on Second Circuit Courts of the Federal Bar Council, 1986. Member: American Bar Association; Federal Bar Council.

**JOHN BLIM** is Of Counsel to KamberEdelson. Mr. Blim is a graduate of Northwestern University School of Law, where he received his J.D. degree cum laude in 1994 and was elected to the Order of the Coif. He served as an associate articles editor on the Northwestern University Law Review from 1993 to 1994. Mr. Blim was also a member of the winning team and voted Best Speaker in the law school's moot court competition. From 1994 to 2000, he was a litigation associate at nationally recognized law firms, including Sidley & Austin.

Mr. Blim has published articles in major legal journals, and his writing has been described as "thoughtful commentary" by a leading treatise on constitutional law. Before attending law school, John earned his Ph.D. in English literature from Northwestern University, where he was also a lecturer in the school's English department.

State and federal courts have appointed John as class counsel in numerous class action cases collectively benefiting millions of individuals.

## NOTABLE CASES

Our members have taken leading roles in the following cases:

## GENERAL CONSUMER PROTECTION CLASS ACTIONS

*Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cook County, Ill.)
Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

*Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cook County, Ill.)

Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

*Kim v. Riscuity*, No. 06 C 01585 (N.D.Ill)
Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

*Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D.Ill)
Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

*Chancer v. Princess Cruises*, No. BC 115472 (Los Angeles Sup. Ct.)
Co-lead counsel in a class action lawsuit challenging a cruise line's deceptive "low price guarantee" as a consumer fraud class action. The settlement provided the class with a collective award with a face value of millions of dollars.

*Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3,000,000.

*Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1,600,000 and $4,800,000.

*Cioe v. Lycos*, No. 02 CH 21456 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit settled under state consumer protection statutes.

*Gavrilovic v. Vintacom Media Group, Inc.*, No. 04 CH 11342 (Cook County, Illinois);
Co-lead counsel in a state-wide class action suit settled under state consumer protection statutes.

*McArthur v. Spring Street Networks*, 100766/2004 (NY Cty.)
Co-lead counsel in a nationwide class action suit settled under New York consumer protection statutes.

*California Reconveyance Cases*

Part of a team of attorneys who settled a series of state court class action cases under California's Reconveyance Statute. Cases settled for a collective amount of over $10,000,0000.

## TECHNOLOGY CLASS ACTIONS

*Shen v. Distributive Networks LLC.* No. 06 C 4403 (N.D.Ill.)
Co-lead counsel in a class action alleging that defendant violated federal law by sending unsolicited text messages to the cellular telephones of consumers throughout the country. The settlement - which is the first of its kind in the country - provided each class member with up to $150 in cash.

*Zurakov v. Register.com.* No. 01-600703 (N.Y.Cty, New York)
Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its deceptive practices in registering internet domain names. In November, 2003, the New York Supreme Court (trial division) granted final approval of a settlement that required Register.com to fully disclose its practices and provided the class with a relief with a collective face value in excess of $17 million.

*Kiesel v. Time Warner*, No. 809542 (Orange County Sup. Ct.)
Co-lead counsel in a representative action on behalf of thousands of apartment and condominium residents in which firewalls were breached during cable installation. The settlement provided the class with complete relief including the inspection of every multi-unit dwelling in the affected county and repair of all breached units wherever they were found.

*Weaver v. WebTV.* No. 793551 (Santa Clara Sup Ct.) co-lead counsel in a certified nationwide consumer class action case Alleging consumer fraud / deceptive advertising of computer services and capabilities. The settlement provided the class with a collective award with a guaranteed minimum face value of six millions of dollars.

## INSURANCE CLASS ACTIONS

*Holloway v. J.C. Penney*, No. 97 C 4555, (N.D.Ill.)
One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to plaintiffs' class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

*Ramlow v. Family Health Plan* (Wisc.Cir.Ct.):
Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

## PRODUCTS LIABILITY CLASS ACTIONS

*In re Pet Foods Product Liability Litigation*, No. 07-2867 (D.NJ)
Appointed co-lead counsel in class action involving largest pet food recall in United States history.

*In re Starlink Corn Products Liability Litigation* (N.D.Ill.)
Represented sub-class of farmers who grew recalled Starlink corn in a consolidated settlement of federal class action valued in excess of $100 million.

*Kan v. Toshiba America Information Systems, Inc.* No. BC327273 (Los Angeles Sup. Ct.)
Class counsel in a defective product / breach of warranty action concerning laptop computers. The settlement provided the class with a collective award with a face value of approximately $45,000,000.

## SECURITIES CLASS ACTIONS

*Stassi et al. v. Loch Harris et al.*, No. GN 200180 (Tex)
Brought derivative action on behalf of technology development company that successfully obtained dissolution of corporation and distribution of assets to shareholders);

*In re Command Systems*, Case No. 98-cv-3279 (S.D.N.Y.)
Brought securities class action against technology company in which participating shareholders recovered over 80% of their losses

## PRIVACY CLASS ACTIONS

*Wormley v. GeoCities*, No. 196032 (Los Angeles Sup. Ct.)
Class Counsel in consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members

*Elvey v. TD AMERITRADE Inc.* (N.D.Cal.)
Pursuing class action against an Internet-based securities broker for failing to disclose a security breach which involved customer names and email addresses for over 6 million accounts.

## MASS/CLASS TORT CASES

*Aaron v. Chicago Housing Authority*, 99 L 11738, (Cook County, Illinois)
Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10,000,000.

*Sturman v. Rush Presbyterian-St. Luke's Medical Center*, 2000 L 11069 (Cook County, Ill.)

Part of team of attorneys in suit against hospital and national association of blood banks alleging failure to warn of risks of hepatits C infection as a result of past blood transfusions.

*Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D.Ind.)
Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

**EXHIBIT B**

1  KAMBEREDELSON, LLC
   ALAN HIMMELFARB
2  2757 Leonis Boulevard
   Vernon, California 90058
3  Telephone: (323) 585-8696

4  Attorneys for Plaintiff
   LINDSEY ABRAMS

5

6

7
                    UNITED STATES DISTRICT COURT
8
                   NORTHERN DISTRICT OF CALIFORNIA
9
                        SAN JOSE DIVISION
10

11
   LINDSEY ABRAMS, individually and on          Case No.  C 07-05378 PVT
12 behalf of a class of similarly situated
   individuals,                                  **DECLARATION OF RANDALL A. SNYDER**
13
                    Plaintiff,
14
             v.
15
   FACEBOOK, INC., a Delaware corporation,
16
                    Defendant.
17

18

19            **DECLARATION OF RANDALL A. SNYDER**

20      I, Randall A. Snyder, hereby declare as follows:

21  **I.   Professional Background**

22      1.  My name is Randall A. Snyder. I am an independent mobile telecommunications

23      technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada,

24      89128. I have been retained by the law firm of KamberEdelson, LLC to provide my

25
        opinions on issues concerning mobile short message service (SMS) technology,
26

27

28
   DECLARATION OF RANDALL A. SNYDER

commonly known as mobile text messaging, the use of this technology by Facebook, Inc., and the matters at issue in the instant litigation.

2. I have over 24 years of experience in mobile telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the field of mobile and cellular telecommunications, mobile and cellular networking technology and specifically short message service technology. A copy of my *curriculum vitae* is attached to this declaration.

3. I have taught many classes and seminars on mobile telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in mobile telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and mobile networks, which is now a fully accredited national standard of the American National Standards Institute (ANSI). I am the author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for mobile engineers at AT&T Wireless and Motorola for several years. The

-2-

1　latter book has also been relied upon and cited numerous times as a reference for

2　various Short Message Service (SMS) patents in the mobile industry, such as Method

3　and Apparatus for Routing Short Messages, US Patent #6308075, Method and

4　System for Wireless Instant Messaging, US Patent # 7058036 and Automatic In-Line

5　Messaging System, US Patent # 6718178. I have been granted several patents myself

6　on mobile networking technology and currently have three additional patent

7　applications filed in the area of Short Message Services for mobile technology. I have

8　also authored several articles on mobile telecommunications technology and have

9　been quoted numerous times in industry trade publications. I have consulted and been

10　employed for many mobile telecommunications companies including McCaw

11　Cellular, AirTouch, AT&T Wireless, Lucent, Nokia, Ericsson, Nextwave, MCI,

12　Sprint and other mobile technology vendors and service providers. I was a founder of

13　m-Qube, Inc. (acquired by Verisign, Inc. in 2006), which develops and markets

14　mobile text messaging services. I was also nominated in 2006 for a National

15　Television Arts Emmy Award for Outstanding Achievement in Advanced Media

16　Technology for unique mobile technology I designed while employed at Entriq, Inc.

17　Still more detail as well as details of publications that I have authored or co-authored

18　within at least the past 10 years are provided in my attached *curriculum vitae*.

## II. Overview of Facebook Mobile

4.　Facebook, Inc. provides an online application that employs what is commonly known

　　as internet-based social networking functionality. Within this online application,

　　Facebook provides a feature known as Facebook Mobile. Facebook Mobile enables

　　Facebook users to communicate with each other via mobile text messages. That is,

-3-

mobile text messages can be sent by online Facebook users to Facebook Mobile users who have registered for such mobile capability. Similarly, mobile text messages can be sent by Facebook Mobile users to other Facebook Mobile users.

5. Sending a mobile text message to a user via the Facebook application requires that the message sender know the name or alias of another user with which they wish to communicate. A mobile text message can only be sent to a user if that user has registered a mobile telephone number within their personal profile of the Facebook application. A text message is sent to a user from the Facebook application to mobile telephone numbers within another user's profile. The message sender never actually knows the mobile telephone number of the intended message recipient to successfully send the text message. The Facebook application enables sending of mobile text messages to mobile phones pseudonymously, if they wish, using only names created within their profiles.

**III. Settlement Agreement**

6. The settlement agreement reached in this matter (i.e., the "Settlement Agreement") requires Facebook to implement three main corrective actions: (1) brand each text message sent out as originating from "Facebook"; (2) include specific opt-out instructions in the body of every 15th text message Facebook sends to a particular telephone number; and (3) undertake commercially reasonable measures in cooperation with wireless carriers to prevent recycling of mobile telephone numbers.

7. Based on my experience and familiarity with the industry, I believe these steps will reduce the amount of unauthorized charges to the class for the following reasons: (1) the number of non-consenting recipients who will be confused as to the source of

-4-

Facebook's text messages, as occurred in the Plaintiff's case, will decrease and cause opt-out rates to increase; (2) the increased frequency with which recipients of Facebook Mobile text messages will receive opt-out instructions (approximately twice per month) will cause opt-out rates to increase; (3) the medium through which opt-out instructions will be communicated (i.e., a text message – the user's medium of choice) will cause opt-out rates to increase; (4) the medium through which the act of opting-out will be exercised as part of the Settlement Agreement's opt-out instructions (i.e., a text message – again, the user's medium of choice) will cause opt-out rates to increase; and (5) Facebook's enhanced coordination with the wireless carriers as provided by the Settlement Agreement will mitigate the ill-effects of recycled mobile telephone numbers.

**IV. Facebook Mobile Growth Rate**

8.  It is my understanding that approximately 14 million mobile text messages were sent to mobile phones via the Facebook Mobile application in January, 2007. Furthermore, it is my understanding that approximately 59.9 million mobile text messages were sent to mobile phones via the Facebook Mobile application in January, 2008 by approximately 1.78 million Facebook Mobile users, per Facebook's estimation. Therefore, each Facebook Mobile user received an average of 33.6 text messages in January, 2008 via the Facebook Mobile application. Based on this and other figures provided by Facebook, between January, 2007 and January, 2008, Facebook

-5-

DECLARATION OF RANDALL A. SNYDER

experienced an average month-to-month growth rate in text message volume of 12.9%.[1]

9. Assuming this rapid growth rate is not sustainable based on both the waning novelty of the Facebook Mobile application among users as well as a natural anticipated decline in ongoing growth rates, I believe a conservative monthly growth rate through mid-year 2010 in the range of 9% to 11% is reasonable. Although the terms of the Settlement Agreement provide for a period of 27 months during which Facebook will implement the corrective action, for purposes of my calculations in this declaration, I have limited that period to 24 months as I assume opt-out rates will not materially change from the status quo (as defined by Facebook's discovery responses) before the fourth month of implementation. This assumption is based on the likelihood that the opt-out rate will not increase above the status quo until the corrective action is allowed to take root throughout the Facebook Mobile user base. Therefore, for the purposes of this declaration, I assume that the corrective action will start in July, 2008 and end no sooner than June, 2010 (i.e., the "Settlement Period").

10. At this 9% to 11% monthly growth rate in the volume of mobile text messages sent to mobile phones from the Facebook application, by June, 2010 a cumulative total of between approximately 7.8 billion and 11.4 billion additional text messages will have been sent. The following table shows the figures for 9% and 11% month-to-month growth through June, 2010.

---

[1] Comparatively, 48 billion text messages are sent nationwide each month, a 157% increase from one year ago (Steve Largent, President and CEO, Cellular Telecommunications and Internet Association, April 1, 2008 Keynote Address, *CTIA2008*, Las Vegas, NV).

-6-

| MONTH | # TEXT MESSAGES (9% GROWTH PER MONTH) | # TEXT MESSAGES (11% GROWTH PER MONTH) |
|---|---|---|
| January 2008 | 59.9M (provided by Facebook) | 59.9M (provided by Facebook) |
| February 2008 | 65.3M | 66.5M |
| March 2008 | 71.2M | 73.8M |
| April 2008 | 77.6M | 81.9M |
| May 2008 | 84.6M | 90.9M |
| June 2008 | 92.2M | 100.9M |
| July 2008 (start corrective action) | 100.5M | 112M |
| August 2008 | 109.5M | 124.3M |
| September 2008 | 119.4M | 138M |
| October 2008 | 130.1M | 153.2M |
| November 2008 | 141.8M | 170.1M |
| December 2008 | 154.6M | 188.8M |
| January 2009 | 168.5M | 209.6M |
| February 2009 | 183.7M | 232.7M |
| March 2009 | 200.2M | 258.3M |
| April 2009 | 218.2M | 286.7M |
| May 2009 | 237.8M | 318.2M |
| June 2009 | 259.2M | 353.2M |
| July 2009 | 282.5M | 392.1M |
| August 2009 | 307.9M | 435.2M |
| September 2009 | 335.6M | 483.1M |
| October 2009 | 365.8M | 536.2M |
| November 2009 | 398.7M | 595.2M |
| December 2009 | 434.6M | 660.7M |
| January 2010 | 473.7M | 733.4M |
| February 2010 | 516.3M | 814.1M |
| March 2010 | 562.7M | 903.7M |
| April 2010 | 613.3M | 1003.1M |
| May 2010 | 668.5M | 1113.4M |
| June 2010 (end corrective action) | 728.7M | 1235.9M |
| TOTAL (April 2008 – June 2010) | 7.8 Billion | 11.4 Billion |

DECLARATION OF RANDALL A. SNYDER

11. Assuming the rate of messages received by Facebook Mobile users in January 2008 (i.e., 33.6 messages per month) remains the same throughout the Settlement Period, this analysis translates to between approximately 21.7 million and 36.7 million Facebook Mobile users in June, 2010. I believe this is a reasonable estimate for the growth rate of the Facebook Mobile application based on my knowledge of industry adoption rates for mobile data, user turnover as a result of the corrective action, attrition and text messaging services.

## V. Text Message Cost

12. Based on my knowledge and experience in the wireless industry, as well as an understanding of the various wireless carrier plans, bundles and costs for ad hoc text messaging, it is my opinion that each of these messages can generate an approximate average fee of up to $0.15 per message. AT&T Mobility, Verizon Wireless, Sprint Nextel and T-Mobile, the four largest domestic wireless carriers by market share, all charge individual text message fees of $0.15 per message, according to their respective websites, and such amount may increase over the Settlement Period.[2] The various text message plans that each of these wireless carriers offers equate to text

---

[2] See text messaging rate plans for AT&T Mobility, LLC; Cellco Partnership d/b/a Verizon Wireless, Sprint-Nextel Corporation and T-Mobile USA, Inc., at:
https://www.wireless.att.com/media/multimedia_messaging_purchase,
http://www.wireless.att.com/learn/messaging-internet/messaging/international.jsp,
http://products.vzw.com/index.aspx?id=messaging_im,
http://b2b.vzw.com/international/Text_Messaging/index.html,
http://support.vzw.com/features/data_services/txt_messaging.html
http://nextelonline.nextel.com/en/services/messaging/textmessaging.shtml?id16=15_t
ext_rate&id12=iSearch_MA_text,
http://www.t-mobile.com/shop/addons/services/MessagingDisclaimer.aspx,
http://www.tmobile.com/shop/addons/services/TzonesDetail.aspx?tp=Svc_Tab_TZon
es&tsp=Svc_Sub_Messaging&tssp=Svc_Sub_TextMessaging&oscid=4CD51BA7-
B5AF-4AB2-85E0-50EC0AF141F9

-8-

message fees of $0.10 per message as long ago as the Fall of 2005, according to a study on the industry at that time published by researchers at Pennsylvania State University.[3] Similarly, the Plaintiff in this action states that she was charged $0.10 by her wireless provider, Verizon Wireless, for her receipt of each text message.[4] These fees are ordinarily charged for both sent and received messages and appear as line item charges on one's cell phone bill. Therefore, I believe an average fee of between $0.10 and $0.15 per text message both sent and received is reasonable.

## VI. Rate of Improper Charges

13. There are several reasons why mobile subscribers may be subject to ongoing improper charges for mobile text messages sent to them via the Facebook Mobile application. Among these reasons are the recycling of mobile telephone numbers wherein a mobile subscriber obtains a previously used mobile telephone number with a new mobile subscription. The previous user of the mobile telephone number is a registered user of the Facebook Mobile application and has not changed the mobile telephone number registered in his or her Facebook Mobile profile. Therefore, I believe it is reasonable that as much as 1% to 2.6% of the improper text message charges may be attributable to mobile telephone number recycling, according to statistics provided by the FCC.[5]

---

[3] See *Exploiting Open Functionality in SMS-Capable Cellular Networks*, November 11, 2005, Alexandria, Virginia, USA. © 2005 ACM 1595932267, at: http://www.smsanalysis.org/smsanalysis.pdf.

[4] Comp., ¶29

[5] See *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993. Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services. Eleventh Report, 21 FCC Rcd 10947. ¶ 145 (Sept. 26, 2006)*. Cellular carriers estimated that 1.5% to 3% of their user base terminates cellular service on a monthly basis in 2005. When a telephone subscriber terminates service and

-9-

14. Another reason is that some mobile subscribers are legitimately registered Facebook Mobile users, but when they received text messages from other Facebook users, there were – prior to the Settlement Agreement - no instructions delivered with the messages that provided any indication of how to stop receiving them. In fact, if text messages were sent by mobile subscribers in response to the received Facebook Mobile text messages attempting to make them stop, they would be charged for the response text messages and they would have no effect.

15. Furthermore, according to a 2006 survey by Silverpop Systems, Inc., a provider of email marketing solutions, as many as 2% of subscribers to email marketing offers choose to opt-out of receiving additional emails when given the opportunity to do so.[6] It is reasonable to surmise that a similar percentage of subscribers to a text messaging application would choose to opt-out as well if given the opportunity. According to a September, 2007 study by M:Metrics, Inc., an international mobile media authority, "The early days of SMS advertising are similar to the advent of email…"[7] The advertising referred to comprises applications that mobile subscribers have opted-in

---

the subscriber's number is disconnected, it must either be recycled or ported to a new carrier by law. 47 C.F.R. § 52.15(f)(ii) (2007). In 2005, the combined national cellular subscriber base totaled 207 millions subscribers. Id., Table 1. Thus, nationally, some 3.1 to 6.2 million cellular subscribers terminated their service per month in 2005. Of those terminating cellular subscribers, only 887,000 of those subscribers took their phone numbers with them by porting the number to a new carrier – and the remainder left their number behind, to be recycled by the old carrier. Id., ¶ 147. Thus, it is reasonable to infer that 2.2 to 5.4 million cellular subscribers left their numbers behind to be recycled by their old carrier each month – or 1% to 2.6% of the national cellular subscriber base.)

[6] See 2006 Email List Growth Study. Silverpop Systems, Inc.; http://www.silverpop.com; © 2007 Copyright Silverpop, Atlanta, GA.
[7] See Spain Has Largest Audience for SMS-Based Mobile Advertising.
M:Metrics; http://www.mmetrics.com; © 2007 Copyright M:Metrics, Inc., Seattle, WA.

-10-

to. I believe even a higher percentage of subscribers to a text messaging application, like Facebook Mobile, would choose to opt-out. This is due to two primary factors:

1. Unlike email applications, mobile subscribers have to effectively pay for each and every mobile text message received whether that be on a line item basis or along with a bundled package.

2. Mobile subscribers are more apt to opt-out due to an ever-increasing volume of receiving unwanted mobile spam and mobile advertisements. Mobile subscribers tend to be more aware of each message received and they have no mechanism available to them to personally filter SMS messages of certain types, similar to the way email can be filtered through an email client application like Microsoft's Internet Explorer.

16. Another reason is that some mobile subscribers are charged for Facebook Mobile text messages sent to their mobile phones when their phones do not support text messaging. Charges for these text messages appear on their phone bills although messages were never received and in fact, the subscriber has no idea they were even sent. And yet another reason is that a wrong mobile telephone number could have been registered within the Facebook Mobile application, either intentionally or not, causing undesired messages to be received by mobile subscribers.

17. While I believe the opt-out rate will be materially higher for these reasons than the 2% determined for commercial email, out of an abundance of caution, I limit my estimate of the number of Facebook Mobile recipients who can be expected to respond to the opt-out instructions sent at regular intervals in the body of the text messages, as required by the Settlement Agreement, to 2%.

-11-

DECLARATION OF RANDALL A. SNYDER

## VII. Conclusion

18. I believe a reasonable estimate of 2.9% to 4.6% of the cost to recipients of text messages from Facebook (1% to 2.6% for number recycling and 2% for responding to the embedded opt-out instructions) over the Settlement Period may be improper charges, but for the corrective action taken by Facebook pursuant to the Settlement Agreement.

19. My opinions in this declaration are based upon extensive experience in the wireless industry, a detailed understanding of how mobile text messaging services operate, a detailed understanding of telephone number administration within the wireless industry and personal experience as a user of the Facebook Mobile application. If called to testify, I could and would testify competently about these opinions.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 7 , 2008

_Randall A. Snyder_
Randall A. Snyder

-12-

DECLARATION OF RANDALL A. SNYDER

**EXHIBIT C**

1  COOLEY GODWARD KRONISH LLP
   MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
2  BENJAMIN F. CHAPMAN (234436) (bchapman@cooley.com)
   4401 Eastgate Mall
3  San Diego, CA 92121
   Telephone:    (858) 550-6000
4  Facsimile:    (858) 550-6420

5  Attorneys for Defendant
   FACEBOOK, INC.

6

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12  LINDSEY ABRAMS, individually and on        Case No. 5:07-cv-05378 JF
    behalf of a class of similarly situated
13  individuals,                               DEFENDANT FACEBOOK, INC.'S
                                               RESPONSE TO PLAINTIFF'S FIRST SET OF
14                    Plaintiff,               INTERROGATORIES

15        v.

16  FACEBOOK, INC., a Delaware corporation,

17                    Defendant.

18

19  PROPOUNDING PARTY:      LINDSEY ABRAMS

20  RESPONDING PARTY:       FACEBOOK, INC.

21  SET NUMBER:             ONE

22        Pursuant to Federal Rule of Civil Procedure 33, Defendant Facebook, Inc.

23  ("FACEBOOK") responds as follows to plaintiff's first set of interrogatories:

24  I.    GENERAL RESPONSES.

25        1.      FACEBOOK's response to plaintiff's first set of interrogatories is made to the best

26  of FACEBOOK's present knowledge, information, and belief.  Said response is at all times

27  subject to such additional or different information that discovery or further investigation may

28  disclose and, while based on the present state of FACEBOOK's recollection, is subject to such

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD

RESPONSE TO INTERROGATORIES
C 07-05378 JF

1    refreshing of recollection, and such additional knowledge of facts, as may result from
2    FACEBOOK's further discovery or investigation. FACEBOOK reserves the right to make any
3    use of, or to introduce at any hearing and at trial, information and/or documents responsive to
4    plaintiff's first set of interrogatories but discovered subsequent to the date of this response,
5    including, but not limited to, any such information or documents obtained in discovery herein.

6        **2.**    To the extent that FACEBOOK responds to plaintiff's interrogatories by stating
7    that FACEBOOK will provide information and/or documents which FACEBOOK or any other
8    party to this litigation deems to embody material that is private, business confidential, proprietary,
9    trade secret, or otherwise protected from disclosure pursuant to Federal Rule of Civil Procedure
10   26(c)(7), Federal Rule of Evidence 501, California Evidence Code section 1060, or California
11   Constitution, article I, section 1, FACEBOOK will do so only upon the entry of an appropriate
12   protective order against the unauthorized use or disclosure of such information.

13       **3.**    FACEBOOK reserves all objections or other questions as to the competency,
14   relevance, materiality, privilege or admissibility as evidence in any subsequent proceeding in or
15   trial of this or any other action for any purpose whatsoever of FACEBOOK's responses herein
16   and any document or thing identified or provided in response to plaintiff's interrogatories.

17       **4.**    FACEBOOK reserves the right to object on any ground at any time to such other
18   or supplemental interrogatories as plaintiff may at any time propound involving or relating to the
19   subject matter of these interrogatories.

20   **II.**    **GENERAL OBJECTIONS.**

21       FACEBOOK makes the following general objections, whether or not separately set forth
22   in response to each interrogatory, instruction, and definition in plaintiff's first set of
23   interrogatories:

24       **1.**    FACEBOOK objects generally to the interrogatories insofar as any such
25   interrogatory seeks information or production of documents protected by the attorney-client
26   privilege or the work product doctrine. Such information or documents shall not be provided in
27   response to plaintiff's interrogatories and any inadvertent disclosure or production thereof shall

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                2.                RESPONSE TO INTERROGATORIES
                                              C 07-05378 JF

1    not be deemed a waiver of any privilege with respect to such information or documents or of any
2    work product immunity which may attach thereto.

3        2.    FACEBOOK objects to the prefatory Document Request, which applies to all the
4    interrogatories, which seeks to require FACEBOOK to identify each document "used or relied
5    upon to respond to any answer to the interrogatories" on the ground that any response thereto
6    would require subjective judgment on the part of FACEBOOK and its attorneys, and would
7    further require disclosure of a conclusion or opinion of counsel in violation of the attorney work
8    product opinion.

9        3.    FACEBOOK objects to the definitions "YOU" and "YOUR" and each
10   interrogatory containing those terms as overbroad to the extent that it purports to define
11   FACEBOOK to include more than the company and its officers, directors, agents, and employees.
12   Without waiving these objections, FACEBOOK construes the terms "YOU" and "YOUR" to
13   refer only to the company and its officers, directors, agents, and employees, and will respond to
14   interrogatories containing that term accordingly.

15       4.    FACEBOOK objects to the instruction related to the assertion of privilege to the
16   extent it seeks to require FACEBOOK to identify anything other than the specific claim of
17   privilege or work product being made and the grounds for such claim.  The instruction would
18   subject FACEBOOK to unreasonable and undue annoyance, oppression, burden and expense and
19   seeks information protected from discovery by privilege and as work product.

20       5.    FACEBOOK objects to all interrogatories to the extent they seek to require
21   FACEBOOK to search for information about documents no longer in existence or in
22   FACEBOOK'S possession, custody or control, on the grounds that said instruction is overly
23   broad, would subject FACEBOOK to undue annoyance, oppression, burden and expense, and
24   seeks to impose upon FACEBOOK an obligation to investigate information or materials from
25   third parties or services who are equally accessible to plaintiff.

26   III.    SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES.

27       Without waiving or limiting in any manner any of the foregoing General Objections, but
28   rather incorporating them into each of the following responses to the extent applicable,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                           3.                    RESPONSE TO INTERROGATORIES
                                                                    C 07-05378 JF

1    FACEBOOK responds to the specific interrogatories in plaintiff's first set of interrogatories as

2    follows:

3    INTERROGATORY NO. 1:

4        Identify the person or persons answering these interrogatories, the position with you of

5    each such person, and the person's duties. For each person so identified, specify each such

6    interrogatory that that person assisted in answering.

7    RESPONSE TO INTERROGATORY NO. 1:

8        Subject to and without waiving the General and Specific Objections, FACEBOOK

9    responds to this interrogatory as follows:

10        (1)    Jed Stremel, Manager, Mobile Product Marketing; Interrogatory No. 6.

11        (2)    Ravi Grover—Data Analyst; Interrogatory Nos. 2, 3, 6, and 7.

12        (3)    Mark Howitson—Deputy General Counsel; Interrogatory No. 11.

13    INTERROGATORY NO. 2:

14        From the date Facebook Mobile was released through January 1, 2008, identify (a) the

15    total number of telephone numbers to which a text message was sent through Facebook Mobile,

16    (b) the average daily number of text messages sent through Facebook Mobile to such telephone

17    numbers, (c) the total number of text messages sent through Facebook Mobile each month since

18    Facebook Mobile was released. Describe the process by which you made these determinations.

19    RESPONSE TO NO. 2:

20        FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

21    FACEBOOK further objects to subpart (b) as redundant. Subject to and without waiving the

22    General and Specific Objections, FACEBOOK responds to this interrogatory as follows:

23        (a)    FACEBOOK further objects to this subpart because it imposes an undue burden on

24    FACEBOOK to search through every text message transaction, and therefore is oppressive. As of

25    February 4, 2008, Facebook Mobile had 1,783,315 registered users. Additionally, at least 57,396

26    Facebook Mobile users have deactivated their telephone number from the Facebook Mobile

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD        4.        RESPONSE TO INTERROGATORIES
C 07-05378 JF

1   service.[1]   Most, if not all, of these deactivated users, likely received text messages from
2   FACEBOOK.  Accordingly, adding these two numbers together equals 1,840,711.

3       FACEBOOK recognizes that the sum of total number of registered users (1,783,315) as of
4   February 4, 2008, and the verifiable number of deactivated Facebook Mobile users (57,396), does
5   not answer the question of how many telephone numbers received a text message through
6   Facebook Mobile.  First, this number does not count many users who previously used Facebook
7   Mobile but stopped prior to February 4, 2008.  FACEBOOK does not maintain information from
8   which they can determine how many telephone numbers fall into this category.  Second, the total
9   number of users only counts users, and some users have multiple telephone numbers registered
10  with Facebook Mobile.  Third, if a user switched telephone numbers at any point, they are still
11  only counted as one individual user, even though they might have had multiple telephone
12  numbers registered with FACEBOOK at various times.  Fourth, not all registered users have
13  necessarily received a text message.

14      Despite these limitations, FACEBOOK believes that the number 1,840,711 represents the
15  closest possible estimate of telephone numbers that received a text message through Facebook
16  Mobile, based on the information that is available to FACEBOOK after a reasonable search.

17      (b)     FACEBOOK does not maintain this data.

18      (c)

19
| MONTH | # SMS SENT |
| --- | --- |
| March 2006 | 2232* |
| April 2006 | 477,129 |
| May 2006 | 1,687,007 |

23

---

24  [1] FACEBOOK maintains a deactivation log, which contains the number of total users per month
25  who either:  (a) respond to a text message from FACEBOOK by writing back "STOP," "OFF,"
    "END," "CANCEL," and/or "QUIT"; and (b) have not received a text through Facebook Mobile
26  in over 30 days; such Facebook Mobile users have their Facebook Mobile service discontinued
    until the owner requests that it be turned back on.  *See* Response to Interrogatory No. 6 for a more
27  detailed explanation of both (a) and (b).  The number 57,396 only encompasses users who
    deactivate from Facebook Mobile in these two particular ways.  It is clear that other Facebook
28  Mobile users have also deactivated from the service in other ways.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                              5.                    RESPONSE TO INTERROGATORIES
                                                                        C 07-05378 JF

| | |
|---|---|
| June 2006 | 4,205,488 |
| July 2006 | 5,025,731 |
| August 2006 | 6,560,405 |
| September 2006 | 6,319,511 |
| October 2006 | 10,538,395** |
| November 2006 | 11,597,865 |
| December 2006 | 10,983,222 |
| January 2007 | 14,013,017 |
| February 2007 | 16,096,930 |
| March 2007 | 17,483,017 |
| April 2007 | 19,352,250 |
| May 2007 | 25,156,925 |
| June 2007 | 40,486,403 |
| July 2007 | 46,569,165 |
| August 2007 | 51,675,454 |
| September 2007 | 49,630,152** |
| October 2007 | 49,813,496 |
| November 2007 | 60,781,454 |
| December 2007 | 50,331,171 |
| January 2008 | 59,957,931 |

\* Logging of text messages began on March 21, 2006.

\** Extrapolated based on partial month data due to missing data due to logging failures

INTERROGATORY NO. 3:

For each sub-part listed in Interrogatory Number 2, state how many of such text messages you estimate were sent to unintended recipients, including those who received "recycled numbers". Describe the process by which you made this determination.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD

6.

RESPONSE TO INTERROGATORIES
C 07-05378 JF

1   RESPONSE TO NO. 3:

2       FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

3   FACEBOOK further objects to this interrogatory as unintelligible because it is impossible for

4   FACEBOOK to know whether a recipient was "unintended." FACEBOOK further objects to this

5   interrogatory as unintelligible because at bottom, every telephone number is a "recycled number."

6       Subject to and without waiving the General and Specific Objections, FACEBOOK

7   responds to this interrogatory as follows: FACEBOOK is not able to know with certainty how

8   many text messaged have been sent to "unintended recipients."

9       FACEBOOK maintains a deactivation log, which contains the number of total users per

10  month who either: (a) respond to a text message from FACEBOOK by writing back "STOP,"

11  "OFF," "END," "CANCEL," and/or "QUIT"; and (b) have not received a text through Facebook

12  Mobile in over 30 days; such Facebook Mobile users have their Facebook Mobile service

13  discontinued until the owner requests that it be turned back on. *See* Response to Interrogatory

14  No. 6 for a more detailed explanation of both (a) and (b).

15      The number of users who have deactivated from Facebook Mobile's services by the

16  manners listed in (a) and (b) above, are listed below by month.

17

| MONTH | # OF USERS WHO DEACTIVATED |
|---|---|
| March 2006 | 4* |
| April 2006 | 285 |
| May 2006 | 1668 |
| June 2006 | 2086 |
| July 2006 | 1976 |
| August 2006 | 2319 |
| September 2006 | 1971 |
| October 2006 | 2995 |

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                        7.                        RESPONSE TO INTERROGATORIES
                                                              C 07-05378 JF

| | |
|---|---|
| November 2006 | 2613 |
| December 2006 | 1709 |
| January 2007 | 2318 |
| February 2007 | 1975 |
| March 2007 | 2551 |
| April 2007 | 2435 |
| May 2007 | 2826 |
| June 2007 | 4096 |
| July 2007 | 3994 |
| August 2007 | 4127 |
| September 2007 | 3400** |
| October 2007 | 3015 |
| November 2007 | 3282 |
| December 2007 | 2837 |
| January 2008 | 2914 |

* Logging of text messages began on March 21, 2006.

** Extrapolated based on partial month data due to missing data due to logging failures.

However, simply taking the total number of users on the deactivation log is not an accurate way to determine how many "unintended recipients" received text messages from FACEBOOK. First, the deactivation log is not a comprehensive list of every user who has deactivated their use of Facebook Mobile. It only registers users who have deactivated in two discrete ways. It is obvious that other users have deactivated their use of Facebook Mobile in other manners. Second, it is impossible to know why a user deactivated their telephone number from Facebook Mobile. It is not logical to assume that every person who is on the deactivation log deactivated because they were an "unintended recipient" of a text message. In fact, many of the users who are on the deactivation log were deactivated because they DID NOT receive text messages from Facebook Mobile for over thirty days.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                                     8.                     RESPONSE TO INTERROGATORIES
                                                                        C 07-05378 JF

1　　　At bottom, FACEBOOK is not able to know with certainty how many text messages have

2　been sent to "unintended recipients," nor is it able to offer a reasonable estimate.

3　INTERROGATORY NO. 4:

4　　　Identify all third-party controlled applications ("Application" or "Application") that

5　originate text messages sent through Facebook Mobile. Identify the third-parties that control each

6　such Application and state whether Facebook maintains a Beneficial Interest, as that term is

7　defined herein, in any such third-party. Identify the total number of text messages sent through

8　Facebook Mobile by such Applications each month since Facebook Mobile was released to

9　January 1, 2008. Describe the process by which you made these determinations.

10　RESPONSE TO NO. 4:

11　　　FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

12　FACEBOOK further objects to this interrogatory on the grounds that the term "Beneficial

13　Interest" is vague, ambiguous, and unintelligible. Interpreting the term "Beneficial Interest" for

14　purposes of responding to this interrogatory would require subjective judgment on the part of

15　FACEBOOK'S attorneys and a conclusion or opinion of counsel in violation of the attorney work

16　product doctrine. FACEBOOK further objects to this interrogatory on the grounds that the term

17　"Application" is vague, ambiguous, and unintelligible. Interpreting the term "Application" for

18　purposes of responding to this interrogatory would require subjective judgment on the part of

19　FACEBOOK'S attorneys and a conclusion or opinion of counsel in violation of the attorney work

20　product doctrine.

21　　　FACEBOOK further objects to this interrogatory as seeking irrelevant information that

22　has no legitimate connection to any issue in this case and constitutes sensitive, confidential,

23　proprietary and privileged information.

24　INTERROGATORY NO. 5:

25　　　For Interrogatory Numbers 2-5, including the respective sub-parts, please provide

26　estimates of the number of such text messages that you expect will be sent to the respective

27　recipients within the next two years. Describe the process by which you made this determination.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD

9.

RESPONSE TO INTERROGATORIES
C 07-05378 JF

1    RESPONSE TO NO. 5:

2        FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

3    FACEBOOK further objects to this interrogatory as speculative. FACEBOOK further objects to

4    this interrogatory on the grounds that it calls for an inadmissible hypothetical opinion.

5    INTERROGATORY NO. 6:

6        Identify with specificity the steps taken by Facebook prior to the filing of this lawsuit to

7    prevent Facebook's transmission of unauthorized text messages.

8    RESPONSE TO NO. 6:

9        FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

10   FACEBOOK further objects to this interrogatory on the grounds that the term "unauthorized" is

11   vague, ambiguous, argumentative, and unintelligible. FACEBOOK further objects to this

12   interrogatory on the grounds that the term "steps" is vague, ambiguous, and unintelligible.

13       Subject to and without waiving the General and Specific Objections, FACEBOOK

14   responds to this interrogatory as follows: FACEBOOK implemented a process with AT&T and

15   Verizon whereby those companies would provide notice to FACEBOOK of the deactivation of

16   mobile telephone numbers. Upon receipt of such notice, FACEBOOK would take action

17   internally to stop messages from being sent to the mobile telephone numbers provided by AT&T

18   and Verizon.

19       FACEBOOK implemented this process with AT&T around May, 2006. However, in late

20   2006, a technical problem arose, and AT&T stopped providing such notice to FACEBOOK. This

21   technical problem was corrected, and AT&T resumed giving FACEBOOK notice starting again

22   in approximately October/November, 2007. FACEBOOK also implemented this process with

23   Verizon in November, 2007. Unfortunately, other mobile telephone operators would not provide

24   notice of deactivation of mobile telephone numbers to FACEBOOK.

25       FACEBOOK also supports and recognizes industry-standard opt-out commands such as

26   "STOP," "OFF," "END," "CANCEL," and/or "QUIT." FACEBOOK also recognizes any of

27   those words if they are followed with a space and more text—for example, "CANCEL SMS" or

28   "STOP SENDING MESSAGES." Thus, by way of example, if a mobile telephone owner

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                                    10.                    RESPONSE TO INTERROGATORIES
                                                                       C 07-05378 JF

1   receives an unwanted text message through FACEBOOK, they can respond to the message with

2   the message "STOP" and/or "OFF" and FACEBOOK immediately discontinues such text

3   messages.

4         Further, when FACEBOOK receives an error message in response to sending a text

5   message to a particular telephone number (meaning the telephone number is no longer in service),

6   FACEBOOK turns off FACEBOOK Mobile for that particular telephone number.

7         Additionally, if a Facebook Mobile user is inactive (meaning they do not receive a text

8   message) for thirty (30) days, FACEBOOK sends a message to the mobile telephone owner

9   stating: "You have not used Facebook texts in over 30 days. Notifications will be turned off. To

10  continue receiving Facebook Mobile Texts, reply 'ON' to this message." Upon FACEBOOK

11  sending this message, text messages are not sent to the mobile telephone owner until the owner

12  requests that they be turned back on.

13        FACEBOOK also supports any customer service requests made through carriers by

14  mobile telephone owners, but FACEBOOK is not aware of ever receiving such a request.

15        FACEBOOK also maintains information on its website informing mobile telephone

16  owners    on    how    to    stop    receiving    text    messages    from    FACEBOOK.    *See*

17  http://www.facebook.com/help.php?page=8.    For example, under the heading "How can I

18  stop/start getting Facebook texts?", it states: "Set Facebook texts to 'on' or 'off' by following the

19  'Edit Preferences' link on the Mobile page. Alternatively , just text 'on' or 'off' to FBOOK

20  (32665)." Further, on that same help page, under the heading "Will Facebook ever spam my

21  phone?", it states: "No, Facebook will never send you any unsolicited texts."

22        FACEBOOK is also in the midst of building a process by which all mobile telephone

23  operators may identify deactivated customer telephone numbers to FACEBOOK. FACEBOOK

24  hopes to launch this process in February 2008.

25  **INTERROGATORY NO. 7:**

26        Prior to the filing of this lawsuit, identify the percentage of the text messages sent through

27  Facebook Mobile which (a) informed the recipient how to opt out of receiving future text

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                    11.                    RESPONSE TO INTERROGATORIES
                                                       C 07-05378 JF

1  messages and (b) contained language stating that the message was sent via Facebook. Please also

2  identify any form messages you believe satisfies the criteria for either sub-part.

3  RESPONSE TO NO. 7:

4      Subject to and without waiving the General Objections, FACEBOOK responds to this

5  interrogatory as follows:

6      (a)    FACEBOOK disclosed on its website how to opt out of receiving text messages,

7  FACEBOOK does not believe that it did so in the actual text messages that were sent through

8  Facebook Mobile, which is understandable given the small number of individual characters that

9  can be sent in text messages.

10      (b)    It is FACEBOOK's understanding that most, if not all text messages sent through

11  Facebook Mobile indicated that the message was being sent through FACEBOOK. Here are

12  three different form messages, all of which contain language indicating they are from

13  FACEBOOK:

14      (1)    Confirmed! Text 'srch' followed by a name to FBOOK (32665) to search.
    'p' to poke, 'm' to msg, 'w' wall post (ie 'p john smith'). '@ msg' to set your

15      status.

16      (2)    {name} has requested to add you as a friend on Facebook. Reply 'a' to add,
    or 'info' to get profile. Reply to msg {name} back. [last sentence not

17      included if that would put SMS over character limit]

18      (3)    Facebook msg from {name}

19      Subj: {subject}
    {message}

20  INTERROGATORY NO. 8:

21      To the extent that Facebook decided not to (a) inform recipients how to opt out of

22  receiving future text message and/or (b) uniformly disclose that its text messages were connected

23  to Facebook, identify the reasons for those decisions and any related documents. If one of the

24  reasons was based on a concern that recipients might opt out of receiving future messages, please

25  provide any estimates you made of the number of such recipients who would likely opt out. If

26  one of the reasons was related to financial concerns, please provide any estimates of the costs

27  associated with making such disclosures.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD    12.    RESPONSE TO INTERROGATORIES
C 07-05378 JF

1   RESPONSE TO NO. 8:

2       FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

3   FACEBOOK further objects to this interrogatory on the grounds that it is argumentative, as it

4   assumes that FACEBOOK made a conscious "decision" to take, or not take, certain actions.

5   FACEBOOK further objects to this interrogatory on the grounds that it is argumentative, as it

6   assumes that FACEBOOK had a duty to inform recipients how to opt out of receiving text

7   messages or to identify that text messages are from FACEBOOK, which is a disputed fact.

8       Subject to and without waiving the General and Specific Objections, FACEBOOK

9   responds to this interrogatory as follows: FACEBOOK disclosed on its website how to stop

10  receiving text messages.

11  INTERROGATORY NO. 9:

12      Please explain whether and to what extent Facebook and/or its business partners

13  generated, generate, or within the next two years are expected to generate, revenue through the

14  transmissions of Facebook Mobile text messages and identify any related documents.

15  RESPONSE TO NO. 9:

16      FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

17  FACEBOOK further objects to this interrogatory as overly broad and as seeking information

18  beyond the scope of permissible discovery to the extent it requests information on FACEBOOK'S

19  business dealings with its "partners." FACEBOOK further objects to this interrogatory on the

20  grounds that this information has no legitimate connection to any issue in this case and constitutes

21  sensitive, confidential, proprietary, privileged, and trade secret information, the disclosure of

22  which could severely damage FACEBOOK'S business.

23  INTERROGATORY NO. 10:

24      Please identify all documents and facts which you intend to rely upon, or provide to the

25  Court, in opposing plaintiff's petition regarding attorneys' fees and an incentive award.

26  RESPONSE TO NO. 10:

27      FACEBOOK objects to this interrogatory on the grounds that it is premature.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

571681 v1/SD                    13.                    RESPONSE TO INTERROGATORIES
                                                       C 07-05378 JF

1    INTERROGATORY NO. 11:

2       Identify any other lawsuit or governmental action filed or threatened to be filed involving

3    any of the issues raised in this litigation.

4    RESPONSE TO NO. 11:

5       Subject to and without waiving the General Objections, FACEBOOK responds to this

6    interrogatory as follows:  None.

7    INTERROGATORY NO. 12:

8       Please provide an estimate of the value of the benefits conveyed through the settlement of

9    this litigation, describe the process by which you made this determination, and state all facts that

10   you believe are relevant to making such an estimate.

11   RESPONSE TO NO. 12:

12      FACEBOOK objects to this interrogatory on the grounds that it is vague and ambiguous.

13   FACEBOOK further objects to this interrogatory on the grounds that the term "benefits" is vague,

14   ambiguous, and unintelligible.  FACEBOOK further objects to this interrogatory on the grounds

15   that responding to this interrogatory would require subjective judgment on the part of

16   FACEBOOK'S attorneys and a conclusion or opinion of counsel in violation of the attorney work

17   product doctrine.  FACEBOOK further objects to this interrogatory on the grounds that it is

18   improperly directed to FACEBOOK—it is up to the Court to determine the value of the benefits

19   conveyed through the settlement of this litigation.   FACEBOOK further objects to this

20   interrogatory as speculative.  FACEBOOK further objects to this interrogatory on the grounds

21   that it calls for an inadmissible hypothetical opinion.

22

23   Dated: February 8, 2008          COOLEY GODWARD KRONISH LLP
                            MICHAEL G. RHODES (116127)

24                           BENJAMIN F. CHAPMAN (234436)

25

26                           Michael G. Rhodes (116127)

27                           Attorneys for Defendant
                           FACEBOOK, INC.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO      571681 v1/SD             14.            RESPONSE TO INTERROGATORIES
                                      C 07-05378 JF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, RAVI GROVER, declare:

I have read Defendant Facebook, Inc.'s Response to Plaintiff's First set of Interrogatories, and know the contents thereof. The matters stated therein are true to the best of my information and belief and on that ground I declare under penalty of perjury under the laws of the State of California that the same are true and correct.

Date: February _8_, 2008

_____
                                    RAVI GROVER

**EXHIBIT D**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

**LINDSAY ABRAMS,** individually and on
behalf of a class of similarly situated
individuals

**Plaintiffs,**

vs.

**FACEBOOK, INC.,** a Delaware
corporation

**Defendants**

### Expert Report of Donald L. Frankenfeld
### May 6, 2008

### Scope of Engagement and Conclusion

I have been asked to determine the economic value to class members of corrective action
taken by Facebook in the above captioned matter. I have requested and received pertinent
documents, including the April 18, 2008 declaration of Randall A. Snyder, and the
Defendant's Response to Plaintiff's First Set of Interrogatories. It is my opinion,
expressed with a reasonable degree of economic certainty, that the value of relief to the
class based on the "midpoint" of Mr. Snyder's analysis is $39,321,506.

### Qualifications

I am a graduate of Yale University (AB 1970) and Harvard Business School (MBA
1975). In 1987 I became a Bush Foundation Fellow and returned to Harvard, where I
studied at Harvard Law School, Harvard Business School, and the Kennedy School of
Government, earning an MPA degree in 1988.

I have worked over the years as a securities analyst, portfolio manager, investment
economist, brokerage firm branch office manager, accountant, state senator, and
securities arbitrator. Since 1984 I have accepted testimonial or consulting engagements as
a forensic economist and financial expert. I have testified more than 80 times in state and
federal courts and in securities arbitrations throughout the United States.

I have particular expertise in computer modeling of economic damages. In 2002, I
developed a damage calculation model, available online at no charge to claimants before
the federal September 11th Victim Compensation Fund. The model became the most

widely used economic tool for claimants, employed in the evaluation of approximately 1,000 claims. In addition, I appeared before the Victim Compensation Fund as a testimonial expert approximately 70 times.

Initially, my forensic engagements were exclusively on behalf of defendants. In recent years, my engagements have been proportioned about one-third to defense cases and two-thirds to plaintiff.

My billing rate for this case is $200 an hour.

## Method

My method incorporates five conclusions offered by Mr. Snyder. First, Facebook's text messaging (SMS) volume as of January, 2008, was 59,957,931 units. Second, monthly growth in SMS volume will moderate somewhat from its prior twelve month growth rate of 12.9% per month, and will be in a range of 9% to 11% per month during the relief period. Third, the estimated cost to a recipient of an SMS unit is within a range of $.10 to $.15 per unit. Fourth, the proportion of improper charges owing to number recycling is within a range of 1.0% to 2.6%. Fifth, the proportion of improper charges owing to opting out is 2.0%; adjusting for some overlap between number recycling and opting out, the adjusted opt-out allowance is 1.98%.

Chart I below uses a logarithmic scale to show historical and projected volume growth. Excluding the initial takeoff phase of the Facebook service in the spring of 2006, volume growth averaged just under 13% per month. Extrapolating the historical trend to the end of the relief period yields estimated volume of 2.27 billion units in the final month. By contrast, the upper end of Mr. Snyder's estimated range leads to a projection of 1.24 billion units, while the lower range leads to a projection of 729 million units.

**Chart I: Monthly growth in SMS units, historical and projected**



The ranges adduced by Mr. Snyder, when applied one to another to determine a dollar value, produce a multiplicity of potential results. Therefore, Appendix I reflects nine scenarios employing different combinations of the most important variables, monthly growth rate in unit volume and the cost to the recipient of each message unit. Although the relief period extends for 27 months, I have evaluated damages over a 24-month period to allow for a possible lag in implementation and effectiveness.

My central estimate of value is based on the midpoint of Mr. Snyder's conclusions; that is, unit growth of 10% per month, unit value of $.125 per message, a number recycling rate of 1.8%, and an opt-out rate (adjusted to eliminate double counting) of 1.98%. The chart below shows the dynamics of this analysis.

**Chart II: Projected monthly SMS Volume and Improper Charges**



Using the left vertical scale, the top line shows projected volume growth of ten percent, extending month-by-month from January, 2008 (the base provided by Facebook) to the end of a 24-month relief period assumed to begin in July, 2008 and extending to June, 2010. Note that while unit volume is necessarily projected during the interval between January and July, 2008, the value of these messages is ultimately excluded from the settlement valuation.

3

Using the right vertical scale, the three lines below the top line show the growth in unit value, month by month, with assumed value per message unit of $.125, and a cumulative improper charge rate of 2.98%, 3.78%, and 4.58%, respectively.

My generalized method to determine settlement value was as follows. First, I projected SMS volume, month by month. In my base case (Appendix Page 5), the rate employed was 10% per month, so that, for example, the projected volume in April of 2009 is 250,459,158 units. Second, I applied a unit value ($.125 in my base case) to each month's volume, month by month. Again, using April, 2009 as an example, the dollar value of SMS units is estimated at $31,307,395. Third, I adjusted SMS value downward by 3.2% to allow for deactivations that would have occurred even in the absence of remedial action. Fourth, I applied to the result, in turn, estimated improper charges due to number recyling at 1.0%, 1.8%, and 2.6%, respectively. Fifth, I likewise applied estimates of adjusted opt-out charges at 1.98%, which is Mr. Snyder's minimum rate. Sixth, I aggregated the proportions of steps four and five, and displayed the result, month by month, in the section labeled "Total Improper Charges." Once again, using April, 2009 as an example, estimated improper charges range from a low of $902,933 to a high of $1,387,729. Seventh, I deducted an amount to allow for the fact that even class members who deactivate service after receiving an SMS deactivation alert after fifteen calls will bear an expense of approximately $1.60 to $2.40 before they deactivate. Eighth, each monthly figure was reduced to present value, applying the discount rate currently available from Treasury securities. Finally, the results were arrayed, from low to high for each month, and totaled to reach a final estimate of value. The low estimate for the base case is $30,451,079; the midpoint estimate is $39,321,506, and the upper range estimate is $48,191,934.

The base case analysis is displayed in detail on page 5 of Appendix I, bracketed by eight additional scenarios embodying the low, midpoint and high end of Mr. Snyder's range of monthly growth rates from 9% to 11%, and a corresponding low, midpoint and high range of message unit value from $.10 to $.15.

## Summary and Conclusion

Table I below summarizes the analysis, using the low, middle and high ranges of Mr. Snyder's conclusions regarding growth and call value. Note that each dollar figure below reflects the midpoint of one of nine scenarios detailed in Appendix I and highlighted in bold on each page of the Appendix. This table permits the finder of fact to calibrate the effect of applying different assumptions to the valuation model.

| Call Value ↔ | | Snyder Low | Snyder Middle | Snyder Upper |
|---|---|---|---|---|
| | | $0.100 | $0.125 | $0.150 |
| Growth | 9.0% | $25,967,094 | $32,458,867 | $38,950,641 |
| | 10.0% | $31,457,205 | $39,321,506 | $47,185,808 |
| | 11.0% | $38,156,491 | $47,695,613 | $57,234,736 |

*Prepared by*
*Donald L Drankfeld*

*May 4, 2008*

4

APPENDIX I

SMS Volume Growth 9% Monthly, Call Value $0.10

| Growth | 9% |
|---|---|
| Call Value | $0.100 |

| Month | SMS Volume 9% | Gross SMS Value @ $0.100 | Net SMS Value @ 3.2% Pre-Reactivation/Deactivation Rate | Improper Charges Due to Number Recycling | | | Improper Charges Due to Opting Out (adjusted) | Total Improper Charges | | | Less 1st Call Lag Allowance | Discount Factor | Value to Citied | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1.0% | 1.9% | 2.5% | 1.9% | 2.0% | 3.70% | 4.59% | | | Low Range | Midpoint* | Upper Range |

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

SMS Volume Growth 9% Monthly, Call Value $0.125

| Growth | 9% | | | | | | | | | | | | | |
| Cα'l Value | $0.125 | | | | | | | | | | | | | |
| Month | SMS Volume | Gross SMS Value @ $0.125 | Net SMS Value @ 3.5% Pre-Remittance Identification Rate | Empnoyer Charges Due to Number Recycling | | | Empnoyer Charges Due to Cycling Out (adjusted) | Total Empnoyer Charges | | | Less 15 Cal Day Allowance | Discount Factor | Value to Client | Midpoint* | Upper Range |
| | 9% | $0.125 | 3.5% | 1.0% | .8% | 2.5% | 1.00% | 2.99% | 3.3% | 4.5% | 4.5% | | Low Range | | |

(Detailed monthly data rows Jan-08 through Mar-10 and Total — numeric values not legibly reproducible)

Page 2 of 9

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

SMS Volume Growth 9% Monthly, Call Value $0.15

Growth: 9%
Call Value: $0.150

| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 2.2% Per Annum Cumulative DeesOverston Rate | Improper Charges Over to Number Recycling 1.0% | 1.1% | 2.0% | Improper Charges Due to Opting Out (adjusted) 1.0% | 2.0% | Total Improper Charges 2.5% | 3.7% | 4.5% | Less 15 Call Lag Allowance | Directional Factor | Value to Close Low Range | Midpoint* | Upper Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-08 | | | | | | | | | | | | | | | | |
| Feb-08 | | | | | | | | | | | | | | | | |
| Mar-08 | | | | | | | | | | | | | | | | |
| Apr-08 | | | | | | | | | | | | | | | | |
| May-08 | | | | | | | | | | | | | | | | |
| Jun-08 | | | | | | | | | | | | | | | | |
| Jul-08 | | | | | | | | | | | | | | | | |
| Aug-08 | | | | | | | | | | | | | | | | |
| Sep-08 | | | | | | | | | | | | | | | | |
| Oct-08 | | | | | | | | | | | | | | | | |
| Nov-08 | | | | | | | | | | | | | | | | |
| Dec-08 | | | | | | | | | | | | | | | | |
| Jan-09 | | | | | | | | | | | | | | | | |
| Feb-09 | | | | | | | | | | | | | | | | |
| Mar-09 | | | | | | | | | | | | | | | | |
| Apr-09 | | | | | | | | | | | | | | | | |
| May-09 | | | | | | | | | | | | | | | | |
| Jun-09 | | | | | | | | | | | | | | | | |
| Jul-09 | | | | | | | | | | | | | | | | |
| Aug-09 | | | | | | | | | | | | | | | | |
| Sep-09 | | | | | | | | | | | | | | | | |
| Oct-09 | | | | | | | | | | | | | | | | |
| Nov-09 | | | | | | | | | | | | | | | | |
| Dec-09 | | | | | | | | | | | | | | | | |
| Jan-10 | | | | | | | | | | | | | | | | |
| Feb-10 | | | | | | | | | | | | | | | | |
| Mar-10 | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | |

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

# SMS Volume Growth 10% Monthly, Call Value $0.10

| Growth | 10% | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Call Value | $0.100 | | | | | | | | | | | | | | |
| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 3.2% Pre-Remediation Deactivation Rate | Improper Charges Due to Number Recycling | | | Improper Charges Due to Opting Out (adjusted) | Total Improper Charges | | | Less 15 Call Lag Allowance | Discount Factor | Value to Class | | |
| | 10% | $0.100 | | 1.0% | 1.8% | 2.6% | 1.98% | 2.98% | 3.78% | 4.58% | | | Low Range | Midpoint* | Upper Range |
| Jan-08 | 59,957,931 | $5,995,793 | $5,802,818 | $58,029 | $104,451 | $150,873 | $114,895 | $172,924 | $219,347 | $265,768 | | | | | |
| Feb-08 | 65,953,724 | $6,595,372 | $6,383,100 | $63,831 | $114,896 | $165,961 | $126,385 | $190,216 | $241,281 | $292,346 | | | | | |
| Mar-08 | 72,549,097 | $7,254,910 | $7,021,410 | $70,214 | $126,385 | $182,557 | $139,024 | $209,238 | $265,409 | $321,581 | | | | | |
| Apr-08 | 79,804,006 | $7,980,401 | $7,723,561 | $77,236 | $139,024 | $200,812 | $152,928 | $230,163 | $291,950 | $353,739 | | | | | |
| May-08 | 87,784,407 | $8,778,441 | $8,495,807 | $84,958 | $152,926 | $220,894 | $168,219 | $253,178 | $321,145 | $389,113 | | | | | |
| Jun-08 | 96,562,847 | $9,656,285 | $9,345,497 | $93,455 | $168,219 | $242,983 | $185,041 | $278,496 | $353,260 | $428,024 | | | | | |
| Jul-08 | 106,219,132 | $10,621,913 | $10,280,047 | $102,800 | $185,041 | $267,281 | $203,545 | $306,345 | $388,586 | $470,826 | -$231,610 | 0.9985 | $74,372 | $156,487 | $238,603 |
| Aug-08 | 116,841,045 | $11,684,105 | $11,308,052 | $113,081 | $203,545 | $294,009 | $223,899 | $336,980 | $427,444 | $517,909 | -$23,151 | 0.9970 | $312,809 | $403,080 | $493,190 |
| Sep-08 | 128,505,153 | $12,850,515 | $12,438,857 | $124,389 | $223,899 | $323,410 | $246,289 | $370,678 | $470,189 | $569,700 | -$25,466 | 0.9955 | $343,530 | $442,590 | $541,649 |
| Oct-08 | 141,377,665 | $14,137,766 | $13,682,742 | $136,827 | $246,289 | $355,751 | $270,919 | $407,746 | $517,208 | $626,670 | -$26,013 | 0.9940 | $377,269 | $486,069 | $594,669 |
| Nov-08 | 155,516,431 | $15,551,643 | $15,051,037 | $150,510 | $270,918 | $391,326 | $298,010 | $448,520 | $568,928 | $689,337 | -$30,614 | 0.9925 | $414,328 | $533,820 | $653,319 |
| Dec-08 | 171,066,475 | $17,106,567 | $16,556,115 | $165,561 | $298,010 | $430,459 | $327,811 | $493,372 | $625,821 | $758,270 | -$33,835 | 0.9910 | $455,011 | $584,261 | $713,511 |
| Jan-09 | 188,173,672 | $18,817,367 | $18,211,730 | $182,117 | $327,811 | $473,505 | $360,592 | $542,710 | $688,403 | $834,097 | -$37,285 | 0.9894 | $499,698 | $643,854 | $788,010 |
| Feb-09 | 206,991,039 | $20,699,134 | $20,032,931 | $200,329 | $360,593 | $520,855 | $396,651 | $596,981 | $757,244 | $917,507 | -$41,013 | 0.9879 | $549,773 | $707,105 | $865,437 |
| Mar-09 | 227,690,143 | $22,769,014 | $22,036,194 | $220,362 | $396,651 | $572,941 | $436,317 | $656,679 | $832,968 | $1,009,258 | -$45,115 | 0.9865 | $602,860 | $774,569 | $950,470 |
| Apr-09 | 250,459,190 | $25,045,910 | $24,239,813 | $242,399 | $436,317 | $630,235 | $479,948 | $722,346 | $916,265 | $1,110,183 | -$49,626 | 0.9850 | $661,855 | $852,657 | $1,043,855 |
| May-09 | 275,505,073 | $27,550,507 | $26,663,794 | $266,638 | $479,948 | $693,259 | $527,943 | $794,581 | $1,007,891 | $1,221,202 | -$54,589 | 0.9835 | $726,856 | $936,640 | $1,146,423 |
| Jun-09 | 303,055,581 | $30,305,558 | $29,330,174 | $293,302 | $527,943 | $762,585 | $580,737 | $874,039 | $1,108,681 | $1,343,322 | -$60,048 | 0.9820 | $798,240 | $1,028,652 | $1,259,065 |
| Jul-09 | 333,361,130 | $33,336,114 | $32,263,181 | $322,632 | $580,737 | $838,843 | $638,811 | $961,443 | $1,219,549 | $1,477,654 | -$66,052 | 0.9805 | $876,634 | $1,129,704 | $1,382,774 |
| Aug-09 | 366,697,253 | $36,669,725 | $35,489,510 | $354,895 | $638,811 | $922,727 | $702,692 | $1,057,587 | $1,341,503 | $1,625,420 | -$72,658 | 0.9790 | $962,727 | $1,240,083 | $1,518,638 |
| Sep-09 | 403,366,978 | $40,336,698 | $39,038,461 | $390,385 | $702,692 | $1,015,000 | $772,962 | $1,163,346 | $1,475,654 | $1,787,962 | -$79,874 | 0.9775 | $1,057,375 | $1,362,563 | $1,667,851 |
| Oct-09 | 443,703,676 | $44,370,368 | $42,942,307 | $429,423 | $772,962 | $1,116,500 | $850,258 | $1,279,681 | $1,623,219 | $1,966,758 | -$87,916 | 0.9760 | $1,161,104 | $1,496,416 | $1,831,728 |
| Nov-09 | 488,074,043 | $48,807,404 | $47,236,538 | $472,365 | $850,258 | $1,228,150 | $935,283 | $1,407,649 | $1,785,541 | $2,163,433 | -$96,707 | 0.9745 | $1,275,139 | $1,643,419 | $2,011,700 |
| Dec-09 | 536,881,447 | $53,688,145 | $51,960,192 | $519,602 | $935,283 | $1,350,965 | $1,028,812 | $1,548,414 | $1,964,095 | $2,379,777 | -$106,378 | 0.9731 | $1,400,367 | $1,804,862 | $2,209,357 |
| Jan-10 | 590,569,597 | $59,056,959 | $57,156,311 | $571,562 | $1,028,812 | $1,486,061 | $1,131,693 | $1,703,255 | $2,160,505 | $2,617,754 | -$117,016 | 0.9716 | $1,537,894 | $1,982,165 | $2,426,436 |
| Feb-10 | 649,626,551 | $64,962,655 | $62,871,853 | $628,718 | $1,131,693 | $1,634,668 | $1,244,862 | $1,873,581 | $2,376,555 | $2,879,530 | -$128,718 | 0.9701 | $1,693,924 | $2,176,884 | $2,664,843 |
| Mar-10 | 714,589,206 | $71,458,921 | $69,159,015 | $691,590 | $1,244,862 | $1,798,134 | $1,369,348 | $2,060,938 | $2,614,211 | $3,167,483 | -$141,587 | 0.9687 | $1,854,791 | $2,390,732 | $2,926,673 |
| Apr-10 | 786,048,127 | $78,604,813 | $76,074,917 | $760,749 | $1,369,348 | $1,977,940 | $1,506,283 | $2,267,033 | $2,875,632 | $3,484,231 | -$155,744 | 0.9672 | $2,036,944 | $2,625,587 | $3,214,229 |
| May-10 | 864,652,940 | $86,465,294 | $83,682,400 | $836,824 | $1,506,283 | $2,175,743 | $1,656,912 | $2,493,736 | $3,163,195 | $3,832,654 | -$171,323 | 0.9657 | $2,242,986 | $2,883,512 | $3,536,038 |
| Jun-10 | 951,118,274 | $95,111,827 | $92,050,640 | $920,506 | $1,656,912 | $2,393,317 | $1,822,603 | $2,743,109 | $3,479,515 | $4,215,920 | -$184,455 | 0.9643 | $2,456,671 | $3,166,775 | $3,876,878 |
| Total | 9,862,721,262 | $986,272,126 | $954,728,454 | $9,545,290 | $17,181,521 | $24,817,753 | $18,899,673 | $28,444,963 | $36,081,194 | $43,717,425 | -$2,071,010 | | $24,360,661 | $31,457,205 | $38,553,547 |

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

## SMS Volume Growth 10% Monthly, Call Value $0.125

| Growth | 10% |
| Call Value | $0.125 |

| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 2.3% Pre-Remediation Deactivation Rate | Improper Charges Due to Nominal Recycling | | | | | Improper Charges Due to Opting Out (adjusted) | Total Improper Charges | | | | Less 15 Cent Lag Allowance | Discount Factor | Value to Class | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | .5% | 1% | 1.5% | 2% | 2.5% | 1.5% | 2.5% | 3% | 3.5% | 4.5% | | | Low Range | Midpoint* | Upper Range |

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

SMS Volume Growth 10% Monthly, Call Value $0.15

| Growth | 10% | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Call Value | $0.150 | | | | | | | | | | | | | | | |
| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 3.7% Pre-Resuscitation Rate | Improper Charges Due to Number Recycling | | | Improper Charges Due to Opting Out (adjusted) | Total Improper Charges | | | Less 15 Call Lag Allowance | Discount Factor | Value to Class | | Midpoint* | Upper Range |
| | 10% | $0.150 | | 1.3% | 1.8% | 2.0% | 1.00% | 1.00% | 3.70% | 4.16% | | | Low Range | | | |

*Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

SMS Volume Growth 11% Monthly, Call Value $0.10

Growth: 11%
Call Value: $0.10

| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 11% Pre-Annualized Distribution Rate | Interpreter Charges Due to Number Recycling | | | Employer Charges Due to Opting Out (adjusted) | | | Total Employer Charges | | | Less 15 Call Log Allowance | Discount Factor | Value to Client | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 11% | 6% | 1% | 11% | 6% | 1% | 3.9% | 2.1% | 4.5% | | | Low Range | Midpoint* | Upper Range |

*Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

APPENDIX I

# SMS Volume Growth 11% Monthly, Call Value $0.125

| Growth | 11% | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Call Value | $0.125 | | | | | | | | | | | | | |
| Month | SMS Volume | Gross SMS Value | Net SMS Value @ 3.2% Pre-Remediation Deactivation Rate | Improper Charges Due to Number Recycling | | | Improper Charges Due to Opting Out (adjusted) | Total Improper Charges | | | Less 15 Call Lag Allowance | Discount Factor | Value to Class | | |
| | | | | | | | | | | | | | Low Range | Midpoint* | Upper Range |
| | 11% | $0.125 | | 1.0% | 1.4% | 2.6% | 1.98% | 2.95% | 3.78% | 4.56% | | | | | |
| Jan-08 | 59,457,931 | $7,494,741 | $7,253,523 | $72,535 | $130,563 | $188,592 | $143,620 | $216,155 | $274,183 | $332,211 | | | | | |
| Feb-08 | 66,551,303 | $8,319,163 | $8,051,411 | $80,514 | $144,925 | $209,137 | $159,418 | $239,932 | $304,343 | $368,755 | | | | | |
| Mar-08 | 73,874,167 | $9,234,271 | $8,937,066 | $89,371 | $160,867 | $232,364 | $176,954 | $266,325 | $337,821 | $409,358 | | | | | |
| Apr-08 | 82,000,325 | $10,250,041 | $9,920,143 | $99,201 | $178,563 | $257,924 | $196,419 | $295,620 | $374,981 | $454,343 | | | | | |
| May-08 | 91,020,361 | $11,377,545 | $11,011,359 | $110,114 | $198,204 | $286,295 | $218,025 | $328,138 | $416,229 | $504,320 | | | | | |
| Jun-08 | 101,032,601 | $12,629,075 | $12,222,600 | $122,226 | $220,007 | $317,788 | $242,000 | $364,234 | $462,015 | $559,795 | | | | | |
| Jul-08 | 112,146,187 | $14,018,273 | $13,567,095 | $135,671 | $244,208 | $352,744 | $268,628 | $404,299 | $512,836 | $621,373 | -$305,535 | 0.9985 | $90,151 | $206,524 | $314,897 |
| Aug-08 | 124,482,267 | $15,560,283 | $15,059,476 | $150,595 | $271,071 | $391,546 | $298,170 | $448,772 | $569,249 | $689,724 | -$33,609 | 0.9970 | $413,805 | $533,916 | $654,028 |
| Sep-08 | 138,175,317 | $17,271,915 | $16,716,018 | $167,160 | $300,888 | $434,616 | $330,977 | $498,137 | $631,865 | $765,594 | -$37,306 | 0.9955 | $458,572 | $591,691 | $724,815 |
| Oct-08 | 153,374,601 | $19,171,825 | $18,554,760 | $185,548 | $333,986 | $482,424 | $367,385 | $552,932 | $701,371 | $849,809 | -$41,410 | 0.9940 | $508,191 | $655,722 | $803,253 |
| Nov-08 | 170,245,808 | $21,280,726 | $20,595,805 | $205,958 | $370,725 | $535,491 | $407,797 | $613,755 | $778,521 | $943,288 | -$45,965 | 0.9925 | $563,157 | $726,680 | $890,203 |
| Dec-08 | 188,972,846 | $23,621,606 | $22,861,344 | $228,613 | $411,504 | $594,395 | $452,655 | $681,268 | $864,159 | $1,047,050 | -$51,021 | 0.9910 | $624,081 | $805,316 | $986,551 |
| Jan-09 | 209,759,859 | $26,219,982 | $25,376,092 | $253,761 | $456,770 | $659,778 | $502,447 | $756,208 | $959,216 | $1,162,225 | -$56,633 | 0.9894 | $691,595 | $892,461 | $1,093,328 |
| Feb-09 | 232,833,444 | $29,104,181 | $28,167,462 | $281,675 | $507,014 | $732,354 | $557,716 | $839,390 | $1,064,730 | $1,290,070 | -$62,863 | 0.9879 | $766,412 | $989,037 | $1,211,661 |
| Mar-09 | 258,445,123 | $32,305,640 | $31,265,883 | $312,659 | $562,786 | $812,913 | $619,064 | $931,723 | $1,181,850 | $1,431,977 | -$69,777 | 0.9865 | $849,324 | $1,096,062 | $1,342,801 |
| Apr-09 | 286,874,086 | $35,859,261 | $34,705,130 | $347,051 | $624,692 | $902,333 | $687,162 | $1,034,213 | $1,311,854 | $1,589,495 | -$77,453 | 0.9850 | $941,204 | $1,214,670 | $1,488,135 |
| May-09 | 318,430,236 | $39,803,779 | $38,522,695 | $385,227 | $693,409 | $1,001,590 | $762,749 | $1,147,976 | $1,456,158 | $1,764,339 | -$85,973 | 0.9835 | $1,043,025 | $1,346,111 | $1,649,198 |
| Jun-09 | 353,457,567 | $44,182,195 | $42,760,191 | $427,602 | $769,683 | $1,111,765 | $846,652 | $1,274,254 | $1,616,335 | $1,958,417 | -$95,430 | 0.9820 | $1,155,040 | $1,491,776 | $1,827,593 |
| Jul-09 | 392,337,894 | $49,042,237 | $47,463,812 | $474,638 | $854,349 | $1,234,059 | $939,783 | $1,414,422 | $1,794,132 | $2,173,843 | -$105,927 | 0.9805 | $1,280,901 | $1,653,203 | $2,025,506 |
| Aug-09 | 435,495,062 | $54,436,883 | $52,684,011 | $526,848 | $948,327 | $1,369,806 | $1,043,160 | $1,570,008 | $1,991,487 | $2,412,965 | -$117,579 | 0.9790 | $1,419,469 | $1,832,099 | $2,244,729 |
| Sep-09 | 483,399,519 | $60,424,940 | $58,480,263 | $584,802 | $1,052,643 | $1,520,484 | $1,157,907 | $1,742,709 | $2,210,550 | $2,678,391 | -$130,513 | 0.9775 | $1,573,026 | $2,030,352 | $2,487,678 |
| Oct-09 | 536,573,466 | $67,071,683 | $64,912,981 | $649,130 | $1,168,434 | $1,687,738 | $1,285,277 | $1,934,407 | $2,453,711 | $2,973,015 | -$144,869 | 0.9760 | $1,743,196 | $2,250,059 | $2,756,922 |
| Nov-09 | 595,596,547 | $74,449,568 | $72,053,409 | $720,534 | $1,296,961 | $1,873,389 | $1,426,657 | $2,147,192 | $2,723,619 | $3,300,046 | -$160,805 | 0.9746 | $1,931,774 | $2,493,540 | $3,055,306 |
| Dec-09 | 661,112,167 | $82,639,021 | $79,979,284 | $799,793 | $1,439,627 | $2,079,461 | $1,583,590 | $2,383,383 | $3,023,217 | $3,663,051 | -$178,493 | 0.9731 | $2,140,751 | $2,763,367 | $3,385,983 |
| Jan-10 | 733,834,506 | $91,729,313 | $88,777,005 | $887,770 | $1,597,986 | $2,308,202 | $1,757,785 | $2,645,555 | $3,355,771 | $4,065,987 | -$198,127 | 0.9716 | $2,372,335 | $3,062,392 | $3,752,449 |
| Feb-10 | 814,556,301 | $101,819,538 | $98,542,475 | $985,425 | $1,773,765 | $2,562,104 | $1,951,141 | $2,936,566 | $3,724,906 | $4,513,245 | -$219,922 | 0.9701 | $2,628,971 | $3,393,775 | $4,158,578 |
| Mar-10 | 904,157,494 | $113,019,687 | $109,382,148 | $1,093,821 | $1,968,879 | $2,843,936 | $2,165,767 | $3,259,588 | $4,134,645 | $5,005,702 | -$244,113 | 0.9687 | $2,913,369 | $3,761,016 | $4,608,662 |
| Apr-10 | 1,003,614,819 | $125,451,852 | $121,414,184 | $1,214,142 | $2,185,455 | $3,156,769 | $2,404,001 | $3,618,143 | $4,589,456 | $5,560,770 | -$270,965 | 0.9672 | $3,228,532 | $4,167,995 | $5,107,457 |
| May-10 | 1,114,012,449 | $139,251,556 | $134,769,744 | $1,347,697 | $2,425,855 | $3,504,013 | $2,668,441 | $4,016,130 | $5,094,296 | $6,172,454 | -$300,771 | 0.9657 | $3,577,700 | $4,619,013 | $5,660,237 |
| Jun-10 | 1,236,553,818 | $154,569,227 | $149,594,416 | $1,495,944 | $2,692,699 | $3,889,455 | $2,961,969 | $4,457,914 | $5,654,669 | $6,851,424 | -$333,856 | 0.9643 | $3,964,826 | $5,118,834 | $6,277,843 |
| Total | 11,932,880,066 | $1,491,610,008 | $1,443,602,535 | $14,436,025 | $25,984,846 | $37,533,656 | $28,583,330 | $43,019,356 | $54,565,176 | $66,115,996 | -$1,368,914 | | $15,888,395 | $47,695,613 | $58,502,921 |

* Midpoint value is recapitulated in the matrix appearing in the Summary and Conclusion of the report.

# APPENDIX I

## SMS Volume Growth 11% Monthly, Call Value $0.15

Growth: 11%
Call Value: $0.15

| Month | SMS Volume | Gross SMS Value @ $0.15 | Net SMS Value @ 2.5% Pre-Termination Deactivation Rate | Improper Charges Due to Number Recycling 1.0% | Improper Charges Due to Number Recycling 1.9% | Improper Charges Due to Number Recycling 2.6% | Improper Charges Due to Opting Out (adjusted) 1.9% | Total Improper Charges 2.99% | Total Improper Charges 3.78% | Total Improper Charges 4.5% | Less 18 Call Log Allowance | Discount Factor | Value to Class Low Value | Value to Class Midpoint* | Value to Class Upper Range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN JOSE DIVISION

| | |
|---|---|
| LINDSEY ABRAMS, individually and on behalf of a class of similarly situated individuals,<br><br>        Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>        Defendant. | Case No.  C 07-05378 PVT<br><br>**ORDER ON PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO STIPULATED ENTRY OF JUDGMENT OF DISMISSAL** |

## PROPOSED ORDER ON PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES

This matter having come before this Honorable Court on Plaintiff Abrams Application for Attorneys' Fees Pursuant to Stipulated Entry of Judgment of Dismissal, the Court having reviewed the submissions and briefs of the Parties, the Court hereby finds as follows:

1.    On January 23, 2008, this Court entered a Stipulated Entry of Judgment of Dismissal in this action.  The Settlement provided for the payment of legal fees to be based not solely on the relief obtained for the plaintiff, but also on the benefits conveyed more generally through this settlement. The plaintiff now comes before this Court for the determination and award of such fees pursuant to the agreement between the Parties and Stipulated Entry of Judgment of Dismissal;

2.    The Settlement of this action was reached following in person and telephonic negotiations between the parties' counsel.  This settlement provided that Plaintiff Abrams released her individual claims in exchange for injunctive relief only, and this injunctive relief requires Facebook to identify each message it sends as having come from Facebook, requires in every 15th message instructions as to how recipients may "opt-out" of receiving such messages in the future, and further requires Facebook to implement improved notification procedures with wireless carriers sufficient to maintain accurate and updated telephone number deactivation and recycling logs;

3.    The Parties further agreed that Facebook would be responsible for the payment of attorneys' fees to Abrams's counsel, and in the event the Parties could not agree on a fee amount, that this Court would decide the amount of the fee award;

4.    As a further part of the settlement agreement, the Parties agreed:

*that any such determination by the Court will be based not solely on the relief obtained for the plaintiff, but also on the benefits conveyed more generally*

*through this settlement. Facebook further agrees that plaintiff shall be entitled to reasonable, limited discovery on this issue, including information relating to (a) the number of text messages Facebook sends out on a daily basis, (b) the number of text messages sent to previously to recycled numbers, and (c) the steps Facebook did or did not previously take to ensure that text messages were not sent to people who did not want them.*

5.    The Plaintiff has submitted, through her counsel, an Application for Attorneys' Fees wherein Plaintiff requests the Court award $5,033,000 in attorneys' fees;

6.    In her Application, Plaintiff has presented the testimony of experts that demonstrate the benefits generally conveyed through the settlement as resulting in a range of savings to all recipients of Facebook Mobile text messages between from $25,967,094 to $57,234,736, but that Plaintiff has based her request on the experts' lowest computation of benefits, being $20,134,762;

**IN CONSIDERATION OF THESE FINDINGS, IT IS HEREBY ORDERED THAT:**

That an award of $5,033,000.00 accurately reflects the Parties' contractual intent as embodied in the settlement agreement and is consistent with "reasonable" percentages of such fees established in governing case law. Defendant is hereby ordered to pay to Plaintiff's counsel $5,033,000.00 within 30 days of the date of this Order. Pursuant to the terms of the Parties' settlement agreement, the Defendant may not appeal this Order.

The Court further orders that Plaintiff Abrams is entitled to a reasonable award for her services pursuant to the Settlement agreement in the amount of $_____.

Date:                                    ENTERED:


                                         _____
                                         JUDGE J. FOGEL

# EXHIBIT B

**E-filed 1/23/08**

1  COOLEY GODWARD KRONISH LLP
   MICHAEL G. RHODES (116127)
2  4401 Eastgate Mall
   San Diego, California 92121
3  Telephone:    (858) 550-6017
   Facsimile:    (858) 550-6420
4  Email: rhodesmg@cooley.com

5  Attorneys for Defendant
   FACEBOOK, INC.

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

11

| | |
|---|---|
| 12  LINDSEY ABRAMS, individually and on behalf of a class of similarly situated individuals, | Case No.  C 07-05378 PVT |
| 13 | **STIPULATED ENTRY OF JUDGMENT OF DISMISSAL WITH PREJUDICE AND GENERAL RELEASE** |
| 14                 Plaintiff, | |
| 15         v. | |
| 16  FACEBOOK, INC., a Delaware corporation, | |
| 17                 Defendant. | |

18

19

20    **WHEREAS**, on October 22, 2007, plaintiff Lindsey Abrams ("plaintiff") filed the putative

21  class action complaint in this action (the "Action") against defendant Facebook, Inc.

22  ("Facebook");

23    **WHEREAS**, the complaint alleges, *inter alia*, that Facebook sent, or caused to be sent,

24  SMS or text messages (collectively, "Messages") to mobile phone users whose numbers were

25  previously associated with Facebook users that had requested such messages be sent to their

26  mobile phones;

27    **WHEREAS**, Facebook denies any and all allegations in the complaint in the Action,

28  including, without limitation, that any member of the purported class has incurred any harm of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

569267 v1/SD

STIPULATED ENTRY OF JUDGMENT OF
DISMISSAL WITH PREJUDICE GENERAL RELEASE
C 07-05378 PVT

1   any kind or nature;

2       WHEREAS, counsel for the parties have met and conferred in an effort to seek an amicable

3   resolution to the issues presented in the Action, during which process counsel met in person on

4   November 19, 2007 and telephonically in the weeks subsequent wherein they discussed, *inter*

5   *alia*, manners in which to address the issue of recycled or deactivated mobile phone numbers that

6   had previously been registered on the Website;

7       WHEREAS, the parties (through counsel) have negotiated the terms of this Stipulation in

8   good faith and at arm's length to avoid the burden, expense and distraction of potentially

9   protracted and complex litigation;

10      IT IS HEREBY STIPULATED by and between the parties herein, through their respective

11  counsel of record, subject to the express approval of the Court, as follows:

12      1.      Within ninety (90) calendar days of the entry of the Court's Order hereon,

13  Facebook shall implement a notice system in which Facebook will include a statement, the exact

14  wording of which will be in Facebook's discretion, to the substantial effect of: "To stop Facebook

15  text messages, reply 'off;'" advising recipients of Messages that, if they do not wish to receive

16  Messages, they should reply to the Message with the word "off" (the "Statement") as follows:  at

17  the bottom of every 15th Message sent from Facebook's system to any mobile telephone number

18  ("Mobile Users") which was registered by any Facebook user on the Website for texting to or

19  from domestic United States mobile telephone numbers.  In the event that the Statement cannot

20  be included in the specified Messages to Mobile Users because of a lack of sufficient text

21  character space in the applicable Message, then Facebook shall include the Statement in the next

22  available Message which contains adequate character space to enable the Statement to be

23  included therein.  The foregoing shall not apply to any Messages originated by applications

24  owned or controlled by third party developers and not by Facebook.

25      2.      Within ninety (90) calendar days of the entry of the Court's Order hereon,

26  Facebook shall undertake commercially reasonable measures to ensure that all Messages sent

27  from the Website to Mobile Users use (as some have been and presently are) the Facebook name

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

569267 v1/SD                         1.                    STIPULATED ENTRY OF JUDGMENT OF
                                                           DISMISSAL WITH PREJUDICE GENERAL RELEASE
                                                           C 07-05378 PVT

sufficient to indicate to a reasonable recipient of Messages that it is sent by Facebook.

3.    As soon as practicable following entry of the Court's Order hereon and to the sole extent to which it has not already done so, Facebook shall undertake commercially reasonable measures to notify mobile carriers with whom Facebook has written agreements that recycling of mobile numbers presents the potentiality that Mobile Users may receive unwanted text messages associated with the prior mobile customer and that, accordingly, accurate deactivation logs should be maintained and updated by such carriers and provided to Facebook or any aggregators that Facebook utilizes to assist in the transmission of its Messages (provided, however, that the parties hereto expressly acknowledge and agree that no action can be taken against Facebook based on the refusal of any such carrier to comply with Facebook's request in this regard).

4.    Facebook shall add to its prevailing Terms of Use, within ninety (90) calendar days of the entry of the Court's Order hereon, a statement to the effect that Mobile Users who change or deactivate registered mobile telephone numbers should advise Facebook of that fact and providing guidance (*e.g.*, describing the process of texting "Off" or "Stop" to Facebook) as to how to prevent unwanted Messages from being sent to the users' numbers once they deactivate them  (such statement and guidance to be located within the Terms of Use in the sole and exclusive discretion of Facebook under the general category of Facebook Mobile Services).

5.    The terms and obligations of Paragraphs 1 through 4, inclusive, of this Stipulation shall remain subsisting so long as Facebook provides and enables mobile phone Messages in substantially the same manner as it currently does; however, the parties recognize that subsequent changes or developments may obviate the need to continue, and underlying purposes for, the requirements of such paragraphs (for example, in the event that Facebook is able to obtain and implement accurate deactivation logs from mobile carriers, such requirements may become moot).  Facebook reserves the right to unilaterally discontinue the obligations of Paragraphs 1 through 4, inclusive, of this Order if material subsequent events, developments or occurrences have transpired which can be shown by Facebook to reasonably obviate the need therefor (and in the event that any challenge is made to such cessation of the obligations of Paragraphs 1 through

Cooley Godward
Kronish LLP
Attorneys At Law
San Diego

569267 v1/SD

2.

Stipulated Entry of Judgment of
Dismissal With Prejudice General Release
C 07-05378 PVT

4, inclusive, of this Stipulation, Facebook shall bear the burden to demonstrate such subsequent change in circumstances), provided, however, that Facebook shall not discontinue its obligations of Paragraphs 1 through 4, inclusive, of this Order under any circumstances for a period of at least 2 years and ninety days following the date of entry of the District Court's final Order.

6.    The parties agree that plaintiff's counsel is entitled to a reasonable award of attorneys' fees and expenses in an amount to be determined by the Court. Facebook agrees that any such determination by the Court will be based not solely on the relief obtained for the plaintiff, but also on the benefits conveyed more generally through this settlement. Facebook further agrees that plaintiff shall be entitled to reasonable, limited discovery on this issue, including information relating to (a) the number of text messages Facebook sends out on a daily basis, (b) the number of text messages sent to previously to recycled numbers, and (c) the steps Facebook did or did not previously take to ensure that text messages were not sent to people who did not want them. The parties have agreed that plaintiff's counsel shall submit to the Court in the Action an application in support of an award to plaintiff's counsel of fees and costs, and that an evidentiary hearing (on such terms as the Court determines are appropriate) shall be held in respect thereto (at a time to be set by the Court) and further that, in connection therewith, Facebook shall be entitled to object to or otherwise contest the amounts to be awarded plaintiff's counsel via written submissions and briefs and orally at the hearing on such application. The parties state further that it is their collective intention to expedite the process of conducting the forgoing evidentiary hearing and enabling the necessary judicial determinations. Facebook agrees not appeal the District's Court's final Order with respect to such application and to pay any amounts awarded thereby within thirty (30) calendar days of the entry of the final order thereon.

7.    Facebook agrees that plaintiff is entitled to a reasonable award for her services in acting as the putative class representative in an amount to be determined by the Court (using the same process described in paragraph 6, above).

8.    As noted above, Facebook expressly denies that it committed any wrong, by

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

569267 v1/SD

3.

STIPULATED ENTRY OF JUDGMENT OF
DISMISSAL WITH PREJUDICE GENERAL RELEASE
C 07-05378 PVT

conduct or omission, including, without limitation, that it violated any provision of any applicable law, with respect to the allegations set forth in the Action, and further states that it is immune from any liability under the Communications Decency Act.

9.    This Action is hereby dismissed with prejudice in its entirety as against the named plaintiff and with prejudice as against the proposed class (as defined in paragraph 35 of the complaint in the Action) solely with respect to any and all claims for injunctive relief set forth in the complaint in the Action.

10.    Excluding all of the terms, conditions, rights, and obligations created hereby or contained herein, plaintiff individually hereby fully, completely and generally forever release Facebook and its agents, employees, representatives, predecessors, successors, affiliates, parent and subsidiary entities, assigns, shareholders, officers, directors, attorneys, insurers, heirs, executors and administrators, from any and all claims, rights, demands, obligations, agreements, contracts, representations, promises, liens, accounts, debts, liabilities, expenses, damages, costs, interest, attorney's fees, judgments, orders, and causes of actions of every kind and nature, whether known or unknown, suspected or unsuspected, existing or claimed to exist, legal or equitable, including without limitation all claims for damages and any other form of relief arising out of or relating in any way to the claims alleged in the Action and, as the named representative and therefore on behalf of the proposed class (as defined in paragraph 35 of the complaint in the Action), all claims brought by such proposed class for injunctive relief set forth in the complaint in the Action. Plaintiff hereto acknowledges that she has read, considered and understand the provisions and significance of Section 1542 of the California Civil Code, which presently provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Plaintiff hereby expressly waives any and all rights she has or may have under Civil Code § 1542 as now worded or hereafter amended. In connection with this waiver, plaintiff

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

569267 v1/SD                4.                STIPULATED ENTRY OF JUDGMENT OF
DISMISSAL WITH PREJUDICE GENERAL RELEASE
C 07-05378 PVT

acknowledges that she is aware that she may hereafter discover claims presently unknown or unsuspected or facts in addition to or different from those which she now knows or believes to be true with respect to the claims, matters and causes of action released herein.

11.    Having obtained the express permission and consent of their respective clients, the undersigned counsel-of-record hereby consent to the terms and conditions set forth above by signing below.

Dated: December 14, 2007                Respectfully submitted,

                                        COOLEY GODWARD KRONISH LLP
                                        MICHAEL G. RHODES (116127)


                                        /s/
                                        _____
                                        Michael G. Rhodes (116127)
                                        Attorneys for Defendant
                                        FACEBOOK, INC.


Dated: December 13, 2007                KAMBEREDELSON, LLC
                                        JAY EDLESON
                                        MYLES MCGUIRE


                                        /s/
                                        _____
                                        Jay Edelson
                                        Attorneys for Plaintiff
                                        LINDSEY ABRAMS


IT IS SO ORDERED.

Dated: ~~December ----, 2007~~ January 23, 2008

                                        _____
                                        Judge, United States District Court
                                        JEREMY FOGEL

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

569267 v1/SD                5.        STIPULATED ENTRY OF JUDGMENT OF
                                      DISMISSAL WITH PREJUDICE GENERAL RELEASE
                                      C 07-05378 PVT

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

| | |
|---|---|
| BRET THIELEN, individually and on behalf of a class of similarly situated individuals, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BUONGIORNO USA, INC., a Florida Corporation, d/b/a BLINKO | ) ) ) |
| Defendant. | ) ) ) |

Hon.

1:05CV0016

**Jury Trial Demanded**

Gordon J. Quist
U.S. District Judge

FILED - GR
06 JAN -6 PM 3: 14

CLERK
WESTERN DISTRICT COURT
DISTRICT MICH
BY

## CLASS ACTION COMPLAINT

Plaintiff Bret Thielen brings this class action complaint against defendant Buongiorno USA, Inc. d/b/a "Blinko" ("Buongiorno") to stop defendant's practice of making unsolicited text message calls to cellular telephones, and to obtain redress for all persons injured by its conduct. For his class action complaint, Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE CASE

1.     In a recent effort to promote the sale of ringtones and other text message services, Buongiorno, a provider of such cellular phone entertainment services, engaged in an especially pernicious form of marketing: the transmission of unauthorized advertisements, in the form of "text message" calls to the cell phones of consumers across the nation.

2.     By effectuating these text message calls (hereinafter, "wireless spam" or "SMS Spam"), Buongiorno has caused such consumers actual harm, not only because the consumers were subjected to the aggravation that necessarily accompanies unsolicited wireless spam, but

also because in virtually all instances consumers actually have to pay their cell phone service providers for the receipt of such wireless spam, notwithstanding that it is sent in violation of specific legislation on the subject.

3.    In order to redress these injuries, Thielen, on behalf of himself and a nationwide class, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, (the "TCPA") which prohibits unsolicited voice and text calls to cell phones.

4.    On behalf of the class, Thielen seeks an injunction requiring Buongiorno to cease all wireless spam activities and an award of actual and statutory damages to the class members, together with costs and reasonable attorney's fees.

## PARTIES

5.    Plaintiff Bret Thielen is a citizen of Michigan, residing in Kent County, Michigan.

6.    Defendant Buongiorno is a self-proclaimed "international company active in the field of multimedia contents for telephony and digital channels. Buongiorno is one of the first companies to reach a worldwide audience in the mobile Value Added Services area, and is a clear market leader in the United States, Europe, and Latin America." It is a Florida corporation with its principle place of business in Miami Beach, Florida.  It does business throughout the United States, including Kent County, Michigan.

## JURISDICTION

7.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Buongiorno, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and

costs, and (c) none of the exceptions under that subsection applies to the instant action.

## VENUE

8.     Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1) and 1391(a)(2).

## CONDUCT COMPLAINED OF

9.     In recent years, marketers, who often have felt stymied by federal laws limiting solicitations over telephones, facsimile machines, and e-mails, have increasingly looked to alternative technologies through which to send bulk solicitations cheaply.

10.     One of the newest types of such bulk marketing is to advertise through Short Message Services.  The term "Short Message Service" or "SMS" is a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 or so characters, on their cellular telephones.

11.     An "SMS message" is a text message call directed to a wireless device through the use of the telephone number assigned to the device.  When an SMS message call is successfully made, the recipient's cell phone rings, alerting him or her that a call is being received.

12.     Unlike more conventional advertisements, wireless spam actually costs its recipients money, because virtually all cell phone users must pay for each text message call they receive, whether or not the message is authorized.

13.     In or about December, 2005, Buongiorno caused a mass transmission of wireless spam to the cell phones of what it hoped were potential customers.

14.     The sender field of the transmission contained only the five-digit number: 42222.

3

The subject line of the message was: "HERE IS ANO...." The body of the message read as follows:

> Here is another chance to receive your text alerts from Blinko.com.
> Simply reply with txt MY PRANK.

15.     On or about December 10, 2005, plaintiff Bret Thielen's cell phone rang, indicating that he had received a text call. Under his contract with his cell phone service provider, this cost him ten cents. Over the next several days, Mr. Thielen received approximately five additional text messages from the same sender that contained an identical message as described above. Mr. Thielen was charged by his cell phone service provider an additional $0.10 per message for the receipt of these text message calls.

16.     The sender of the text call identified itself as only "42222".

17.     When he accessed the full message, he saw that it was the wireless spam advertisement from Buongiorno, quoted in full above.

## CLASS ALLEGATIONS

18.     Thielen brings this action, pursuant to FRCP 23(b)(2) and FRCP 23(b)(3), on behalf of himself and a class (the "Class") consisting of all persons residing in the United States of America who, within four years of the filing of this lawsuit, (1) received a text message from Buongiorno and (2) subscribed to a cellular telephone plan wherein they were required to pay to receive text messages based upon the number of text messages they received.

19.     Upon information and belief, there are thousands of members of the Class who are geographically dispersed, such that joinder of all members is impracticable.

4

20.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting individual members. Common questions for the Class include:

    (a)     Is Buongiorno's conduct governed by the TCPA?

    (b)     Does the wireless spam Buongiorno distributed violate the TCPA?

    (c)     Are the class members entitled to treble damages based on the willfulness of Buongiorno's conduct?

21.     Thielen will fairly and adequately protect the interests of the Class, his claims are typical of the claims of the members of the respective classes, and he has retained counsel competent and experienced in class action litigation.

22.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, among other things, (a) joinder of all members of the respective classes is impracticable, and (b) many members of the classes cannot vindicate their rights by individual suits because their damages are small relative to the burden and expense of litigating individual actions.

## COUNT I

23.     Thielen incorporates by reference the foregoing allegations.

24.     Buongiorno made unsolicited commercial text calls to the members of the Class using an automatic telephone dialing system and/or using an artificial and prerecorded message to the wireless telephone numbers of the Class.

25.     These calls were made without the prior express consent of the called parties.

26.     Buongiorno has, therefore, violated the TCPA, 47 U.S.C. 227(b)(1)(A)(iii).

27.    As a result of Buongiorno's illegal conduct, the members of the class suffered actual damages and, under section 227(b)(3)(B), are each entitled, *inter alia,* to a minimum of $500.00 in damages for each such violation of the TCPA

28.    Because Buongiorno's misconduct was willful and knowing, the Court should, pursuant to section 227(b)(3)(C), treble the amount of statutory damages recoverable by the members of the Class.

WHEREFORE, Plaintiff Bret Thielen, on behalf of himself and the Class, prays for the following relief:

1.    An order certifying the Class as defined above;

2.    An award of actual and/or statutory damages;

3.    An injunction requiring Buongiorno to cease all wireless spam activities

4.    Reasonable attorney's fees and costs; and

5.    Such further and other relief the Court deems appropriate.


**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: January 6, 2006

Phillip C. Rogers (P34356)
Attorney for Plaintiff
40 Pearl Street, N.W., Suite 336
Grand Rapids, Michigan 49503-3026
(616) 776-1176
ConsumerLawyer@aol.com

6

John Blim
Jay Edelson
Myles McGuire (Of Counsel)
BLIM & EDELSON, LLC
Attorneys for Plaintiff
53 West Jackson Boulevard, Suite 1642
Chicago, Illinois 60604
Telephone: (312) 913-9400
Telefax: (312) 913-9401


John G. Jacobs
Bryan G. Kolton
THE JACOBS LAW FIRM, CHTD.
Attorneys for Plaintiff
122 South Michigan Avenue, Suite 1850
Chicago, Illinois 60603
Telephone: (312) 427-4000
Telefax: (312) 427-1850

# EXHIBIT D

1  JOHN BLIM (*PRO HAC VICE* pending)
   JAY EDELSON (*PRO HAC VICE* pending)
2  MYLES MCGUIRE (Of Counsel) (*PRO HAC VICE* pending)
   BLIM & EDELSON, LLC
3  53 West Jackson Boulevard
   Suite 1642
4  Chicago, Illinois 60604
   Telephone: (312) 913-9400
5  Facsimile: (312) 913-9401

6  JOHN G. JACOBS (*PRO HAC VICE* pending)
   BRYAN G. KOLTON (*PRO HAC VICE* pending)
7  THE JACOBS LAW FIRM, CHTD.
   122 South Michigan Avenue
8  Suite 1850
   Chicago, Illinois 60603
9  Telephone: (312) 427-4000
   Facsimile: (312) 427-1850
10
   TERRY M. GORDON - SBN 75604
11 LAW OFFICES OF TERRY M. GORDON
   Three Harbor Drive, Suite 317
12 Sausalito, California 94965
   Telephone:   (415) 331-3601
13 Facsimile:   (415) 331-1225

14 ATTORNEYS FOR PLAINTIFFS                    C 06 6567

15

16                 IN THE UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18 RUSSELL BRADBERRY, individually and        ) Case No.
   on behalf of a class of similarly situated  )
19 individuals,                                ) **COMPLAINT FOR DAMAGES**
                                               ) **AND INJUNCTIVE RELIEF**
20                Plaintiff,                   )
                                               )
21 v.                                          )
                                               ) DEMAND FOR JURY TRIAL
22 T-MOBILE USA, INC., a Delaware              )
   corporation                                 )
23                                             ) **CLASS ACTION**
                Defendant.                     )
24

25

26

27

28
   **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

## CLASS ACTION COMPLAINT

Plaintiff Russell Bradberry ("Bradberry"), on behalf of himself a class and sub-class of similarly situated individuals, brings this class action against T-Mobile USA, Inc. ("T-Mobile") seeking to stop T-Mobile's unlawful practice of "recycling" "dirty" cellular telephone numbers, which practice has resulted in unauthorized charges to customers' accounts, and to obtain redress for all persons injured by T-Mobile's conduct. Plaintiff, for his class action complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE CASE

1.      In a widespread industry practice little known by those outside the industry, T-Mobile routinely "recycles" so-called "dirty" telephone numbers to its customers when they sign up for new cellular telephone service. The numbers are "recycled" in that they were previously owned and/or used by other persons or entities. The numbers are "dirty" in that they are encumbered with pre-existing billing obligations for products and services authorized to be purchased, if at all, by the previous owners and/or users of those numbers.

2.      T-Mobile's practice of re-issuing "dirty" phone numbers has resulted in unauthorized charges being placed on unsuspecting customers' telephone bills, in an illegal practice known as "cramming." For years, T-Mobile has systematically, repeatedly and without authorization, placed charges on customers' monthly bills for third-party services (such as ring tones, joke-a-day programs, wallpaper, screensavers and other forms of software provided by third-party vendors) that were never authorized to be purchased by the current owners of the affected phone numbers, (a) in violation of federal statute; (b) in breach of contract and the duty of good faith and fair dealing, (c) in violation of California Public Utilities Code section 2890 and California Public Utilities Commission Revised

1  General Order 168, and (d) in violation of California Business and Professions Code

2  sections17200 and 17500 consumer fraud provisions.

3      3.    Because of T-Mobile's wrongful actions, Plaintiff seeks on behalf of himself

4  and the class members, money damages, injunctive and declaratory relief, costs, and

5  reasonable attorneys' fees.

6

7                              **PARTIES**

8      4.    Plaintiff Russell Bradberry is a citizen of California.

9      5.    Defendant T-Mobile USA, Inc. ("T-Mobile") is a leading provider of cellular

10 telephone service in the United States. T-Mobile is a Delaware corporation with its principal

11 place of business in the State of New York. T-Mobile does business throughout the United

12 States, including the State of California and this judicial district.

13

14                           **JURISDICTION**

15     6.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. §

16 1331. It also has jurisdiction under section 1332(d), because (a) at least one member of the

17 putative class is a citizen of a state different from Defendant, (b) the amount in controversy

18 exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under

19 that subsection applies to the instant action. This Court has supplemental jurisdiction over

20 the remaining counts under 28 U.S.C. § 1367.

21

22                              **VENUE**

23     7.    Venue is proper in this district under 28 U.S.C. §§ 1391 (b) and (c).

24 ///

25 ///

26 ///

27

28 _____
   **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
                          3

1                  **THE FACTS RELATING TO THE NAMED PLAINTIFF**

2       8.     On November 2, 2005, Plaintiff visited the store of an authorized T-Mobile

3 sales representative located in Visalia, California to purchase new cell phone service for his

4 personal use.

5       9.     On that same day, in exchange for a T-Mobile cell phone plan of 600

6 "anytime" minutes, Plaintiff agreed to pay T-Mobile $39.99 each month for a period of 12

7 months. (A copy of T-Mobile's Service Agreement with Plaintiff is attached hereto as

8 Exhibit A.)

9      10.     Upon execution of his Service Agreement and activation of his cellular

10 telephone account, T-Mobile provided Plaintiff a cellular phone number or "GSM #" (that is,

11 a Global System for Mobile Communications number) of "tmo+6194468694."

12      11.     Unbeknownst to Plaintiff, T-Mobile provided him with a recycled "dirty"

13 phone number -- one saddled with preexisting obligations, encumbrances and billing

14 arrangements for products and services authorized to be purchased, if at all, by the previous

15 owner(s) and/or user(s) of that number.

16      12.     Thus, beginning on or about November 2, 2005 -- the same day Plaintiff

17 obtained his cell phone number and started receiving service from T-Mobile -- and

18 continuing through at least April 28, 2006, Plaintiff's cell phone received multiple unwanted

19 "premium" text message calls on a near daily basis from a company called Cellfish Media,

20 LLC, f/d/b/a Lagardere Active North America, Inc. ("Cellfish"), a third-party seller of

21 cellular ringtone products and services. "Premium" text messages are apparently those that

22 include various forms of software, such as ringtones.

23      13.     Throughout the relevant period, Plaintiff received hundreds of such messages.

24      14.     At no time did Plaintiff authorize the purchase of said products and services

25 offered by Cellfish and at no time did Plaintiff consent to Cellfish's sending of text messages

26 to his telephone number.

27

28

   **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1    15.    Throughout the relevant time period, T-Mobile billed Plaintiff for "premium"
2  text messaging charges of $0.50 for each incoming "premium" text message, in addition to
3  its standard charge of $0.05 per each incoming text message.

4    16.    At no time did Plaintiff authorize T-Mobile to bill him for said charges.

5    17.    In or about early 2006, Plaintiff contacted T-Mobile to inquire why his bills
6  were so high and was told that it was because of the premium text message calls he received
7  from Cellfish. Plaintiff advised T-Mobile that he did not authorize the purchase of said
8  products and services offered by Cellfish and that at no time did he consent to Cellfish's
9  sending of any text messages to his telephone number. Plaintiff then asked T-Mobile how he
10  could stop being sent these unauthorized messages from Cellfish for which he was being
11  charged by T-Mobile.

12    18.    T-Mobile never offered to remove the unauthorized charges from Plaintiff's
13  bill, never undertook to resolve the dispute to Plaintiff's satisfaction, never verified that
14  Plaintiff had, in fact, provided authorization to purchase products and services offered by
15  Cellfish, never verified whether Plaintiff had, in fact, provided consent to Cellfish's sending
16  of any text messages to his telephone number, and never verified that Plaintiff had, in fact,
17  provided authorization to bill his account for said charges. Rather, T-Mobile simply "passed
18  the buck," advising Plaintiff to contact Cellfish.

19    19.    On multiple occasions thereafter, Plaintiff attempted to contact Cellfish, but
20  was unable to speak directly with anyone at the company and instead was forced to leave
21  voice mail messages, which Cellfish failed to return.

22    20.    Plaintiff visited Cellfish's website (www.texttoy.com) and was informed that
23  to stop receiving text messages from Cellfish he would need to reply to one of its messages
24  with the word "STOP." Plaintiff followed those instructions, but instead of stopping the
25  unwanted messages, he began to receive even more such messages.

26
27
28
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
5

1    21.    Having not heard from Cellfish and having had no success in stopping the

2  messages, Plaintiff once again contacted T-Mobile. In response, T-Mobile did nothing.

3    22.    Plaintiff, through his counsel, was finally able to contact Cellfish, through its

4  Director of Legal & Business Affairs, Lisa M. Weissberg. On May 11, 2006, Ms. Weissberg

5  provided Plaintiff's counsel what she described as "the initial, voluntary sign up by your

6  client for this service as of July 13, 2005. The messages received are not spam," Ms.

7  Weissberg claimed, "but messages related to the service that, according to the terms of use of

8  the service agreed to by your client, are being sent."

9    23.    The purported authorization to be billed for such charges was obtained from

10  an unidentified person with the same "GSM #" eventually assigned by T-Mobile to Plaintiff

11  ("tmo+6194468694"); however, the authorization for the subject charges was obtained on

12  July 13, 2005 – a date *more than three months prior* to the time that Plaintiff signed his

13  Service Agreement with T-Mobile, obtained that same cell phone number from T-Mobile, or

14  started receiving T-Mobile service.

15    24.    Plaintiff could not possibly have authorized the charges for which he was

16  being billed. He did not have any account with T-Mobile at that time. Indeed, from May

17  2005 until October 2005, Plaintiff was out of the country in the Persian Gulf serving in the

18  United States Navy aboard the U.S.S. Nimitz, without access to a working cellular phone.

19

20    **ADDITIONAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

21    25.    T-Mobile is a telephone corporation and public utility as defined in California

22  Pub. Util. Code sections 216 and 234 and is certified by the California Public Utilities

23  Commission ("CPUC") to offer, and does in fact offer and sell, mobile cellular

24  telecommunication services throughout the State of California.

25    26.    T-Mobile uses uniform form contracts ("Service Agreements") under which

26  customers purchase cell phone services.

27

28
    **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

                                        6

1    27.    T-Mobile's services include providing access to and billing for various third-

2  party services such as ring tones, joke-a-day programs, wallpaper, screensavers and other

3  forms of software provided by numerous third-party vendors with names such as Jamster, M

4  Qube, Cellfish Media LLC (f/k/a Lagardere Active North America, Inc.), and many others.

5    28.    T-Mobile allows such third-party services to be billed directly on a customer's

6  monthly wireless bill.

7    29.    Envisioning the potential for abuse, the California Legislature adopted

8  California Public Utilities Code section 2890 which provides, in relevant part, that: "(a) A

9  telephone bill may only contain charges for products or services, the purchase of which the

10  subscriber has authorized."

11    30.    Public Utilities Code section 2890 was intended to deter the unlawful practice

12  of "cramming," *i.e.*, the placing of unauthorized charges on telephone bills, as defined in the

13  Legislative History of Public Utilities Code sections 2889.9 and 2890:

14          ["This bill addresses the problem of 'cramming,' a practice in
            which consumers are charged for unauthorized services in their
15          phone bills. [¶] ... [¶] A relatively new, and growing, scam on
            telephone customers is the imposition of charges on the
16          telephone bill for products or services the customer has not
            bought.... [¶] Often the charges which are 'crammed' on the
17          customer's bill are relatively small, less than $10, and
            inconspicuously labeled. If one does not carefully scrutinize
18          the telephone bill, the crammed charge could easily be
            overlooked."]; Sen. Bill No. 378, approved by Governor, Sept.
19          30, 1998 (Amend.Aug.21, 1998) (1997 1998 Reg. Sess.) ["
            'Cramming' charges are usually comprised of services such as
20          unauthorized voice mail options, Internet access options,
            calling cards, paging services, and 800 numbers. In many
21          cases[,] these unauthorized charges are initiated from
            sweepstakes, raffles, and telemarketers of unknown and
22          unscrupulous companies."].)

23  Assem. Bill No. 2142, 3d reading May 7, 1998, Assem. Floor (1997 1998 Reg. Sess.).

24    31.    According to the CPUC, "the practice of cramming has become a serious and

25  widespread problem in California, draining time and money from California consumers and

26  businesses."

27

28  _____
    **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
                        7

1       32.    Revised General Order 168, "Market Rules to Empower Telecommunications

2   Consumers and to Prevent Fraud" similarly provides that "Telephone companies may bill

3   subscribers only for authorized charges."

4       33.    Further, the duty of good faith and fair dealing, a part of every contract,

5   requires that T-Mobile not bill any customer for any good or service not authorized by the

6   customer.

7       34.    Upon execution of said Service Agreements and activation of cellular

8   telephone accounts, T-Mobile provides its customers a ten-digit cellular telephone number.

9       35.    Unbeknownst to its customers, T-Mobile often "recycles" "dirty" telephone

10  numbers, numbers that they were previously owned and/or used by other persons or entities

11  and encumbered with pre-existing billing obligations for products and services authorized to

12  be purchased, if at all, by the previous owners and/or users of said numbers.

13      36.    T-Mobile has no effective system, policy or procedure in place for ensuring

14  that the ten-digit cellular phone numbers it provides customers have been properly

15  "screened" and scrubbed "clean" so as to ensure that its customers are not adversely affected

16  by the actions, inactions, obligations and/or encumbrances of previous owners and/or users of

17  the telephone numbers.

18      37.    As a result, T-Mobile has for years been systematically, repeatedly and

19  without authorization, billing its customers for products and services not authorized to be

20  purchased by those customers. Indeed, if such purchases were authorized at all, they were

21  authorized by previous owners and/or users of such telephone numbers. T-Mobile and third-

22  party service providers have, on information and belief, profited greatly from this practice.

23      38.    T-Mobile's unlawful charging is further exacerbated by its failure to strictly

24  comply with various disclosure-related requirements of Public Utilities Code section 2890,

25  making it more difficult for customers to discover the unauthorized charges, realize what

26  their options are, and thereafter dispute said charges.

27

28

1     39.    Public Utilities Code section 2890(d) provides, in relevant part, as follows:

2          (d) (1) A billing telephone company shall clearly identify, and
use a separate billing section for, each person, corporation, or
3          billing agent that generates a charge on a subscriber's telephone
bill. A billing telephone company may not bill for a person,
4          corporation, or billing agent, unless that person, corporation or
billing agent complies with paragraph (2).

5

          (2) Any person, corporation, or billing agent that charges
6          subscribers for products or services on a telephone bill shall do
all of the following:

7

          (A) Include, or cause to be included, in the telephone
8          bill the amount being charged for each product or service,
including any taxes or surcharges, and a clear and concise
9          description of the service, product, or other offering for which
a charge has been imposed.

10

          (B) Include, or cause to be included, for each entity that
11         charges for a product or service, information with regard to
how to resolve any dispute about that charge, including the
12         name of the party responsible for generating the charge and a
toll free telephone number or other no cost means of contacting
13         the entity responsible for resolving disputes regarding the
charge and a description of the manner in which a dispute
14         regarding the charge may be addressed. Each telephone bill
shall include the appropriate telephone number of the
15         commission that a subscriber may use to register a complaint.

16     40.    Although required to do so, the bills issued by T-Mobile systematically failed

17 to include information with regard to how to disputes specific charges, failed to include the

18 name of the party responsible for generating the charge, failed to include a toll-free telephone

19 number or other no-cost means of contacting the entity responsible for resolving disputes

20 regarding the charge and a description of the manner in which a dispute regarding the charge

21 may be addressed. T-Mobile's bills also systematically failed to "include the appropriate

22 telephone number of the commission that a subscriber may use to register a complaint," as

23 required by section 2890(d) (2) (b).

24     41.    According to the CPUC, "[t]he obvious purpose of including the

25 Commission's contact information is to safeguard consumers' Rights to Public Participation

26 and Enforcement (consumers have a right to be informed of their rights and what agency

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
9

1  enforces those rights) and Accurate Bills and Redress (consumers have a right to fair, prompt
2  and courteous redress for problems they encounter). Without this information, many or most
3  consumers won't realize what their options are."

4      42.    Public Utilities Code section 2890(e) further requires that "[i]f an entity
5  responsible for generating a charge on a telephone bill receives a complaint from a subscriber
6  that the subscriber did not authorize the purchase of the product or service associated with
7  that charge, the entity, not later than 30 days from the date on which the complaint is
8  received, shall verify the subscriber's authorization of that charge or undertake to resolve the
9  billing dispute to the subscriber's satisfaction." T-Mobile systematically failed to adhere to
10 these "cramming" rules in its treatment of Plaintiff and other affected customers.

11     43.    Pursuant to Public Utilities Code section 2890(d)(2)(D), "[i]f there is a
12 dispute, there is a rebuttable presumption that an unverified charge for a product or service
13 was not authorized by the subscriber and that the subscriber is not responsible for that
14 charge." Plaintiff and the Class dispute said charges and, thus, are entitled to a presumption
15 that said charges were unauthorized.

16
17 **CLASS ALLEGATIONS**

18     44.    Plaintiff brings this action, pursuant to Federal Rule of Civil Procedure
19 23(b)(2) and (b)(3), on behalf of himself and a class consisting of all T-Mobile wireless
20 telephone subscribers who received a telephone number from T-Mobile and suffered losses
21 or damages as a result of T-Mobile's billing for products and services not authorized by the
22 new owner of the number (the "Plaintiff Class" or "Class"), but, rather, if at all, by a prior
23 owner or user of the number; provided, however, that the following are excluded from this
24 proposed Class: (i) defendant, and (ii) any relative or employee of defendant.

25
26
27
28
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
10

1    45.    Additionally, Plaintiff brings this action on behalf of a state-wide sub-class
2 (the "Sub-Class") consisting of all members of the Class who entered into subscription
3 contracts within the state of California.

4    46.    The Class and Sub-Class each consist of thousands of individuals and other
5 entities, making joinder impractical, in satisfaction of Rule 23(a)(1).

6    47.    The claims of Plaintiff are typical of the claims of all of the other members of
7 the respective classes.

8    48.    Plaintiff will fairly and adequately represent and protect the interests of the
9 other members of the respective classes. Plaintiff has retained counsel with substantial
10 experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are
11 committed to vigorously prosecuting this action on behalf of the other Class members, and
12 have the financial resources to do so. Neither Plaintiff nor his counsel have any interest
13 adverse to those of the other Class members.

14    49.    Absent a class action, most Class members would find the cost of litigating
15 their claims to be prohibitive, and will have no effective remedy. The class treatment of
16 common questions of law and fact is also superior to multiple individual actions or piecemeal
17 litigation in that it conserves the resources of the courts and the litigants, and promotes
18 consistency and efficiency of adjudication.

19    50.    Defendant has acted and failed to act on grounds generally applicable to the
20 plaintiff and the other members of the respective classes, requiring the Court's imposition of
21 uniform relief to ensure compatible standards of conduct toward the Class members.

22    51.    The factual and legal bases of Defendant's liability to Plaintiff and to the other
23 members of the respective classes are the same, resulting in injury to the plaintiff and to all of
24 the other Class members. Plaintiff and other Class members have all suffered harm and
25 damages as a result of all of Defendant's unlawful and wrongful conduct.

26
27
28
---
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
11

1    52.    There are many questions of law and fact common to the claims of Plaintiff

2    and the other members of the respective class members, and those questions predominate

3    over any questions that may affect individual Class members within the meaning of Rule

4    23(a)(2) and 23(b)(3). Common questions for the Class include but are not limited to the

5    following:

6              (a)    Whether Defendant's conduct described herein is "unjust and

7    unreasonable" as specified in 47 U.S.C. § 201(b); and

8              (b)    Whether Defendant's conduct described herein is in breach of contract.

9    53.    Common questions for the Sub-Class include:

10             (a)    Whether Defendant's conduct described herein is in violation of

11   California's Public Utility Code section 2890;

12             (b)    Whether Defendant's conduct described herein violates California

13   Business and Professions Code sections 17200, *et seq*; and

14             (c)    Whether Defendant's conduct described herein violates California

15   Business and Professions Code sections17500, *et seq*.

16

17                                **COUNT I**
                **(Violation Of 47 U.S.C. § 201 on behalf of the Class)**
18
     54.    Plaintiff incorporates the foregoing allegations.
19
     55.    Section 201 of 47 U.S. Code provides in relevant part as follows:
20
                 All charges, practices, classifications, and regulations for and
21               in connection with such communication service [*i.e.*, interstate
                 or foreign communication by wire or radio], shall be just and
22               reasonable, and any such charge, practice, classification, or
                 regulation that is unjust or unreasonable is declared to be
23               unlawful . . . .

24
     56.    T-Mobile's practice of charging Plaintiff and class members for services they
25
     never ordered or subscribed to is neither just nor reasonable and is in fact unjust and
26
     unreasonable, as set forth in 47 U.S.C. § 201, and violates the said statute.
27

28
     **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
                                    12

57. 47 U.S.C. § 206, in turn, provides in relevant part:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee . . . .

58. Finally, 47 U.S. C. § 207 provides in relevant part that

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may . . . bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction . . .

## COUNT II
### (Unauthorized Telephone Charges In Violation Of California Public Utilities Code § 2890 on behalf of the Sub-Class)

59. Plaintiff incorporates by reference the foregoing allegations.

60. California Public Utilities Code section 2106 provides aggrieved persons the following private right of action:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury maybe brought in any court of competent jurisdiction by any corporation or person.

61. In an effort to deter the unlawful practice of "cramming," *i.e.*, the placing of unauthorized charges on telephone bills, the California legislature enacted Public Utilities Code section 2890, which provides, in pertinent part, as follows:

> (a) A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13

(b) When a person or corporation obtains a written order for a product or service, the written order shall be a separate document from any solicitation material. The sole purpose of the document is to explain the nature and extent of the transaction. Written orders and written solicitation materials shall be unambiguous, legible, and in a minimum 10 point type. Written or oral solicitation materials used to obtain an order for a product or service shall be in the same language as the written order. Written orders may not be used as entry forms for sweepstakes, contests, or any other program that offers prizes or gifts.

(c) The commission may only permit a subscriber's local telephone service to be disconnected for nonpayment of charges relating to the subscriber's basic local exchange telephone service, long distance telephone service within a local access and transport area (intraLATA), long distance telephone service between local access and transport areas (interLATA), and international telephone service.

(d) (1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill. A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

---

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

14

1  (C) Establish, maintain, and staff a toll free
telephone number to respond to questions or disputes
2  about its charges and to provide the appropriate
addresses to which written questions or complaints may
3  be sent. The person, corporation, or billing agent that
generates a charge may also contract with a third-party,
4  including, but not limited to, the billing telephone
corporation, to provide that service on behalf of the
5  person, corporation or billing agent.

6  (D) Provide a means for expeditiously resolving
subscriber disputes over charges for a product or
7  service, the purchase of which was not authorized by
the subscriber. In the case of a dispute, there is a
8  rebuttable presumption that an unverified charge for a
product or service was not authorized by the subscriber
9  and that the subscriber is not responsible for that
charge. With regard to direct dialed
10  telecommunications services, evidence that a call was
dialed is prima facie evidence of authorization. If
11  recurring charges arise from the use of those subscriber
initiated services, the recurring charges are subject to
12  this section.

13  (E) If an entity responsible for generating a
charge on a telephone bill receives a complaint from a
14  subscriber that the subscriber did not authorize the
purchase of the product or service associated with that
15  charge, the entity, not later than 30 days from the date
on which the complaint is received, shall verify the
16  subscriber's authorization of that charge or undertake to
resolve the billing dispute to the subscriber's
17  satisfaction.

18  62.  Defendant violated section 2890 by virtue of its conduct alleged above,

19  including its billing for products or services, the purchase of which he never authorized,

20  thereby causing Plaintiff and the members of the class to suffer loss, damage, and injury.

21  63.  Plaintiff and the Class are entitled to actual damages pursuant to Public

22  Utilities Code sectin 2106. Plaintiff and the Sub-Class are further entitled to exemplary

23  damages to the extent the evidence shows that Defendant's violations were willful.

24  ///

25  ///

26  ///

27

28
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
15

**COUNT III**
**(Breach Of Contract on behalf of the Class)**

64. Plaintiff incorporates by reference the foregoing allegations.

65. Plaintiff entered into an agreement with Defendant whereby Plaintiff agreed to pay a certain sum of money in exchange for Defendant's activation of Plaintiff's cellular telephone account and its promise to provide various communication and related services to Plaintiff.

66. Defendant expressly and/or impliedly agreed to provide Plaintiff with a cellular telephone number free of preexisting billing obligations for products and services ordered, purchased and/or authorized by the previous owners and/or users of said telephone numbers.

67. Defendant further expressly and/or impliedly agreed to bill Plaintiff only for products or services the purchase of which he had authorized.

68. Defendant further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

69. Defendant breached its contractual obligations by providing Plaintiff with a phone number saddled with preexisting obligations, encumbrances and billing arrangements for products and services ordered, purchased and/or authorized, if at all, by the previous owners and/or users of said telephone numbers.

70. Defendant further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiff for products or services, the purchase of which he never authorized.

71. Plaintiff has performed his obligations under the contract.

72. The aforementioned breaches of contract have proximately caused the Plaintiff economic injury and other damages.

///

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
16

**COUNT IV**
**(Unlawful, Unfair and Deceptive Business Practices in Violation of**
**California Business & Professions Code § 17200, et seq. on behalf of the Sub-Class)**

73.     Plaintiff incorporates by reference the foregoing allegations.

74.     The Unfair Business Practices Act proscribes unfair business competition and defines same to include any "unfair," "unlawful," or "fraudulent" business act or practice. California Business & Professions Code §17200 *et seq*.

75.     Defendant violated, and continues to violate this proscription through its conduct alleged above, including its unlawful violations of the California Public Utilities Code section 2890, as set forth above in connection with Plaintiff's First Cause of Action.

76.     Defendant, through its acts of unfair competition, has obtained money from Plaintiff and members of the proposed Class. Plaintiff and the members of the Sub-Class ask that this Court restore this money to them and enjoin Defendant from continuing its illegal practices.

77.     Such conduct is ongoing and continues to this date. Plaintiff, the Sub-Class members and the general public are therefore entitled to the relief described herein.

**COUNT V**
**(False and Misleading Advertising in Violation of**
**California Business & Professions Code § 17500, et seq. on behalf of the Sub-Class)**

78.     Plaintiff incorporates by reference the foregoing allegations.

79.     California Business & Professions Code § 17500 provides that:

> It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with

the proposed performance or disposition thereof, which is
untrue or misleading, and which is known, or which by the
exercise of reasonable care should be known, to be untrue or
misleading, or for any such person, firm, or corporation to so
make or disseminate or cause to be so made or disseminated
any such statement as part of a plan or scheme with the intent
not to sell such personal property or services, professional or
otherwise, so advertised at the price stated therein, or as so
advertised.

80.     Defendant violated, and continues to violate this provision by virtue of its

conduct alleged above.

81.     Defendant, through its acts of unfair competition, has obtained money from

Plaintiff and members of the Sub-Class. Plaintiff and the members of the Sub-Class ask that

this Court restore this money to them and enjoin Defendant from continuing its illegal

practices.

82.     Such conduct is ongoing and continues to this date. Plaintiff, the Sub-Class

members and the general public are therefore entitled to the relief described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Russell Bradberry, on behalf of himself and the respective

classes, prays for the following relief:

       a)     Certify this case as a class action on behalf of the Class and

Sub-Class as defined above and appoint Russell Bradberry Class

Representative, and appoint John G. Jacobs. and Jay Edelson, as co-lead

counsel;

       b)     Declare that the actions of T-Mobile, as set out above,

constitute a breach of contract, and are in violation of 47 U.S.C. § 201,

California Public Utilities Code § 2890 and California Business and

Professions Code §§17200 and 17500;

       c)     Enter judgment against T-Mobile for all economic, monetary,

actual, consequential, and compensatory damages caused by Defendant's

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

18

1  conduct, and if Defendant's conduct is proved willful, award Plaintiff and the

2  Class exemplary damages;

3            d)     Award Plaintiff and the Classes reasonable costs and attorneys'

4  fees;

5            e)     Award Plaintiff and the Classes pre- and post-judgment

6  interest;

7            f)     Enter judgment for an injunctive and/or declaratory relief as is

8  necessary to protect the interests of Plaintiff and the Classes;

9            g)     Award such other and further relief as equity and justice may

10  require.

11

12  **JURY DEMAND**

13  Plaintiff requests trial by jury of all claims that can be so tried.

14

15  Respectfully submitted,

16  Dated: October 20, 2006              LAW OFFICES OF TERRY M. GORDON

17

18

19

20  By: _____

    TERRY M. GORDON

21      One of the Attorneys for RUSSELL

    BRADBERRY, individually and on

22      behalf of a class of similarly situated

    individuals

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1  JOHN BLIM (*PRO HAC VICE* pending)
   JAY EDELSON (*PRO HAC VICE* pending)
2  MYLES MCGUIRE (Of Counsel) (*PRO HAC VICE* pending)
   BLIM & EDELSON, LLC
3  53 West Jackson Boulevard
   Suite 1642
4  Chicago, Illinois 60604
   Telephone: (312) 913-9400
5  Facsimile: (312) 913-9401

6  JOHN G. JACOBS (*PRO HAC VICE* pending)
   BRYAN G. KOLTON (*PRO HAC VICE* pending)
7  THE JACOBS LAW FIRM, CHTD.
   122 South Michigan Avenue
8  Suite 1850
   Chicago, Illinois 60603
9  Telephone: (312) 427-4000
   Facsimile: (312) 427-1850
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
   **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**



**EXHIBIT A**

# T Mobile — Off Site Service Agreement

## FOR OFFICE USE ONLY

Activation Date **11/02/05**  ☒ New  ☐ Add-on  Store Name **Alert Cellular**

Account # _____  Agent Code **1556890**  Location Phone **SM 733-047?**

Onyx Code _____  Credit Class _____  For Questions, rate plan changes or other functions, visit my.t-mobile (at t-mobile.com) or call 611 (from T-Mobile wireless) or (800) 937-8997

Salesperson Name **Mary Herrera**

## CUSTOMER BUSINESS INFORMATION

Name **Russell Bradberry**

Business Name _____

Address **3264 Pepper Grass Dr**

City, State, Zip **San Diego CA 9215**

SS# or Federal Tax ID # **570 71 6871**

Driver's License # & State **D2552154 CA**

E-Mail _____

Daytime Phone **559 737-7284**

Date of Birth **06/13/1982**

Fax _____

Password _____

## SERVICE INFORMATION

### LINE 1  ☐ A  Mobile # **619 - 746 - 8694**

Rate Plan **39.99**  Monthly Access Fee _____

SIM# **8901260310031355349**

IMEI # **350655300119385**

Manufacturer/Model # **own phone**

Minutes Included **600 whenever**

Overage Charges _____  1st Month Prorated Charges **39.97**

Optional Features

☒ Included **whenevers**  ☐ Added **1st plan 499**  **400**

☒ Included **unl wknds**  ☐ Added _____

☐ Included _____  ☐ Added _____

### LINE 2  Mobile # _____

Rate Plan _____  Monthly Access Fee _____

SIM # _____

IMEI # _____

Manufacturer/Model # _____

Minutes Included _____

Overage Charges _____  1st Month Prorated Charges _____

Optional Features

☐ Included _____  ☐ Added _____

☐ Included _____  ☐ Added _____

☐ Included _____  ☐ Added _____

### LINE 3  Mobile # _____

Rate Plan _____  Monthly Access Fee _____

SIM# _____

IMEI # _____

Manufacturer/Model # _____

Minutes Included _____

Overage Charges _____  1st Month Prorated Charges _____

Optional Features

☐ Included _____  ☐ Added _____

☐ Included _____  ☐ Added _____

☐ Included _____  ☐ Added _____

### Smart Access Customers Only:

You have a $150 spending limit. If your balance exceeds $150, T-Mobile may suspend your service until you bring the balance below $150. Even if suspended, you will continue to be liable for all charges incurred. Service Comments: **120.00 non refundable fee**

## PAYMENT

Security Deposit _____  Check/Money order # _____  Reference # _____

Method of Payment: ☐ Cash  ☐ Check  ☐ Credit Card  ☒ Withdrawal From Bank Account  ☐ P.O.  ☐ Deferred Payment (Business Accounts Only)

Credit Card Information: ☐ MC  ☒ Visa  ☐ AmEx  ☐ Other

Credit Card # **1060 9580 0041 1708**  Exp. Date **07/07**  Authorization No. **055906**

Bank Account Information: Routing Transit # _____  Account # _____

**AUTOMATIC PAYMENT FROM CREDIT CARD OR BANK ACCOUNT:** Please charge my monthly T-Mobile service fees to my credit card or bank account. By signing, I authorize T-Mobile to debit my account.

Signature _____  Date **02 Nov 05**

## CUSTOMER INFORMATION

* **THIS AGREEMENT INCORPORATES THE T-MOBILE TERMS AND CONDITIONS AND THE FOLLOWING BROCHURES AND MATERIALS:** Welcome Guide; Welcome Letter; Rates and Services; Coverage Brochure; Coverage Maps; Regional Plan Brochures; T-Mobile for Business Brochure; International Brochure; Handhelds Brochure; Added Value Brochure and other rate plan materials.
* You have selected a plan with a fixed service term of **at least 12 months.** Our fixed term plans are subject to **a $200 early cancellation fee** per line of service.
* The monthly access fee and included minutes, if any, will be prorated for the number of days you are actually on service with T-Mobile for your first month.
* There will be a one time **$35.00 activation fee** per line of service. **A Regulatory Programs fee of 86¢** per line/month applies.
* **Cancellation and Return Policy.** You may cancel your service within 14 days of your service activation date (30 days in CA) without a cancellation fee. You may also return your Phone to T-Mobile within the same time period for a refund. Other restrictions apply, please see Section 5 of the T-Mobile Terms and Conditions for a full text of the Cancellation and Return Policy.
* We are required to use the residential or business street address you provided, which must be within our licensed service area, to determine certain taxes and fees. If you give us an address (such as a PO box) that is not a recognized street address, you will be assigned a default location for tax and fee calculation, which may result in a higher or lower charge for taxes and fees.

**INITIAL TERM** _____ **MONTHS**  **EARLY CANCELLATION FEE OF $200 PER LINE OF SERVICE**

Customer Initials _____  I understand that if I terminate service for any reason prior to the Initial Term, I will pay the Early Termination Fee

# ALERT CELLULAR, LLC

Visalia Mall #2
2031 South Mooney Blvd
Space #5529
Visalia, CA 93277
1-800-716-1755

**INVOICE #** 1034253

**NAME:** RUSSELL BRADBERRY
**HOME PHONE:** 5597397284
**ADDRESS:** 3264 PEPPERGRASS DR
**CITY:** SAN DIEGO **STATE:** CA **ZIP:** 6891
**PLAN CODE:** T-CLASS CUSTOMERS

**WORK PHONE:**

**CC AUTH #:** 011379

**DATE:** 11/02/05
**SALES PERSON:** HERRERA, MARY
**PAYMENT TYPE:** Visa
**SALES ID #:** 3954

**INVENTORY LOCATION:** 337 **DEPARTMENT:** VISALIA2
**CARRIER:**

| QTY | ITEM# | DESCRIPTION | PLAN | CELL # | ESN / IMEI | UNIT PRICE | TOTAL |
|-----|-------|-------------|------|--------|-----------|-----------|-------|
| 1 | CONVERSION | ACTIVATION ONLY - CONVERSION | T-CLASS | 6194468694 | | 20.00 | 20.00 |
| 1 | TACTFEE | T-CLASS ACT FEE (NONREFUNDABLE) | | | | 75.00 | 75.00 |

**CUSTOMER HELP SURVEY**

You have seen the personal coverage map and the salesperson verified that there is
coverage in your area

Your Voicemail can be set by pressing 123 send for T-Mobile and *86 send for Verizon.

You can reach your provider by dialing 611 for T-Mobile or *611 for Verizon

Your first bill will include a one-time activation fee of $_____ and your bill cycle will start
on the _____ of the month. Your first bill will include a prorated amount of $_____ for
your partial month of service.

I ACCEPT / DECLINE (Circle One) GWG Protection Program and fully understand my
coverage. Coverage begins the 31st day and is valid for 1 year from purchase date. Any
change o my service needs to be reported to wireless provider and to GWG.

Unreported changes to handset will void coverage. GWG claim # is 1-888-980-8894.

You can check your up-to-date minutes by dialing #646# (T-Mobile) or #646 (Verizon)

You feel comfortable with the additional features added to your account and your
representative has shown you how they work (Internet, text messaging, etc.)

The salesperson has explained to you the _____ year agreement.

Your salesperson's name and number is _____

**TERMS AND CONDITIONS OF SALE**

DEFECTIVE HANDSETS - Alert will exchange manufacture defective handset under
14 days over the counter. The returned phone must be complete with box, battery,
charger, instruction manual. Anytime after 14 days the carrier will rapid
replace the handset through the mail. Alert employees are happy to assist with
replacement arrangements.

RETURN POLICY: Alert's return policy is 14 days for T-Mobile Phones and Service
(30 days in CA) and 3 days for Verizon Phones and Service. All returns must include
merchandise in resellable condition with the unmarked
original box, instruction manual, battery, homecharger and original invoice.
Accessories are non-refundable.

REFUNDS may take 4-6 weeks to process.

SECONDARY AGREEMENT: I understand the phone sold to me at a discounted
price was based on the _____ year contract I signed with the carrier. I authorize my
credit card to be charged $350 per line if I terminate this contract for any
reason prior to the contract expiration date.

| | |
|---|---|
| SUBTOTAL | 95.00 |
| TAX | 0.00 |
| Exchange Credi | |
| **TOTAL** | **95.00** |

FORM

# EXHIBIT E

1 | Mark A. Chavez (CA BAR #90858)
2 | Kathryn C. Palamountain (CA BAR #183246)
  | CHAVEZ & GERTLER, LLP
3 | 42 Miller Avenue
  | Mill Valley, CA  94941
4 | Phone:  (415) 381-5599
  | Fax:      (415) 381-5572
5 | Email:  chris@chavezgertler.com

6 | Jay Edelson (*pro hac vice* pending)
7 | John Blim (*pro hac vice* pending)
  | BLIM & EDELSON, LLC
8 | 53 West Jackson Boulevard, Suite 1642
  | Chicago, IL  60604
9 | Phone: (312) 913-9400
  | Fax: (312) 913-9401
10 |

11 | John G. Jacobs (*pro hac vice* pending)
   | Bryan G. Kolton (*pro hac vice* pending)
12 | THE JACOBS LAW FIRM, CHTD.
   | 122 South Michigan Ave., Suite 1850
13 | Chicago, IL 60603
   | Phone: (312) 427-4000
14 | Fax: (312) 427-4000

15 | Attorneys for PLAINTIFF
16 | LACI SATTERFIELD

ORIGINAL
FILED

MAY - 3 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

17

### IN THE UNITED STATES DISTRICT COURT

18

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

19

20 | LACI SATTERFIELD, Individually,
   | and on behalf of others similarly situated,

21 |     PLAINTIFF,

22 |         vs.

23 | SIMON & SCHUSTER, Inc., a New York
24 | Corporation, and IPSH!NET, Inc., a Delaware
   | Corporation d/b/a IPSH!,

25 |

26 |     Defendants.

27 |

28 |

) Case No.: C06 2893 CW
)
) **CORRECTED**
) **COMPLAINT FOR DAMAGES AND**
) **INJUNCTIVE RELIEF**
)
) DEMAND FOR JURY TRIAL
)
) CLASS ACTION
)
)
)
)
)
)



## PRELIMINARY STATEMENT

1.     In a recent effort to promote the sale of a new Stephen King book entitled "Cell," Defendant SIMON & SCHUSTER, INC. ("SIMON & SCHUSTER"), one of the largest publishers of books in the nation, along with its marketing agent IPSH!NET, INC., d/b/a Ipsh! ("IPSH"), engaged in an especially pernicious form of marketing: the transmission of unauthorized advertisements, in the form of "text message" calls (hereinafter "wireless spam" or "SMS SPAM") to the cellular telephones of consumers across the nation.

2.     PLAINTIFF Laci Satterfield ("PLAINTIFF") brings this class action complaint against defendants SIMON & SCHUSTER, INC. and IPSH to halt defendants' practice of making unsolicited text message calls to cellular telephones, and to obtain redress for all persons injured by their conduct. For her class action complaint, PLAINTIFF alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE CASE

3.     By effectuating wireless spam, Defendants have caused consumers actual harm, not only because the consumers were subjected to a violation of their right to privacy, but also because of the annoyance and aggravation that necessarily accompanies unsolicited wireless spam. In virtually all instances, subscribers to cellular telephone services actually have to pay their cell phone service providers for the receipt of such wireless spam, or the request that more such spam not be sent in the future, notwithstanding that it is sent in violation of a federal statute specifically on the subject.

4.     In order to challenge and stop these marketing and business practices and redress injuries arising from them, PLAINTIFF, on behalf of herself and a nationwide class, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227. *et seq.* ("TCPA")

5.     The TCPA prohibits unsolicited voice and text calls to cellular phones, or other common carrier services in which the called party is charged for the call, in order to protect consumers' right to privacy and to further protect them from unsolicited and

1

1    unwanted cellular communications, including commercial and marketing

2    communications for which they are charged.

3        6.    On behalf of the class, PLAINTIFF seeks an injunction requiring Defendants to

4    cease all wireless spam activities and an award of damages to herself and all similarly situated

5    persons, together with costs and reasonable attorneys' fees.

6                                    **PARTIES**

7        7.    PLAINTIFF Laci Satterfield is and has been, at all times material to this

8    Complaint, a citizen of New York, residing in Suffolk County, New York.

9        8.    Defendant IPSH is a Delaware company with its principal place of business in

10    San Francisco, California.  According to its own statements, Defendant IPSH is "the North

11    American leader in innovating, developing and deploying effective, turnkey mobile marketing

12    strategies."

13        9.    Defendant SIMON & SCHUSTER is a New York company with its principal

14    place of business in New York.  SIMON & SCHUSTER is a leading publisher and purveyor

15    of books in the United States, and it does business throughout the United States.

16                                  **JURISDICTION**

17        10.    The Court has original jurisdiction over this action pursuant to 28 U.S.C.

18    § 1332(d), because (a) at least one member of the putative class is a citizen of a state different

19    from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and

20    costs, and (c) none of the exceptions under that subsection apply to this action.

21                                      **VENUE**

22        11.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (c).

23                **FACTS COMMON TO ALL CAUSES OF ACTION**

24        12.    In recent years, telemarketers, who often have felt stymied by federal laws

25    limiting solicitations over telephones, facsimile machines, and e-mails, have increasingly

26    looked to alternative technologies through which to send bulk solicitations cheaply.

27    ///

28    ///

                                        2

1     13.    One of the newest types of such bulk marketing is to advertise through Short

2    Message Services.  The term "Short Message Service" or "SMS" is a messaging system that

3    allows cellular telephone subscribers to use their cellular telephones to send and receive short

4    text messages, usually limited to 160 or so characters, on their cellular telephones.

5     14.    An "SMS message" is a text message call directed to a wireless device through

6    the use of the telephone number assigned to the device.  When an SMS message call is

7    successfully made, the recipient's cell phone rings, alerting him or her that a call is being

8    received.

9     15.    Unlike more conventional advertisements, wireless spam actually costs its

10   recipients money, because virtually all cellular telephone phone users are charged for each

11   text message call they receive, even if the message is unsolicited and without the consumer's

12   permission.

13     16.    In or about January, 2006, Defendants and/or their authorized agents, vendors,

14   or contractors, used an automatic telephone dialing system to make text message calls to

15   cellular telephone users in California and in other states in the United States, including a text

16   message to the cellular telephone owned by PLAINTIFF.

17     17.    The "sender" field of one such transmission contained only the five-digit

18   number: 49421. The subject line of the message was:  "The next call..."  The body of the

19   message read as follows:

20          The next call you take may be your last... Join the Stephen King VIP
            Mobile Club at www.cellthebook.com. RplySTOP2OptOut.
21          PwdByNexton.

22

23     18.    At 1:41 AM on January 18, 2006, PLAINTIFF's cell phone rang, while in

24   possession of her 10 year old son at the time, indicating that she had received a text call.

25     19.    The sender of the text call identified itself as only "49421," and that the subject

26   field alluded provocatively to the next call.

27

28

                                               3

20.    Defendants either made the text message call to PLAINTIFF's cellular telephone using an automatic telephone dialing system, or contracted with another entity to make said call using an automatic telephone dialing system.

## CLASS ALLEGATIONS

21.    PLAINTIFF brings this action, pursuant to FRCP 23(b)(2) and FRCP 23(b)(3), on behalf of herself and a class (the "Class") consisting of all persons residing in the United States of America who were sent wireless spam by or on behalf of either one of the Defendants.

22.    PLAINTIFF is unable to state the precise number of potential members of the proposed class, information which is in the possession of Defendants. PLAINTIFF is informed and believes, and on that basis alleges, that the proposed class numbers at least in the thousands, and is so numerous and geographically diverse that joinder of all members would be impracticable. The exact size of the proposed class, and the identity of the members thereof, will be ascertainable from Defendants' business records.

23.    It is appropriate to maintain this lawsuit as a class action for injunctive relief pursuant to Federal Rule of Civil Procedure, Rule 23(b)(2) because Defendants acted on grounds generally applicable to the class, thereby making injunctive and declaratory relief appropriate with respect to the class as a whole.

24.    It is also appropriate to maintain this lawsuit as a class action for damages pursuant to Federal Rule of Civil Procedure, Rule 23(b)(3) because questions of law and fact common to the members of the class predominate over questions affecting only individual members and because a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Common questions for the Class include, but are not limited to:

a.    Whether Defendants' conduct described herein is governed by the TCPA;

b.    Whether the transmission of wireless spam by or on behalf of Defendants as alleged herein violates the TCPA; and

4

COMPLAINT AND DEMAND FOR JURY TRIA

c.    Whether the class members are entitled to treble damages based on the willfulness of Defendants' conduct.

25.    The claims of the PLAINTIFF are typical of those of the class that she seeks to represent.

26.    PLAINTIFF will fairly and adequately represent the interests of the class. She is represented by counsel competent and experienced in consumer protection and class action litigation.

27.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impracticable and economically infeasible for class members to seek redress individually. The prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to individual class members against Defendants, and would establish incompatible standards of conduct for Defendants.

28.    PLAINTIFF and members of the class had not previously given express consent to Defendant SIMON & SCHUSTER to make or caused to be made any call to their cellular telephones using an automatic telephone dialing system and/or an artificial or prerecorded voice.

29.    PLAINTIFF and members of the class had not previously given express consent to Defendant IPSH to make or caused to be made any call to their cellular telephones using an automatic telephone dialing and/or an artificial or prerecorded voice.

30.    PLAINTIFF's cellular telephone service is structured such that she is billed, charged, or otherwise responsible to pay for text messages, including wireless SPAM sent by third parties, including Defendants.

///

///

///

///

5

## FIRST CAUSE OF ACTION FOR VIOLATION OF TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. 227 ET SEQ.

31.    PLAINTIFF refers to and incorporates all previous paragraphs as though fully set forth herein.

32.    The TCPA prohibits the making of any call – without prior express consent of the called party – by using any automatic telephone dialing system or artificial or prerecorded voice to any cellular telephone. Defendants violated the TCPA and PLAINTIFF's right to privacy by electronic transmission of written material to the cellular telephones of the members of the class, namely unsolicited commercial advertisements through text message calls using an automatic telephone dialing system and/or using an artificial and prerecorded message.

33.    These text message advertisement calls were made without the prior express invitation or permission of PLAINTIFF and the members of the class.

34.    Defendants have, therefore, violated the TCPA, 47 U.S.C. 227(b)(1)(A)(iii).

35.    As a result of Defendants' illegal conduct as alleged herein, the members of the class suffered actual damages and, under section 227(b)(3)(B), are each entitled, inter alia, to a minimum of $500.00 in damages for each such violation of the TCPA.

WHEREFORE, PLAINTIFF, on behalf of herself and the Class, prays for the following relief:

a.    An order certifying the Class as defined above;

b.    An award of actual and/or statutory damages;

c.    An injunction requiring Defendants to cease all wireless spam activities

d.    Reasonable attorneys' fees and costs; and

e.    Such further and other relief the Court deems appropriate.

/ / /

/ / /

/ / /

/ / /

COMPLAINT AND DEMAND FOR JURY TRIAL

<u>**SECOND CAUSE OF ACTION FOR INJUNCTIVE RELIEF**</u>

36.    PLAINTIFF refers to and incorporates all previous paragraphs as though fully set forth herein.

37.    Defendant and/or its agents or independent contractors have possession, custody and control of the business records, databases, computer systems and other information and equipment necessary to identify the members of the class, including but not limited to the names, addresses and cellular telephone numbers of the class members. Unless immediate injunctive relief is ordered, defendant will alter, erase, delete, destroy or otherwise dispose of and remove such systems, records and equipment. For this reason, PLAINTIFF is entitled to an order prohibiting and enjoining defendant and its agents or independent contractors from altering, deleting, destroying or otherwise disposing of any documents, records, databases or computer systems that are necessary to identify the members of the class.

38.    Defendant should be enjoined from further violations of the TCPA.

WHEREFORE, PLAINTIFF, on behalf of herself and the Class, prays for the following relief:

a.    An order certifying the Class as defined above;

b.    An injunction requiring Defendants to cease all wireless spam activities and restraining Defendants from altering, erasing, changing, deleting, destroying or otherwise removing or disposing of any documents, records, databases, computer systems and the like currently in its possession or control or in the possession or control of its agents and contractors which are used or useful in identifying all persons, corporations or other entities to whom defendant has transmitted its text message advertisements;

c.    An order preliminarily and permanently enjoining Defendants from engaging in the practices challenged herein;

d.    Reasonable attorneys' fees and costs; and

COMPLAINT AND DEMAND FOR JURY TRIA

e.    Such further and other relief the Court deems appropriate.

Dated: May 3, 2006

Respectfully submitted,

CHAVEZ & GERTLER, LLP

THE JACOBS LAW FIRM, CHTD.

BLIM & EDELSON, LLC

By: _____
        Mark A. Chavez

Attorneys for PLAINTIFF
LACI SATTERFIELD

8

<u>DEMAND FOR JURY TRIAL</u>

PLAINTIFF hereby demands a trial by jury on all issues so triable.

Dated: May 3, 2006                  Respectfully submitted,

                                    CHAVEZ & GERTLER, LLP

                                    THE JACOBS LAW FIRM, CHTD.

                                    BLIM & EDELSON, LLC

                                    By: _____
                                          Mark A. Chavez

                                    Attorneys for PLAINTIFF
                                    LACI SATTERFIELD

9

COMPLAINT AND DEMAND FOR JURY TRIAL

1

2 <u>CERTIFICATION OF INTERESTED ENTITIES OR PERSONS</u>

3

4     Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other

5 than the named parties, there is no such interest to report.

6

7 Dated: May 3, 2006                 Respectfully submitted,

8                             CHAVEZ & GERTLER, LLP

9                             THE JACOBS LAW FIRM, CHTD.

10

11                             BLIM & EDELSON, LLC

12

13         By:

14                             Mark A. Chavez

15

16                             Attorneys for PLAINTIFF
LACI SATTERFIELD

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIA