**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL CRISSWELL, individually and on
behalf of a class of similarly situated
individuals,

                    Plaintiff,

    v.

MYSPACE, INC., a Delaware corporation,


                 Defendant.

No. 08 CV 01578

Judge Milton I. Shadur

Magistrate Judge Sidney I. Schenkier


**MOTION FOR PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

Plaintiff Michael Crisswell, through his counsel, respectfully moves this Court for a preliminary injunction, including the imposition of a constructive trust, and the certification of a class under Rule 23(b)(2) to the extent it is necessary to support the injunctive relief sought herein:

1.     MySpace transmits content wirelessly through text messages and other protocols (collectively known as "mobile content"). Such mobile content is routed to the intended recipient through such recipient's wireless telephone number. Recipients frequently incur charges when MySpace's mobile content is received. MySpace and/or its agents receive a portion of the resulting charges, and wrongfully retain this income in the case of unauthorized charges. Both California and Illinois provide for the imposition of a constructive trust where a defendant wrongfully retains property which belongs to another.

2.     The unauthorized text messages from MySpace's Mobile Service cause noneconomic damages as well, such as slowing the wireless devices down, consuming the devices' memory and storage capacity, consuming the time of users attempting to delete existing unauthorized text messages and to prevent similar messages in the future, and generally impeding the use of their cellular telephones. Unauthorized mobile content further threatens recipients with dispossession of their cellular telephones should payment for such products not be timely made. A preliminary injunction will protect and vindicate the property rights of wireless device

owners, like Plaintiff, in their devices against MySpace's unauthorized text messages. Plaintiff seeks a preliminary injunction to prevent MySpace's continuing trespass by transmitting through its Mobile Service to wireless devices whose owners do not want these messages.

3.     Plaintiff moves the Court to certify this action as a class action, to designate Plaintiff as representative of the Class, and to designate KamberEdelson LLC as Class counsel under Rule 23(b)(2) and Rule 23(c)(4) only if and to the extent necessary for the Court to grant the preliminary injunction sought herein.

4.     Plaintiff incorporates herein by reference his Brief in support of Plaintiff's Motion for Preliminary Injunction and Class Certification

WHEREFORE, it is respectfully requested that this Court enter an order

a)     Imposing a constructive trust

   i)     on funds or proceeds which MySpace received through the operation of its Mobile Service ("Constructive Trust Funds"),

   ii)    which MySpace and/or its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the Court's order ("Constructive Trustees") possess or control; and

b)     Requiring MySpace to provide notice of the Court's order to any person which it knows or has reason to believe has control over Constructive Trust Funds, and to certify to the Court that it has provided such notice no later than 5 days after the entry of the Court's order; and

c)     Requiring each Constructive Trustee (i) to provide the Court and Plaintiff an accounting of all Constructive Trust Funds, no later than 30 days after the entry of the Court's order; and (ii) to certify to the Court no later than 10 days after the entry of the Court's order that all Constructive Trust Funds in their control as of the date of the Court's order, or which come into the control of the Constructive Trustees after the date of the Order, have been placed into a segregated, interest-bearing fiduciary account maintained by a FDIC-insured financial institution.

d)     Enjoining MySpace (or its officers, agents, servants, employees, attorneys, or other persons who are in active concert or participation with any of the foregoing) from

   i)     transmitting any mobile content (i.e., messages through protocols such as Short Messaging Service (SMS), Inter-carrier SMS (ICSMS), Multimedia Messaging Service (MMS), Inter-carrier MMS (ICMMS), Application to Person (A2P) from either itself or on behalf of any of its users, to any cellular telephone number,

ii)    except that this prohibition shall not extend to such cellular phone numbers where MySpace, Inc. has verified that the cellular subscriber(s) using such cellular phone number and paying the service fees for maintaining such cellular telephone number has affirmatively consented to such text messages; but

iii)    MySpace's verification mechanism must involve non-public credentials which may be available to cellular subscribers' carriers, but cannot consist entirely of the cellular telephone number itself, and/or MySpace-specific credentials, such as a MySpace user name or password.

e)    Certifying this action as a class action under Rule 23(b)(2) and Rule 23(c)(4), to the extent necessary, and only to the extent necessary, for the Court to grant the preliminary injunction sought herein, and

i)    designating Plaintiff as representative of a class of all wireless telephone subscribers in the nation who suffered losses or damages as a result of incurring charges on their cellular telephone bills from or on behalf of Defendant MySpace not authorized by the subscriber ("Class");

ii)    and a subclass of all members of the Class residing in the State of Illinois ("Subclass");

iii)    designating KamberEdelson, LLC as class counsel; and

f)    such further or additional relief as the Court deems appropriate.

Respectfully submitted,

Dated: June 11, 2008

By: /s/ Myles McGuire
Jay Edelson
Myles McGuire
Ethan Preston
KAMBEREDELSON LLC
53 West Jackson Ave., Suite 550
Chicago, IL 60604
(312) 589-6370
mmcguire@kamberedelson.com

## CERTIFICATE OF SERVICE

Pursuant to LR 5.5, I hereby certify that I served the foregoing Notice of Motion, Motion, and attached supporting Memorandum through this Court's ECF system, consistent with Section IX of General Order 07-0023, on the following date.

Dated: June 11, 2008

By: /s/ Myles McGuire
    Myles McGuire
    KAMBEREDELSON LLC
    53 West Jackson Ave., Suite 550
    Chicago, IL 60604
    (312) 589-6370
    mmcguire@kamberedelson.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL CRISSWELL, individually and on behalf of a class of similarly situated individuals, | No. 08 CV 01578 |
| Plaintiff, | |
| v. | Judge Milton I. Shadur |
| MYSPACE, INC., a Delaware corporation, | |
| | Magistrate Judge Sidney I. Schenkier |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

Plaintiff Michael Crisswell ("Crisswell"), respectfully files this Brief in Support of his

Motion for Preliminary Injunction and Class Certification under Federal Rule of Civil

Procedure 65 and 23.

Crisswell's Complaint arises from the operation of MySpace's Mobile Service.

MySpace operates a social networking website with over 100 million users. (Pl.'s Compl. ¶¶ 1,

17.) As part of its efforts to attract additional users, the MySpace website offers a feature

("Mobile Service") that allows MySpace users to transmit text messages to one another

through the MySpace website. (*Id.* ¶¶ 11-12.) At least, that is how Mobile Service is supposed

to work: in fact, MySpace relies entirely on its users to input and validate their own wireless

telephone numbers to which Mobile Service transmits text messages. (*Id.* ¶ 16.) In fact,

MySpace uses wireless telephone numbers which are often outdated, wrong, or even false – so

that the users of these wireless numbers do not consent or authorize the text messages sent

through the Mobile Service. (*Id.* ¶¶ 16-17.) This is especially problematic because wireless

subscribers are frequently charged for receiving text messages. (*Id.* ¶ 14.) In addition, the

receipt of these text messages slows the wireless devices down, consumes the devices'

memory and storage capacity, consumes the time of recipients attempting to delete existing

unauthorized text messages and to prevent similar text messages in the future, and generally

impedes the use of wireless devices. (*Id.* ¶ 15.)

1

To remedy these harms, Crisswell brings a claim for, *inter alia*, trespass to chattels and restitution/unjust enrichment on behalf of all wireless telephone subscribers in the nation who suffered losses or damages as a result of incurring charges on their cellular telephone bills from or on behalf of MySpace not authorized by the subscriber (the "Class") and a subclass of all Class members residing in Illinois (the "Subclass"). (*Id.* ¶¶ 24, 37-43.)

Now that Crisswell's Motion to Remand has been resolved and his case is definitively in federal court,

## I.    The Facts Available to Crisswell Support His Trespass and Unjust Enrichment Claims

Plaintiff has maintained a cellular telephone subscription account with an established carrier since approximately 2003. (*Id.* ¶ 19.) Beginning in or about October 2007, Plaintiff began to receive text messages which he did not consent to or otherwise authorize. (*Id.* ¶ 21.) Initially, the source of these text messages was not readily apparent to Plaintiff. After the quantity of such text messages increased, however, with many specifically referencing "MySpace" or "MySpace Message," their MySpace origin became clear. (*Id.* ¶ 21.) At no time did Plaintiff consent to receive text messages from MySpace or its users, and specifically did not provide his cellular telephone number to MySpace. (*Id.* ¶ 22.)

Plaintiff was repeatedly charged on his cellular telephone bill for the receipt of MySpace's text messages. Plaintiff paid numerous additional fees to his wireless carrier for such text messages. (Crisswell Decl. ¶ 4.) If Plaintiff had not paid such fees, he would have had his cellular telephone service terminated. On information and belief, Plaintiff asserts that MySpace received income in connection with mobile content charges including those Plaintiff incurred receiving these text messages. (Pl.'s Compl. ¶¶ 14.)

Furthermore, Plaintiff's receipt of MySpace's text messages has caused a variety of noneconomic damages including frustration, inconvenience, interrupted sleeping, lost time spent deleting such text messages, investigating the source of messages, and preventing future charges. Additionally, the capabilities of Plaintiff's cellular telephone were diminished by such text messages consuming storage, processing capacity, and bandwidth on his device, and

2

generally impeding and interfering with his exclusive possession and use of his cellular telephone. (*Id.* ¶ 15.)

Following Plaintiff's investigation of the source of these text messages, Plaintiff took extraordinary steps to report the intrusion to MySpace. On several occasions, Plaintiff notified MySpace by email that such text messages were unwelcome and unauthorized, and repeatedly requested in writing that its text messages to him be immediately discontinued. Despite such requests, MySpace continued to send text messages to Plaintiff. Having been repeatedly rebuffed by MySpace, in or about December, 2007 Plaintiff was left with little choice but to file a complaint with the Federal Communications Commission (FCC) reporting MySpace and its unauthorized text message calls. (Attached as Exhibit A.)

## II.    Crisswell's Claims Support the Relief Sought in This Motion

On the basis of Crisswell's experience, it is plain he has claims under trespass to chattels and unjust enrichment under either law that may apply (namely, California and Illinois).[1] There is no particular need to determine whether California or Illinois law applies at this juncture because these states effectively mirror each other on all points relevant to the attached Motion and reach the same result. Under either state's law, Plaintiff is entitled to a constructive trust, an accounting, and a preliminary injunction preventing further trespass to the Class's wireless devices.

### A.    Constructive Trust and Accounting Are Equitable Remedies for Unjust Enrichment

---

[1]    Crisswell brings his claims on behalf of a national class against a California company, as well as an Illinois subclass as to certain claims. The Court must apply the choice of law rules of the forum state to determine applicable substantive law. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704-05 (7th Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Illinois choice of law, the "law that has the most significant relationship with the occurrence and with the parties determines their rights and liabilities." *Clark v. TAP Pharm. Prods., Inc.*, 343 Ill. App. 3d 538, 547, 798 N.E.2d 123, 130 (Ill. App. Ct. 2003). The following factors determine which state has the most significant relationship: "(1) the place where the injury occurred, (2) the place where the conduct occurred, (3) the parties' domicile, nationality, place of incorporation, and place of business, and (4) the place where the parties' relationship is centered." *Id.* Where MySpace is headquartered in California and presumably caused the transmission of the text messages at issue from its headquarters, and where the Class is scattered throughout the country, it would appear that California has the most significant relationship. *Cf. id.* Conversely, however, Illinois law may well apply to the Illinois Subclass.

The facts averred in Crisswell's attached Declaration support a cause of action for unjust enrichment under Illinois and for restitution under California law. In Illinois, an unjust enrichment claim arises when "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Eighteen Investments, Inc. v. NationsCredit Fin. Servs. Corp.*, 376 Ill. App. 3d 527, 535, 876 N.E.2d 1096, 1103 (Ill. App. Ct. 2007) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 545 N.E.2d 672, 679 (1989)). California law also recognizes a cause of action for restitution "where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct" and "is unjustly enriched at the expense of another [and] as between the [the plaintiff and the defendant,] it is unjust for the [defendant] to retain [the benefit]." *McBride v. Boughton*, 123 Cal. App. 4th 379, 389, 20 Cal. Rptr. 3d 115, 121-22 (Cal. App. Ct. 2004) (citations, punctuation omitted).

Plaintiff received text messages from MySpace's Mobile Service beginning in or about October, 2007. (Crisswell Decl. ¶ 3.) Crisswell never consented to receiving text messages from MySpace, and specifically did not provide his wireless telephone number to MySpace. (*Id.* ¶ 8.) Separate line-item charges for the receipt of these text messages from MySpace's Mobile Service repeatedly appeared on Plaintiff's cellular telephone bills. (*Id.* ¶ 4.) Plaintiff paid such fees to maintain his wireless subscription account. (*Id.* ¶ 4.) On information and belief, MySpace received income in connection with mobile content charges including those Plaintiff incurred to receive the text messages at issue. (Pl.'s Compl. ¶14.) Under the applicable law, Plainitff has a claim for unjust enrichment/restitution to retrieve any such funds retained by MySpace.

MySpace's wrongful retention of these funds is sufficient grounds for a constructive trust. In Illinois, "[a]constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct." *Eychaner v. Gross*, 202 Ill.2d 228, 274, 779 N.E.2d 1115, 1143 (2002). "A constructive trust is created when a court declares the party in possession of wrongfully acquired property the constructive trustee of that property because it would be inequitable for that party to retain possession of it" even where the possession is the result of a mistake, where "no wrongdoing is involved." *Smithberg v. Illinois Mun. Retirement Fund*, 192

4

Ill.2d 291, 299, 735 N.E.2d 560, 566 (2000). *See also Norton v. City of Chicago*, 293 Ill. App. 3d 620, 628, 690 N.E.2d 119, 126 (Ill. App. Ct. 1997). California imposes constructive trusts under similar situations. *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 398, 58 Cal. Rptr. 3d 516, 547 (Cal. App. Ct. 2007). *See also Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg*, 216 Cal. App. 3d 1139, 1154, 265 Cal. Rptr. 330, 337-38 (Cal. App. Ct. 1989). In California, the law provides for a constructive trust whenever a defendant "gains a thing by fraud . . . or other wrongful act . . . unless he has some other and better right thereto." Cal. Civ. Code § 2224 (2008). "The only conditions necessary to create a constructive trust are those stated" in California Civil Code sections 2223 and 2224. *GHK Assocs. v. Mayer Group*, 224 Cal. App. 3d 856, 878, 274 Cal. Rptr. 168, 182 (Cal. Ct. App. 1990). "Under section 2224 of the Civil Code, the courts have even gone so far as to hold that the theory behind the creation of [a constructive] trust extends to practically any case where there is a wrongful acquisition of property to which another is entitled." *Ornbaun v. Main*, 198 Cal. App. 2d 92, 99, 17 Cal. Rptr. 631, 634 (Cal. Ct. App. 1961) (citation, punctuation omitted). *See also GHK*, 224 Cal. App. 3d at 878, 274 Cal. Rptr. at 182 ("a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled").

The provisions of the order Plaintiff seeks dovetail with a constructive trust's legal effects. The constructive trust will require MySpace to sequester funds it obtained through its Mobile Service. Further, the Motion seeks to have MySpace notify recipients of constructive trust funds of the Court's order. This will further serve to ensure the preservation of the constructive trust's res which is now in possession of third parties. *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51-52, 924 P.2d 996, 1003 (1996) (restitution claim against recipient who knows or has constructive knowledge that funds are traceable to constructive trust); *Smithberg*, 192 Ill.2d at 300, 735 N.E.2d at 566 ("[e]xcept where a bona fide purchaser for value is concerned . . . a constructive trust may be imposed even though the person wrongfully receiving the benefit is innocent of collusion").

**B.     Crisswell Is Entitled to a Preliminary Injunction to Prevent Continued Trespass to His Wireless Device**

Crisswell's Declaration establishes MySpace's liability for trespass to chattels and his right

5

to a preliminary injunction preventing continued trespass to the wireless devices owned by Plaintiff and the rest of the Class. Crisswell never provided his wireless telephone number to MySpace for such purpose and never consented to receiving text messages from Mobile Service. (Crisswell Decl. ¶ 5.) Nevertheless, he has received numerous text messages from MySpace's Mobile Service. (*Id.* ¶ 3.) Further, Crisswell has been concretely damaged by MySpace's text messages – he has sustained additional charges to his wireless subscription account. (*Id.* ¶ 4.) In addition, MySpace's continuing trespass causes a variety of noneconomic harms – the frustration, inconvenience, and lost time attributable to deleting text messages, investigating the source of the messages and ways to stop future messages, as well as consuming his wireless device's storage and processing capacity, and generally impeding the use of his device. (*Id.* ¶ 3.) Finally, MySpace continued to send Crisswell text messages even though he repeatedly informed MySpace that he did not authorize MySpace to transmit text messages to his wireless device. (*Id.* ¶ 7.)

Illinois and California recognize trespass to chattels as a cause of action. *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1346-66, 71 P.3d 296, 299-312 (2003) (following Restatement (Second) of Torts § 218 (1965)); *Loman v. Freeman*, 375 Ill. App. 3d 445, 457-58, 874 N.E.2d 542, 552 (Ill. App. Ct. 2006) (following Restatement (Second) of Torts § 278). The law supports a claim for trespass to chattels, where MySpace transmits electronic signals to Crisswell's property without his authorization or consent and these signals damage him and impair his use of his wireless device. *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229-32 (N.D. Ill. 2005) (installation of malicious software on class members' computers was trespass to chattels under Illinois law); *Ebay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058, 1066-67 (N.D. Cal. 2000) (competitor's automated searches of plaintiff's servers was trespass to chattels under California law); *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1572, 54 Cal. Rptr. 2d 468, 476-477 (Cal. Ct. App. 1996) (electronic signals sent over telephone line to computerized switching network was trespass to chattels).

An injunction is the established remedy to protect and vindicate property owner's rights against a continuing trespass. Without the remedy of a preliminary injunction, "a trespasser could take a compulsory license to use another's personal property for as long as the trespasser could

perpetuate the litigation." *Ebay*, 100 F. Supp. 2d at 1067 (granting injunctive relief against continued automated searches of plaintiff's servers). *Cf. CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1015, 1022 (S.D. Ohio 1997) (granting preliminary injunction against transmission of spam under Restatement and Ohio law, cited with approval by *Sotelo*, 384 F. Supp. 2d at 1230-31).

## III.    There Are Sufficient Grounds to Grant the Preliminary Injunction Sought By Crisswell

The Seventh Circuit has established the prerequisites of a preliminary injunction under Rule 65: 1) "likelihood of success on the merits"; 2) absence of an adequate remedy at law; and 3) irreparable harm if the injunction is not granted. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1054-55 (7th Cir. 2004). When these elements are satisfied, courts must consider "any irreparable harm an injunction would cause the nonmoving party" and the public interest in the requested injunction; all these factors must then be weighed "employing a sliding-scale approach." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). "[T]he more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in [his] favor." *Id.*

In a diversity action like this, state law determines whether and when a movant has met the prerequisites above. "Rule 65 sets forth the procedures for issuing a preliminary injunction, but does not create substantive rights. The substantive rights must come from another source." *Transwestern Pipeline Co., LLC v. 9.32 Acres, More or Less, of Permanent Easement Located in Maricopa County*, 544 F. Supp. 2d 939, 945 (D. Ariz. 2008).[2] Thus, where the Court sits in diversity and Plaintiff's claims arise under state law, state law determines the availability of the remedies for those claims.[3] These federalism principals extend to the availability of preliminary

---

[2]    *See also Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) (Rule 65 does not alter "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief"); *Slazengers Ltd. v. Stoller*, No. 88-3722, 1989 WL 157984, at *8 (N.D. Ill. Dec. 12, 1989) (same; Rule 65 provides procedure, Lanham Act provided substantive right to preliminary injunction).

[3]    *Chambers v. NASCO, Inc.*, 501 U.S. 32, 53 (1991) (federalism "guarantees a litigant that if he takes his state law cause of action to federal court, . . . the result in his case will be the same as if he had brought it in state court").

equitable relief: state law controls where "the remedy sought is so inextricably interwoven with the substantive right invaded that the denial of the remedy would be tantamount to the denial of the right." *Port of N.Y. Auth. v. E. Air Lines, Inc.*, 259 F. Supp. 745, 753 (S.D.N.Y. 1966) (New York law, not federal law, controls availability of injunctive relief on New York claim).[4]

### A.    Crisswell Is Likely to Prevail on His Claims

Crisswell's evidence establishes a *prima facie* case of liability for trespass to chattels and unjust enrichment/restitution. MySpace sent unauthorized text messages to Crisswell's wireless device without Crisswell's consent, that resulted in charges to Crisswell's wireless subscription account. (Crisswell Decl. ¶ 4.) MySpace received income in connection with such unauthorized text messages. (Pl.'s Compl. ¶¶ 14.) Throughout its communications with Crisswell and his counsel, MySpace has never denied these essential facts. There is a sufficient showing that MySpace is liable on Crisswell's claims for trespass to chattels and unjust enrichment/restitution to support the relief sought by the attached Motion.

### B.    Absent the Injunction, Crisswell Will Suffer Irreparable Harm And Has No Adequate Remedy at Law

A constructive trust is an ancient and established equitable remedy for the wrongful retention of property which rightfully belongs to another. Likewise, there is a hoary tradition of injunctions against continuing trespasses, especially where much of the damage caused is not susceptible to any formulaic calculation. Both Illinois and California law recognize that no remedy at law can adequately substitute for these equitable remedies under these circumstances.

### 1.    Constructive Trust

Crisswell cannot adequately recreate the relief from a constructive trust through a remedy at law. "An adequate remedy at law is one which is clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." *Scheffel & Co., P.C. v. Fessler*, 356 Ill. App. 3d 308, 314, 827 N.E.2d 1, 6 (Ill. App. Ct. 2005) (citation, punctuation

---

[4]    *See, e.g.,Waterproofing Systems, Inc. v. Hydro-Stop, Inc.*, 440 F.3d 24, 33 (1st Cir. 2006) (preliminary injunction proper under federalism principals when Puerto Rico law provided for injunction, even in absence of irreparable harm); *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988) (California law controls availability of preliminary injunction under California law claim).

omitted). The mere existence of a remedy at law does not render it adequate. The relevant question is "whether the remedy at law compares favorably with the remedy afforded by the equity court." *Frederickson v. Blumenthal*, 271 Ill. App. 3d 738, 741-42, 648 N.E.2d 1060, 1062 (Ill. App. Ct. 1995) (quoting *Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 1082, 571 N.E.2d 1085, 1096 (Ill. App. Ct. 1991)). California effectively presumes irreparable harm in cases where a constructive trust is available: "an action in equity to establish a constructive trust does not depend on the absence of an adequate legal remedy." *Heckmann v. Ahmanson*, 168 Cal. App. 3d 119, 134, 214 Cal. Rptr. 177, 187 (Cal. App. Ct. 1985) (cited, followed in relevant part by *GHK*, 224 Cal. App. 3d at 878, 274 Cal. Rptr. at 182). *Frederickson*, *Hill*, *Heckmann*, and *GHK* all affirmed constructive trusts imposed in preliminary injunctions, and all rejected the argument that the availability of remedy at law prevented imposition of constructive trust. Constructive trusts are superior remedies for unjust enrichment, and damages are inadequate by comparison, because damages provide only

> a judgment equal to the amount of money defendant wrongfully acquired plus the legal rate of interest. . . . The purpose of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrong. . . . Thus, under a constructive trust upon money, the plaintiff is entitled to trace the fund to its ultimate product or profit. . . . By the time plaintiff obtains a final judgment, the original fund may have grown far greater than the legal rate of interest would recognize. To allow the defendant to pocket the difference would reward the defendant for his wrongdoing.

*Heckmann*, 168 Cal. App. 3d at 135, 214 Cal. Rptr. at 188 (citations, punctuation omitted).
Likewise, constructive trusts are procedurally superior to damages. In *Frederickson*, the court explained that there was no reason to force the plaintiff "to jump through the hoops of collection and post-judgment proceedings only to discover that defendant had withdrawn the funds from the account. [Under a constructive trust,] an equity court [can] freeze the account, determine the rights of the parties, and enter a turnover order on the bank." *Frederickson*, 271 Ill. App. 3d at 742, 648 N.E.2d at 1062.

Finally, a preliminary injunction is necessary to prevent dissipation of a constructive trust's *res*, which would work irreparable harm to Plaintiff and the Class's constructive trust remedy. The interest of Crisswell and the other members of the Class have an interest in property which is, at

present, in MySpace's and/or its agents' hands. Under the law of both California and Illinois, this interest extends not only to property traceable to the funds taken from them, but also to the profits MySpace has made through the use of this property. *See Heckmann*, 168 Cal. App. 3d at 135, 214 Cal. Rptr. at 188; *Gluth Bros. Construction, Inc. v. Union Nat. Bank*, 166 Ill. App. 3d 18, 28-29, 518 N.E.2d 1345, 1353 (Ill. App. Ct. 1988). Moreover, "[t]he purpose of a constructive trust . . . is to make available against the involuntary trustee all the conventional remedies available against a conventional fiduciary for breach of duty. . . . The trustee's duty to serve the interests of the beneficiary with complete loyalty, excluding all self-interest, prohibits him from dealing with the trust property for his individual benefit." *David v. Russo*, 119 Ill. App. 3d 290, 297-98, 456 N.E.2d 342, 347 (Ill. App. Ct. 1983).

> [T]he equitable remedy of constructive trust would be ineffectual if the trustee were permitted to defeat recovery by wrongfully permitting the *res* to be dissipated. Similarly, the remedy of constructive trust is defeated if plaintiffs are unable to trace the trust property into its succeeding transfigurations. . . . [The] purpose [of a constructive trust is] to restrain the [defendant] from dissipating the profit from [its unjust enrichment] and, thereby, destroying plaintiffs' equitable remedy of constructive trust.

*Heckmann*, 168 Cal. App. 3d at 136, 214 Cal. Rptr. at 189. Under the law of both California and Illinois, the imposition of a constructive trust in a preliminary injunction is necessary to preserve the efficacy of the remedy against actions MySpace may take between now and the final disposition of this case that might diminish or reduce the constructive trust's *res*.

## 2.   Preliminary Injunction Against Continued Trespass

Crisswell's Complaint alleges a continuing trespass to his property and to the property of the Class. Despite repeated requests to MySpace to stop sending him text messages, MySpace continued to send text messages to Crisswell and to the Class and may continue to do so. (Crisswell Decl. ¶ 7.) Irreparable injury "denotes transgressions of a continuing nature… of such constant and frequent recurrence that no fair or reasonable redress can be had therefor in a court of law." *Sports Unlimited, Inc. v. Scotch & Sirloin of Woodfield, Inc.*, 58 Ill. App. 3d 579, 583, 374 N.E.2d 916, 920 (Ill. App. Ct. 1978). *See also Hadley v. Dept. of Corrections*, 362 Ill.App.3d 680, 688, 840 N.E.2d 748, 756 (Ill. App. Ct. 2005). *Cf. Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 927-28, 605 N.E.2d 1092, 1097 (Ill. App. Ct. 1992) (injunction proper "where repeated trespasses

are threatened of such a character that the amounts recoverable as damages in actions at law would be so small and disproportionate to the vexation and expense of the actions as to render the remedy at law inadequate"). The charges against Crisswell's cellular telephone account plainly fall into categorization.

Conversely, there is no adequate legal remedy for this conduct, where it would "require that [Crisswell] return repeatedly to court to prove [his] damages." *Borrowman v. Howland*, 119 Ill. App. 3d 493, 501, 457 N.E.2d 103, 108 (Ill. App. Ct. 1983) (no adequate legal remedy for ongoing trespass). *See also Intel*, 30 Cal. 4th at 1352, 71 P.3d at 303 (recognizing authority providing injunction where repetitive suits for damages against continuing trespass would be inadequate remedy). Damages are not adequate when they are not as "clear, complete, and as practical and efficient to the ends of justice and its prompt administration as" the preliminary injunction requested by Crisswell. *Scheffel & Co*, 356 Ill. App. 3d at 314, 827 N.E.2d at 6 (citation, punctuation omitted). Injunctive relief against trespass is necessary to vindicate property owners' fundamental right to exclude others; without it, trespassers could "take a compulsory license to use another's personal property for as long as the trespasser could perpetuate the litigation." *Ebay*, 100 F. Supp. 2d at 1066-67. *Cf. FoodComm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) ("[i]nadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered").

Moreover, the Mobile Service causes harm beyond the economic damages to Plainitff's wireless subscription account, including frustration, inconvenience, and lost time attributable to deleting text messages, investigating the source of the messages and ways to stop future messages, as well as consuming wireless devices' storage and processing capacity, and generally impeding the Class's use of their property. (Crisswell Decl. ¶ 3.) Where Crisswell and the Class use their wireless devices for personal (rather than business) purposes, they can recover these damages. *Acadia, Cal., Ltd. v. Herbert*, 54 Cal.2d 328, 337, 353 P.2d 294, 299 (1960); *Hassoldt v. Patrick Media Group, Inc.*, 84 Cal. App. 4th 153, 172, 100 Cal. Rptr. 2d 662, 676 (Cal. App. Ct. 2000); *First Baptist Church of Lombard v. Toll Highway Auth.*, 301 Ill. App. 3d 533, 543-45, 703 N.E.2d 978, 985-87 (Ill. App. Ct. 1998). *See also Collins v. Reynard*, 195 Ill. App. 3d 1067, 1069, 553 N.E.2d 69, 70

(Ill. App. Ct. 1990).

However, noneconomic damages like these are not susceptible to any easy calculation. "[T]here are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of [noneconomic damages] suffered by a plaintiff as a result of the wrongful act of the defendant." *Buell-Wilson v. Ford Motor Co.*, 160 Cal. App. 4th 1107, 1137, 73 Cal. Rptr. 3d 277, 302 (Cal. App. Ct. 2008). "[N]on-economic damages have no commercial value . . . and cannot be translated into monetary units with precision." *Exchange Nat. Bank of Chicago v. Air Ill., Inc.*, 167 Ill. App. 3d 1081, 1091, 522 N.E.2d 146, 152 (Ill. App. Ct. 1988) (citation, punctuation omitted).[5] In fact, both Illinois and California prohibit mathematical calculation of noneconomic damages.[6] Rather, jury awards for noneconomic damages rely on "the unmentionable and magical conversion from broken bones to hard cash." *Beagle v. Vasold*, 65 Cal.2d 166, 176, 417 P.2d 673, 678 (1966).

While juries indeed convert noneconomic damages to fixed sums with regularity, courts candidly acknowledge the strong arbitrary and subjectives element to such jury awards.[7] Hence,

---

[5] "[N]oneconomic losses, which includes pain and suffering, among other things, are subjective and therefore more difficult to quantify. There is great difficulty in determining proper compensation for noneconomic losses . . ." *Best v. Taylor Mach. Works*, 179 Ill.2d 367, 476-77, 689 N.E.2d 1057, 1108 (1997) (Miller, J., concurring in part and dissenting in part). *See also Anzalone v. Kragness*, 356 Ill. App. 3d 365, 369-71, 826 N.E.2d 472, 476-78 (Ill. App. Ct. 2005) (describing difficulties in analyzing value of pets); *Franz v. Calaco Dev. Corp.*, 352 Ill. App. 3d 1129, 1140, 818 N.E.2d 357, 368 (Ill. App. Ct. 2004) (citing C. Sunstein, D. Kahneman, & D. Schkade, Assessing Punitive Damages (With Notes on Cognition and Valuation in Law), 107 Yale L.J. 2071, 2131 (1998) for the proposition that punitive damages and pain and suffering damages "both defy precise calculation").

[6] *Loth v. Truck-A-Way Corp.*, 60 Cal.App.4th 757, 767-68, 70 Cal.Rptr.2d 571, 577-78 (Cal. App. Ct. 1998); *Caley v. Manicke*, 24 Ill.2d 390, 391-94, 182 N.E.2d 206, 207-09 (1962); *Ramirez v. City of Chicago*, 318 Ill.App.3d 18, 27-28, 740 N.E.2d 1190, 1198 (Ill. App. Ct. 2000).

[7] *Beagle v. Vasold*, 65 Cal.2d 166, 176, 417 P.2d 673, 678 (1966) (it is "axiomatic that pain and suffering are difficult to measure in monetary terms"); *Courtney v. St. Joseph Hosp.*, 149 Ill. App. 3d 397, 400, 500 N.E.2d 703, 705 (Ill. App. Ct. 1986) (difficulty of calculating damages for emotional distress, defamation, malicious prosecution, and assault); *Van Brocklin v. Gudema*, 50 Ill. App. 2d 20, 27, 199 N.E.2d 457, 460-61 (Ill. App. Ct. 1964) (damages plaintiffs sustained from "inconvenience and discomfort involved in having no water supply for eight months" were "incapable of exact pecuniary measurement"). *See also Securities and Exchange Com'n v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002) (noting calculation of punitive damages and damages for pain and suffering are not "formulaic"); *Ocampo v. Paper Converting Machine Co.*, No. 02-4054, 2005 WL 2007144, at *5 (N.D. Ill. Aug. 12, 2005) (damages for intangibles "are not amenable to formulaic calculations").

money damages are a far less practical and sensible remedy than an injunction to prevent such noneconomic harm in the first place. [D]ifficulty in ascertaining damages is a factor favoring injunctive relief." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 418, 58 Cal. Rptr. 3d 527, 541 (Cal. App. Ct. 2007) (citing Cal. Code. Civ. Proc. § 526(a)(4)). Hence, an "[i]njunction is a proper remedy against threatened repeated acts of trespass, particularly where the probable injury resulting therefrom will be 'beyond any method of pecuniary estimation', and for this reason irreparable." *Uptown Enters. v. Strand*, 195 Cal. App. 2d 45, 52, 15 Cal. Rptr. 486, 490-91 (Cal. App. Ct. 1961). "Irreparable injury does not mean that the harm inflicted is beyond the possibility of repair or beyond compensation in damages or even that the injury is great." *Sports Unlimited*, 58 Ill. App. 3d at 583, 374 N.E.2d at 920. *See FoodComm*, 328 F.3d at 304 ("[i]nadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered").

## C.    The Balance of Harms, and the Public Interest, Favor the Requested Relief

There is no need to balance MySpace's interests with Crisswell's or the Class's interests where MySpace's trespass is intentional. *Strodel v. Wilcox*, 137 Cal. App. 2d 781, 785, 291 P.2d 95, 97 (Cal. App. Ct. 1955) (where trespass was intentional, "court could not deny a mandatory injunction . . . and had no right to balance the conveniences of the parties"); *Whitlock v. Hilander Foods, Inc.*, 308 Ill. App. 3d 456, 463, 720 N.E.2d 302, 307 (Ill. App. Ct. 1999) (where trespass is "deliberate," "the court may issue the injunction without considering the relative hardships" to the parties). This principal has been directly applied to digital trespasses, such as occurred here. "[A] defendant who builds a business model based upon a clear violation of the property rights of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those property rights." *eBay*, 100 F. Supp. 2d at 1069. Crisswell repeatedly informed MySpace that its Mobile Service's text messages to his device were unauthorized: where MySpace had notice that its actions were trespass and proceeded anyway, MySpace's trespass is intentional. *Cf. Whitlock*, 308 Ill. App. 3d at 463, 720 N.E.2d at 307-08.

Moreover, Crisswell's requested relief has been carefully crafted and narrowly tailored

to impose the lightest burden on MySpace which will adequately protect his interests and the interests of the Class. Crisswell does **not** seek to halt the operation of Mobile Service altogether: rather, he seeks to require MySpace to validate telephone numbers before send text messages that will create charges on Class members' wireless subscription accounts. The relief Crisswell seeks is a speedbump – or, more accurately, guardrails – rather than a roadblock.

Likewise, constructive trusts are an inherently balanced remedy which limits the harm visited on the trustees: it "deals fairly with both parties by conforming relief to the dimensions of the wrong." *Snepp v. United States*, 444 U.S. 507, 515 (1980).

> [T]he trust remedy simply requires [the trustee] to disgorge the benefits of [its statutory violations]. Since the remedy is swift and sure, it is tailored to deter those who would [violate the Class's rights.] And since the remedy reaches only funds attributable to [the torts alleged in the Complaint], it cannot saddle [the trustee] with exemplary damages out of all proportion to [its] gain.

*Id.* at 515-16 (constructive trust "protects" both parties). Crisswell's requested constructive trust is tailored to address MySpace's conduct; it merely requires that MySpace sequester the constructive trust's *res* in an interest-bearing, FDIC-insured account. As MySpace remains in possession of the *res* until final determination of the case, a constructive trust imposes only minimal out-of-pocket expenses. Indeed, if the dispute is resolved in its favor, Defendant would incur no expense and may simply resume its use of the *res*. As constructive trusts are inherently conservative equitable measures, the benefits to Crisswell and the Class greatly outweigh the inconvenience to MySpace.

The public interest also favors the relief requested in the Motion. The public, and specifically MySpace's users, have an interest in the preliminary injunction. As it stands, Mobile Service's own users are left with the impression that they have contacted their acquaintances through a text message, but in fact those text messages are misdirected with respect to Crisswell and the Class members. Where an injunction protects against the confusion of third parties, the public interest favors the injunction. *See Promatek*, 300 F.3d at 813-14; *Genderm Corp. v. Biozone Labs.*, No. 92-2533, 1992 WL 220638, at *19 (N.D. Ill. Sept. 3, 1992).

14

## D.    The Court Should Impose a Nominal Bond

Federal Rule of Civil Procedure 65(c) requires that a movant for a preliminary injunction give "security . . . in such sum as the court deems proper" before any preliminary injunction issues. Fed. R. Civil P. 65(c). Rule 65(c) "is sufficiently flexible to permit a district court discretion in setting the amount of the bond, which could include even a nominal amount under appropriate circumstances." *Smith v. Office of Civilian Health and Med. Program of Uniformed Servs.*, 97 F.3d 950, 954 n.5 (7th Cir. 1996). Consequently, the requirement of a bond has been dispensed with in any number of circumstances. *Cronin v. U.S. Dep't. of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990) (citing cases); *Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill.*, 717 F.2d 385, 392 (7th Cir. 1983) (nominal bond appropriate for indigent); *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007) ($1,000 bond); *Bd. of Educ. of Oak Park & River Forest High School Dist. No. 200 v. Ill. State Bd. of Educ.*, 10 F. Supp. 2d 971, 981-82 (N.D. Ill. 1998) ($10 bond). Crisswell' status as class representative, his inability to absorb the expenses of a massive commercial enterprise like MySpace's Mobile Service, and the public interest features of the relief sought all weigh in favor of a minimal bond, or no bond at all. (*Cf.* Crisswell Decl. ¶ 1) (Crisswell cannot afford a bond over $1,000).

## III.    Plaintiff Seeks Class Certification Under Rule 23(b)(2) and Rule 23(c)(4) to the Extent the Court Deems Class Certification Necessary to Obtain the Preliminary Injunction

Crisswell may not need class certification to obtain the preliminary injunction sought. Ample authority supports the entry of preliminary injunctions to protect the class prior to class certification. "[I]nsofar as the relief sought in a class action is prohibitory, an action seeking declaratory or injunctive relief is the archetype of one where class action designation is largely a formality, at least for the plaintiffs." *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005) (citing *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.1973), punctuation omitted).[8] If and

---

[8]    *See Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (class certification sometimes unnecessary preliminary injunctions that provide class relief).*See also Howe v. Varity Corp.*, No. 88-1598, 1989 WL 95595, at *15 (S.D. Iowa July 14, 1989), *rev'd on other grounds*, 896 F.2d 1107 (8th Cir. 1990); *Bowman v. Nat'l Football League*, 402 F. Supp. 754, 755 (D. Minn. 1975).

only if the Court finds that the requested injunction exceeds its equitable powers as to Crisswell's individual claims, he then seeks class certification for the narrow purpose of effectuating the preliminary injunction. *Cf.* Fed. R. Civ. P. 23(c)(4) (an action may be maintained as a class action "with respect to particular issues"). The attached Motion seeks class certification *exclusively* for the purpose of obtaining the injunctive relief sought therein. Plaintiff is not eager to mount a battle over class certification without the benefit of discovery. When due discovery is taken, Plaintiff will file another motion to certify the Class's claims for permanent relief under Rule 23(b)(3). *Cf.* Fed. R. Civ. P. 23(c)(1)(4) (order on class certification can be "altered or amended before final judgment").

Rule 23(c)(4) provides more than enough flexibility to certify classes "with respect to particular issues" (and not other issues). Rule 23(c)(4) provides the Court with the flexibility "to limit the issues in a class action to those parts of a lawsuit which lend themselves to convenient use of the class action motif." *Soc'y for Individual Rights, Inc. v. Hampton*, 528 F.2d 905, 906 (9th Cir. 1975) (quotation marks, citation omitted, certification of class only for prospective injunctive relief was proper). For instance, "[a] court may certify a Rule 23(b)(3) class for certain claims, allowing class members to opt out, while creating a non-opt-out Rule 23(b)(1) or (b)(2) class for other claims." Manual for Complex Litigation § 21.24 (4th ed. 2004). *See Scholes v. Douglas*, No. 09-1292, 1992 WL 329310, at *5 (N.D. Ill. Nov. 4, 1992) (class certification "as to the limited issue of whether the information disseminated by [defendant] contained an untrue statement of material fact or omitted to state a material fact").

> [Rule 23(c)(4)] is particularly helpful in enabling courts to restructure complex cases to meet the . . . requirements for maintaining a class action. . . . [Rule 23(c)(4)] is designed to give the court maximum flexibility in handling class actions, its proper utilization will allow a Rule 23 action to be adjudicated that otherwise might have had to be dismissed or reduced to a nonrepresentative proceeding because it appears to be unmanageable.

*In re Activision Sec. Litig.*, 621 F. Supp. 415, 438 (N.D. Cal. 1985) (certification on single issue related to liability). *See Denberg v. U.S. R.R. Retirement Bd.*, 696 F.2d 1193, 1207 (7th Cir. 1983) (class properly certified as to liability issues, leaving determination of damages for individual proceedings); *Valdez v. Local 25, Service Employees Int'l Union AFL-CIO*, No. 90-

203,, 1990 WL 91476, at *4 (N.D. Ill., June 25, 1990) (certifying class for resolution of injunctive and declaratory claims, and delaying certification of damages claims, citing *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103 (7th Cir. 1987) (rules permit separate certification of injunctive and damages portions of single suit); *Rota v. Brotherhood of Railway, Airline, & S.S. Clerks*, 64 F.R.D. 699, 707 & n.9 (N.D.Ill. 1974)).[9] Indeed, many courts have already granted the limited certification sought here: certification of a class for injunctive relief now under Rule 23(b)(2), while deferring the certification of a damages class under Rule 23(b)(3).[10]

## A.    Members of the Class Are So Numerous That Joinder Is Impractical

Rule 23(a) requires a class to be "so numerous that joinder of all members is impracticable" before a class action may be certified. "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Ringswald v. County of DuPage*, 196 F.R.D. 509, 512 (N.D. Ill. 2000). Plaintiffs "are not required to specify the exact number of persons in the class." *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989). Rather, a movant for class certification need only present sufficient evidence to support "a good faith estimate is sufficient to satisfy the numerosity requirement where it is difficult to assess the exact class membership. *Buycks-Roberson v. Citibank Federal Sav. Bank*, 162 F.R.D. 322, 329 (N.D. Ill. 1995) (citation, punctuation omitted).

---

[9] *See also In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002) (remanding with recommendation that the trial court consider "[class] certification only for questions of generic causation common to plaintiffs who suffer from the same or a materially similar disease"); *Cent. Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 184-87 (4th Cir. 1993) (certification on certain issues related to asbestos liability).

[10] *Fraser v. Major League Soccer, LLC*, 180 F.R.D. 178, 182 (D. Mass. 1998) (certification of only claims for injunctive and declaratory relief is "an appropriate limitation"); *Schreiber v. NCAA*, 167 F.R.D. 169, 176-77 (D. Kan. 1996) (where plaintiffs did not have sufficient evidence to support certification under Rule 23(b)(3) because of defendants failure to comply with discovery deadlines, class certification nonetheless appropriate for injunctive relief only under Rule 23(b)(2)), *amended by Law v. NCAA*, No. 94-205, 1998 U.S. Dist. LEXIS 6608 (D. Kan. Apr. 17, 1998) (class certification under 23(b)(3) ultimately granted, motion to decertify denied); *Wakefield v. Monsanto Co.*, 120 F.R.D. 112, 117-18 (E.D. Mo. 1988) ("recommended procedure" in employment cases is to certify a class on liability issues and injunctive relief, and if liability is found, "to certify the damage phase as a Rule 23(b)(3) class action").

The papers before the Court are sufficient to support numerosity at this stage. Crisswell has alleged that MySpace has over 100 million users. (Pl.'s Compl. ¶ 17.) Courts accept "as true all allegations made in support of certification and do not examine the merits of the case." *Sadowski v. Med1 Online, LLC*, No. 07-2973, 2008 WL 2224892, at *1 (N.D. Ill. May 27, 2008) (citing, e.g., *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)). Indeed, tens of thousands of misdirected and unauthorized text messages have been estimated to have been sent by MySpace's Mobile Service. (Snyder Decl. ¶ 9.) Where numerosity requires only a tiny percentage of the population of potential class members to be actual class members, this Court has found numerosity. *See Ringswald*, 196 F.R.D. at 511 (evidence that there were over 5,000 felony cases and 33,000 misdemeanors sufficient to support numerosity of class of detainees charged illegal bonding fee); Peterson v. H & R Block Tax Services, Inc., 174 F.R.D. 78, 81 (N.D. Ill. 1997) (where population of potential class members was over one hundred thousand tax filers, there was sufficient evidence of numerosity of class of persons claiming earned income tax credits). Moreover, MySpace removed this action from Illinois state court on the basis of the assumptions that 1) MySpace had 100 million users, 2) "1 percent of MySpace members are MySpace Mobile users," 2) and "those users received . . . the same number of messages as Criswell." (Def.'s Opp. Mot. Remand 5 n.4.) MySpace used those assumptions to remove Crisswell's action to this Court, and it should be obliged to accept these same for numerosity purposes.

### B.    The General Application of the MySpace Policies to Plaintiff and the Other Members of the Classes Establish Commonality, Typicality, and Class Cohesion

The attached Motion addresses MySpace policies that are common and uniform to each Class member, and the Motion proposes equitable relief which will be uniform to each Class member. The commonality of MySpace's policies and the uniformity of the requested relief satisfy the commonality and the typicality elements of Rule 23(a), and the requirements of Rule 23(b)(2), all at once.

Class certification under Rule 23(b)(2) is appropriate for injunctive relief which is uniform across the class. "Rule 23(b)(2) operates under the presumption that the interests of

18

the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000). Unlike Rule 23(b)(3) classes, Rule 23(b)(2) provide "declaratory or injunctive relief [that] will usually have the same effect on all the members of the class as individual suits would." *In re Allstate Ins. Co.*, 400 F.3d 505, 506 (7th Cir. 2005). If MySpace were enjoined from sending any more text messages or forced to establish a constructive trust of funds from its text message fees, "there wouldn't be any purpose in allowing individual members of the class to opt out and seek their own injunction." *Id.* at 407. "The need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about." Allen v. Int'l Truck & Engine Corp., 358 F.3d 469, 471 (7th Cir. 2004). Hence, where a class is proposed solely for equitable relief that "will inure to all class members," it renders the "specificity of the class definition less critical." *Rahman v. Chertoff*, 244 F.R.D. 443, 449 (N.D. Ill. 2007). Here, the Class and Subclass are defined by MySpace's conduct – its transmission of unauthorized text messages. This provides a sufficient definition to the Class under Rule 23(b). *See Buycks-Roberson*, 162 F.R.D. at 328 (certifying class "defined by reference to the defendants' conduct")

There is sufficient commonality between Class members' claims to satisfy Rule 23(a)(2). Each member of the Class (including Crisswell) has received (and may continue to receive) unwanted and unauthorized text messages from MySpace's Mobile Service, and are harmed thereby from text message charges. This "common nucleus of operative fact" – "standardized conduct towards members of the proposed class" – is "enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992), punctuation omitted). Where this common nucleus of operative fact exists, "factual variations among class members' grievances do not defeat a class action." *Id.* (fact that class representative did not pay defendant's unlawful fee did not defeat commonality). *See also Rosario*, 963 F.2d at 1017-18 (existence of two satisfied students did not defeat commonality of claim that chain of trade

schools operated scheme to defraud and deceive prospective students).

Finally, Crisswell's claim is typical of the class he seeks to represent where it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his claims are based on the same legal theory." *Keele*, 149 F.3d at 595 (citation, punctuation omitted). Rule 23(a) concerns "whether the named representatives' claims have the same essential characteristics as the claims of the class at large." Typicality can be satisfied "even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Crisswell's claims arise from MySpace's practice of sending him unauthorized text messages – these are precisely the same claims he seeks to certify in the attached Motion.

## C.    Class Representatives and Their Counsel Are Adequate to Represent the Classes

Lastly, Rule 23(a)(4) requires that Plaintiffs and their counsel fairly and adequately protect the class's interests. To satisfy Rule 23(a)(4), the plaintiff must show that: "(1) the representative does not have conflicting or antagonistic interests compared with the class as a whole; (2) the representative is sufficiently interested in the case outcome to ensure vigorous advocacy; and (3) class counsel is experienced, competent, qualified and able to conduct the litigation vigorously." *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 837 (N.D. Ill. 2008) (citation, punctuation omitted). Crisswell has already demonstrated his ample motivation to stop MySpace's misconduct by repeatedly complaining to the company and by contacting the FCC (and, ultimately, counsel). (Crisswell Decl. ¶ 8.) Plainly, his interests are aligned with the Class and Subclass in altering MySpace's conduct. Crisswell is an adequate class representative. "Absent any conflict between the interests of the representative and other class members, and absent any indication that the representative will not aggressively conduct the litigation, fair and adequate protection of the class may be assumed." *In re General Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 313 (S.D. Ill. 2007) (citation, punctuation omitted). MySpace's objections to adequacy merit inherent skepticism – "[w]hen it comes, for instance, to determining whether 'the representative parties will fairly and adequately protect

the interests of the class' . . . [defendant's arguments against adequacy are] a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 895 (7th Cir. 1981).

Likewise, Plaintiff's counsel are well qualified and highly experienced in litigating consumer fraud actions, and specifically text message cases. Counsel's extensive litigation experience in this industry weighs in favor of counsel's adequacy. *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d at 837 ("the experience of class counsel in similar cases weighs in favor of finding that class counsel is competent and qualified"). Counsel will advance the costs of litigation and will represent the Class on a contingent fee basis, and will provide representation to the class adequate pursuant to Rule 23(a)(4).

## IV.    Conclusion

Plaintiff and the other Class members are entitled to the equitable relief sought in the attached Motion to vindicate their property interests in their wireless devices under the applicable law. The attached Motion has narrowly tailored the equitable relief it seeks to minimize the burden on MySpace while protecting the interests of Plaintiff and the Class. The attached Motion should be granted, an order entered for the preliminary injunction and constructive trust which the Motion requests, and a Class (and/or Subclass) certified as the Court determines necessary.

Respectfully submitted,

Dated: June 11, 2008

By: /s/ Ethan Preston
    Jay Edelson
    Myles McGuire
    Ethan Preston
    KAMBEREDELSON LLC
    53 West Jackson Ave., Suite 550
    Chicago, IL 60604
    (312) 589-6370
    jedelson@kamberedelson.com
    mmcguire@kamberedelson.com
    epreston@kamberedelson.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL CRISSWELL, individually and on behalf of a class of similarly situated individuals, | ) ) ) )  No. 08 CV 01578 |
| Plaintiff, | )  Judge Milton I. Shadur |
| v. | ) |
| MYSPACE, INC., a Delaware corporation, | )  Magistrate Judge Sidney I. Schenkier )  |
| Defendant. | ) ) ) ) ) |

### DECLARATION OF PLAINTIFF MICHAEL CRISSWELL

I, Michael Crisswell, hereby declare as follows:

1. My name is Michael Crisswell. I am a resident of Illinois and live on a modest income. I am the plaintiff in the instant lawsuit against MySpace, Inc. ("MySpace"). I have personal knowledge of the facts set forth in this declaration.

2. For at least four years, I have had a cellular telephone account for my personal use.

3. In or about October, 2007, I began to receive numerous unsolicited text messages from MySpace. I found the content of these text messages offensive and disruptive to the use of my cellular telephone. MySpace's text messages caused me frustration, interrupted my sleeping, interfered with the use of my phone and inconvenienced me greatly.

4. My wireless service provider charged me for the receipt of these text messages in separate line-item fees on my cellular telephone bill. Had I not paid such fees, I understood that my cellular telephone service could be interrupted and terminated.

5.    At no time did I consent to receive such text messages or consent to be charged for these text messages. Nor did I provide MySpace with my cellular telephone service to be sent such text messages.

6.    Beginning in or about November, 2007, I sent MySpace more than ten emails to report my receipt of these unauthorized text messages and request that a stop be put to these unsolicited text messages.

7.    Despite repeatedly providing it with additional information and requests to stop, MySpace failed to discontinue the transmission of its text messages to me and I was forced to turn elsewhere.

8.    In or about December, 2007, I filed a complaint with the Federal Communications Commission reporting these unauthorized MySpace text messages. A true and correct copy of which is attached as Exhibit A.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June _6_, 2008

Respectfully submitted,

_Michael Crisswell_
Michael Crisswell

## Form 1088G – Call or Message to Wireless Device
### (Cell Phone or Pager) Complaint
** ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT. **
### Background information is at the end of this section

---

User Complaint Number: **07-T00072001**

## Consumer's Information:

First Name: **Michael**    Last Name: **Crisswell, Jr.**

Company Name:
(Complete only if you are filing this complaint on behalf of a company or an organization.)

Street Address or Post Office Box Number: ███████████
City: ██████████    State: **IL**    Zip Code:█████

Email:██████████████

Telephone Number: ██████████████

---

1. Call/message received on:   **Cell Phone: (618) 578 - 8903**

2. Is the number where you received the call/message on the National-Do-Not-Call Registry?     **Yes**
      Is this a personal (non-business) phone?   **Yes**

3. When did you receive the call(s)/message(s)?
      Date: **2007-12-04 13:33:00.0**
      Date: **2007-12-04 10:17:00.0**
      Date: **2007-12-04 13:10:00.0**
      Date: **2007-12-03 15:59:00.0**

4. TYPE OF CALL OR MESSAGE: **Text message**

5. Was the following information provided DURING the call/message?
      Name of the business, individual, or other entity responsible for the call/message: **Yes**
      Name(s) provided: **MySpace & WindowsLive**
      Was this provided at the beginning of the call/message? **Yes**
      Business telephone number for the entity responsible for the call/message: **No**
      Numbers provided:
      Other information provided: **MySpace Profile Names**
      Did you listen to the entire call/message? **Yes**

6. Did you receive caller ID information for the call/message in question? **No**
      (If you answer No or Don't Have, skip to **question 5.**)
      Information obtained through caller ID:
      Business name:

# Form 1088G – Call or Message to Wireless Device
## (Cell Phone or Pager) Complaint
## ** ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT. **
### Background information is at the end of this section

---

6. (Cont'd)    Did the caller ID information accurately report the name and/or calling number for the call/message in question?
    How did you determine it was not accurate?

7. List any names, telephone numbers, or other identifying information (e.g., addresses, websites) you obtained through other means (e.g., reverse call back through *57 or your own research).

    Business name(s)
    Other information
    How did you obtain this information?

8. Did the call/message indicate any emergency purpose (a necessary communication in any situation affecting the health and safety of consumers)? No    (If you answer No, skip to **question 9.**)
    Describe:

9. Have you or anyone else in your household given the advertiser or anyone associated with the advertised property, goods, or services permission to call? No

10. Did the call/message claim to be on behalf of a tax-exempt nonprofit organization?  **No**

11. Does the call/message advertise the commercial availability or quality of any property, goods, or services? **Yes**
    What property, goods, or services does the call/message promote? **MySpace, Reunion.com**

12. Have you or anyone else in you household:

    Done any business with the advertiser or involving the advertised property, goods, or services (a purchase or other transaction) within the past 18 months prior to receiving the call/message? **No**

    Made an inquiry or application to the advertiser or involving the advertised property, goods, or services within the past 3 months prior to receiving the call/message?  **No**

13. Do you or anyone else in your household have a personal relationship (family, friend, or acquaintance) with the individual who made the call?  **No**

14. Have you or anyone else in your household asked the advertiser or anyone associated with the advertised property, goods, or services NOT to contact you on your wireless number? **Yes**
    (If you answer No, skip to **question 15.**)




## Form 1088G – Call or Message to Wireless Device
### (Cell Phone or Pager) Complaint
## * * ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT. **
### Background information is at the end of this section

---

**14.** (Cont'd) (Provide as much detail as possible.)
   When?   Date **Date: 2007-12-07 00:00:00.0**
   How did you make your request?
   By telephone during a telemarketing call:
   By telephone to:
   By fax to:
   By e-mail to: **Yes**
   By website request at:
   By letter to:
   Provide name and address:

   Describe any response from, or other contact with, the advertiser or telemarketer including any difficulty in making your do-not-call request, or any telemarketing calls that you received from this advertiser after making your do-not-call request. **I have contacted MySpace numerous times. They tell me it's not from them however I get a text message everytime someone leaves an email or comment on someones profile page. It doesnt tell me who they are leaving messages for...just who left the message.**

**15.** Did any prerecorded message disconnect promptly (within about 5 seconds) after you hung up?
   **No**

**16.** Did the commercial e-mail message provide the following information? (Check all that apply.)

   An Internet e-mail address or website to receive your request that no future messages be sent to your wireless device: .
(Internet e-mail address or website)

   Identification of the sender as having received your permission to e-mail your wireless device:
   Neither of the above: **Yes**
   Not certain:

## Continue to the Attestation Page to Complete Your Complaint

---

### BACKGROUND

Several FCC rules protect consumers who use wireless communications devices such as cell phones and pagers from calls or messages that may be costly, tie up the line, or deliver unwanted advertising.

- <u>The FCC prohibits the use of automatic telephone dialing systems or prerecorded messages to call such wireless communications devices unless the call is made for emergency purposes or with the called party's prior express permission.</u>

You may not know whether or not a call you received used an automatic dialing system. Calls to multiple telephone lines in quick succession often involve an automatic dialing system. Automatic dialing systems




# Form 1088G – Call or Message to Wireless Device
## (Cell Phone or Pager) Complaint

are used by many entities that regularly make calls to large numbers of telephone lines including telemarketers who rely heavily on such systems to conduct their business.

- **The FCC prohibits sending unsolicited commercial e-mail messages to such wireless communications devices.**

The FCC's ban on sending "spam" to wireless devices applies to all commercial messages – messages for which the primary purpose is to advertise or promote a commercial product or service – unless you have provided prior express authorization for the message to be sent. The FCC's ban does not cover "transactional or relationship" messages, which are notices to facilitate a transaction you have already agreed to. Such messages would include, e.g., statements about an existing account or warranty information about a product you've purchased. Finally, the ban also does not cover non-commercial messages such as political and religious messages.

The FCC's ban covers messages to wireless devices, **if the message uses an Internet address that includes an Internet domain name** (usually the part of the address after the individual or electronic mailbox name and the "@" symbol). The ban does not apply to "short messages," typically sent from one cell phone to another, which do not use an Internet address. Also, the FCC's ban does not cover e-mail messages that you have forwarded from your computer to your wireless device.

- **The FCC enforces National-Do-Not-Call rules for advertising calls made to personal (not business) wireless communications devices.**

The FCC enforces National Do-Not-Call rules for advertising calls made to your personal (not business) cell phone. If you have registered your personal cell phone number on the National Do-Not-Call Registry, telemarketers are prohibited from making advertising calls to you UNLESS you (1) have agreed in writing to accept telemarketing calls from the business, (2) have established a business relationship with the business by a purchase or having some other transaction within the past 18 months or by making an inquiry or application within the past 3 months, or (3) have a personal relationship (friend, family, acquaintance) with the individual who calls you. In these situations, however, you may rescind the permission to call, end your business relationship, or prevent future calls based on a personal relationship by making a company-specific do-not call request. Advertisers have no more than 30 days to honor National Do-Not-Call registrations and company specific do-not-call requests. Such requests must be honored for a period of 5 years.

Determining whether an automatic dialing system has been used to make a particular call or identifying and locating a sender of spam can be difficult. The more details you are able to provide, the greater the likelihood that the FCC will be able to determine whether a violation has occurred that could lead to an enforcement action.



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL CRISSWELL, individually and on behalf of a class of similarly situated individuals, | No. 08 CV 01578 |
| Plaintiff, | Judge Milton I. Shadur |
| v. | |
| MYSPACE, INC., a Delaware corporation, | Magistrate Judge Sidney I. Schenkier |
| Defendant. | |

**DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

I, Randall A. Snyder, hereby declare as follows:

1. My name is Randall A. Snyder. I am an independent mobile telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by the law firm of KamberEdelson, LLC to provide my opinions on issues concerning mobile short message service (SMS) technology, commonly known as mobile text messaging, and the use of this technology by MySpace, Inc.

2. I have over 24 years of experience in mobile telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the field of mobile and cellular telecommunications, mobile and cellular networking technology and specifically short message service technology. A copy of my *curriculum vitae* is attached to this declaration.

3. I have taught many classes and seminars on mobile telecommunication network technologies and have been a panelist and speaker at numerous conferences at the

Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in mobile telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and mobile networks, which is now a fully accredited national standard of the American National Standards Institute (ANSI). I am the author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for mobile engineers at AT&T Wireless and Motorola for several years. The latter book has also been relied upon and cited numerous times as a reference for various Short Message Service (SMS) patents in the mobile industry, such as Method and Apparatus for Routing Short Messages, US Patent #6308075, Method and System for Wireless Instant Messaging, US Patent # 7058036 and Automatic In-Line Messaging System, US Patent # 6718178. I have been granted several patents myself on mobile networking technology and currently have three additional patent applications filed in the area of Short Message Services for mobile technology. I have also authored several articles on mobile telecommunications technology and have been quoted numerous times in industry trade publications. I have consulted and been

employed for many mobile telecommunications companies including McCaw
Cellular, AirTouch, AT&T Wireless, Lucent, Nokia, Ericsson, Nextwave, MCI,
Sprint and other mobile technology vendors and service providers. I was a founder of
m-Qube, Inc. (acquired by Verisign, Inc. in 2006), which develops and markets
mobile text messaging services. I was also nominated in 2006 for a National
Television Arts Emmy Award for Outstanding Achievement in Advanced Media
Technology for unique mobile technology I designed while employed at Entriq, Inc.
Still more detail as well as details of publications that I have authored or co-authored
within at least the past 10 years are provided in my attached *curriculum vitae*.
(Attached as Exhibit B.)

4.  MySpace, Inc. provides an online application that employs what is commonly known
    as internet-based social networking functionality. The website application provides
    users the capability to communicate with one another for the purpose of creating a
    social community of friends or colleagues for sharing information and interests. A
    user is required to create a personal profile record within MySpace's database (i.e., to
    register with the application) and the information provided in this profile enables
    communication between that user and other users who have also created profiles.
    These profiles contain user-names or alias names, passwords, email addresses and a
    variety of personal preferences as well as personal information. Users can also create
    custom individual web pages, upload and download content, such as images, videos
    and audio, as well as send messages to each other through the MySpace application.
    Furthermore, the application enables users to communicate with each other via
    mobile text messages through the MySpace Mobile portion of the application. To do

this, users must add their mobile telephone numbers to their account settings. One of the key functions of the MySpace social networking application is the ability to enable users to communicate with each other pseudonymously, if they wish, using only names created within their profiles. A mobile text message can only be sent to friends if they have registered a mobile phone number within their personal profile. The text message is sent to that friend from the MySpace application to the mobile telephone number within the friend's profile. There is no need for the message sender to know the actual mobile telephone number of the intended message recipient in order to successfully send the message.

5. Typically, mobile text messages are sent peer-to-peer; that is, from one mobile subscriber's telephone to another mobile subscriber's telephone. In this typical case, the originating address of the text message is the mobile telephone number of the sender of the message and the terminating address is the mobile telephone number of the intended recipient, or destination, of the message. Both the originating address, i.e., the mobile telephone number of the sender, and the terminating address, i.e., the mobile telephone number of the intended recipient, are entirely preserved as part of the message. In the case of the MySpace application, text messages are sent from the online application to a mobile telephone. The application provides its own address as the originating address of the mobile text message, properly formats the text message, adds special message options and sends the message to the mobile telephone number stored in the profile of the intended recipient. In this way, the MySpace application actively modifies the message and automatically enables the message to be delivered to the destination mobile telephone number. The MySpace application itself

substitutes the destination mobile telephone number for the name of the intended recipient entered by the sender, enabling the sender to communicate with a friend via the wireless carrier's network without directly knowing the friend's mobile telephone number. The MySpace application enables users to send and receive a variety of specific mobile text message types defined by the MySpace application itself. Among these messages are requests to become a friend, comments on a public profile, invitations to an event, comments on public photos, etc.

6. Operating in the manner described, MySpace is categorized as a Value Added Service Provider (VASP) communicating with wireless carriers and providing application-based mobile text messaging services to its users. VASPs connect to the wireless carriers using internet-based connections and communications protocols. These VASPs use a special number as the address by which mobile text messages are sent to properly communicate with mobile subscribers. This number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, NeuStar, Inc., that manages and assigns these number resources in the United States. Individual short code numbers are leased by VASPs for which specific applications are being run. The VASPs request that these numbers be provisioned (i.e., programmatically stored) by the wireless carriers so that text messages can be properly sent from the VASP to mobile subscribers. In the case of the MySpace application, the short code number "697726," which spells M-Y-S-P-C-M is used as the originating address from which mobile text messages are sent to mobile subscribers. Conversely, for a mobile subscriber to reply to the sender of a text message that emanated from the MySpace application, the short code 697726 is

used as the destination address of a reply text message. In this case, the MySpace

application receives the reply text message and maps the destination address (i.e.,

697726) to the original sender's address stored in the sender's personal profile. In this

way, both the sender and recipient of the mobile text message communicate with each

other via the wireless carriers using the MySpace application as an enabling

intermediary message processing system.

7.  Typically, VASP applications that incorporate mobile text message communications,

connect to the wireless carriers via the internet-based Short Message Peer-to-Peer

(SMPP) communications protocol. The SMPP protocol was specifically designed to

enable automated mobile text message applications to communicate with each other

via wireless carriers. VASPs have a commercial relationship with the wireless carriers

as the wireless carriers maintain direct control of the network systems used to

communicate with subscribers via text messaging. The MySpace application uses the

SMPP protocol to communicate with the Short Message Service Centers (SMSCs) of

the wireless carriers in order to send mobile text messages to subscribers and receive

mobile text messages from subscribers. SMSCs are network entities that are

maintained and controlled within the wireless carriers' networks and are the store and

forward repositories of text messages to be both delivered to and sent from mobile

subscribers. Connectivity to SMSCs is tightly controlled by the carriers and requires a

commercial relationship with them to obtain a connection.

8.  The SMPP protocol optionally enables the delivery of failure notifications in response

to an application for messages that cannot be delivered by the wireless carriers'

SMSC. There are a variety of reasons why delivery of a text message fails. One

reason is that it may not be delivered to a destination mobile telephone number. The number may be invalid or may be of an invalid format, or the number may be unassigned to a subscriber within a particular carrier's network. If the MySpace Mobile application sends a message to an unassigned mobile telephone number, a failure notification may be received from the wireless carriers. In this case, the MySpace application should disable the sending of subsequent messages to that number to ensure that erroneous messages are no longer delivered.

In many cases, mobile text messages are properly sent to a valid mobile telephone number from a VASP application, but that mobile telephone number is not the actual intended recipient. Mobile telephone numbers are a finite resource within the telecommunications industry. Because mobile telephone numbers may be rapidly used up, wireless carriers can reassign numbers to new subscribers when they are relinquished by other subscribers who no longer wish to maintain mobile telephone service. The recycling of mobile telephone numbers may cause the new user of a given number to receive mobile text messages that are intended for the previous user of the number. In the case of the MySpace application, a registered MySpace mobile application user may relinquish a mobile telephone number and fail to update their personal profile by either deleting or changing the existing mobile telephone number within their profile. The MySpace Mobile application sending mobile text messages on behalf of users intending to communicate with other users may inadvertently send mobile text messages to mobile telephone numbers that are no longer associated with the intended recipient of the message. When this situation occurs, the mobile subscriber receiving a text message from the MySpace application that is intended for

-7-

a previous subscriber who used and then relinquished the number, incurs the cost to receive the message. The subscriber receives the erroneous message identified by MySpace's short code 697726 as the sender of the message. In essence, the MySpace application treats the new owner of a recycled mobile telephone number as the previous owner who is still a valid registered user of the MySpace application. Users of recycled mobile telephone numbers incur the cost to receive these erroneous text messages.

9. Based on my knowledge of the wireless industry, the quantity of recycled numbers, the average percentage of wireless carrier churn rates, as well as other factors, it is my opinion that number of mobile subscribers that may have received erroneous messages from the MySpace Mobile application may be in the tens of thousands.

10. My opinions in this declaration are based upon extensive experience in the wireless industry, a detailed understanding of how mobile text messaging services operate, a detailed understanding of telephone number administration within the wireless industry and personal experience as a user of the MySpace Mobile application. If called to testify, I could and would testify competently about these opinions.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June ___, 2008            _____
                                                    Randall A. Snyder

# Randall A. Snyder

8113 Bay Pines Avenue, Las Vegas, NV 89128 • (702) 521-7900 • rsnyder@wrsvs.com

## C-LEVEL EXECUTIVE MOBILE TELECOMMUNICATIONS
## PRODUCT MANAGEMENT, SYSTEM ENGINEERING, TECHNOLOGY, CONSULTING

Mobile telecommunications technology and industry expert, executive manager and leader, designing, developing, marketing and managing mobile telecommunication system and software products.

- 18 years' experience specializing in mobile telecommunication technology, network architecture, design, system engineering, marketing and product management.

- Reputable leader and strategic developer with a successful background building start-ups.

- Skilled presenter, communicator, and educator with success impacting organizational performance, corporate reputation and increasing sales.

- Results-oriented, highly organized and creatively focused on adhering to organizational missions and philosophy while designing best-of-breed mobile technology solutions.

- Extensive travel experience to Asia-Pac, Latin America and Europe supporting engineering, sales and marketing with familiarity with wireless network operators and manufacturers worldwide.

- Author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively.

- Author of several articles and taught several seminars on mobile telecommunications technology.

- Hold several patents on mobile networking technology.

- Member of the Mobile Multimedia Institute.

- Advisory board member for four startups.

- Nominated for a Technology and Engineering Emmy Award for Outstanding Achievement in Advanced Media Technology in 2006.

## CORE COMPETENCIES

| | |
|---|---|
| **Technology:** | Mobile Network System Engineering, Design and Architecture, Mobile Multimedia Systems, Mobile Internet, Mobile Video, Mobile Marketing, Mobile Telecommunications Standards, SMS, MMS, WAP, GSM and ANSI-41 (CDMA) Networking, Signaling System No. 7 (SS7), Communications Protocol Design |
| **Management:** | Strategic/Tactical Planning, Product Management, Marketing Management, Operations Management, Competitive Analysis, Problem Resolution, Project Planning, Risk Management |
| **Organizational:** | P&L Management, Budget Planning/Preparation, Expense Reductions, and Cost Control |
| **Business Relations:** | Seminars, Sales Presentations and Sales Engineering |
| **Legal:** | Sales and Vendor Contract Negotiations and Review, Provisional and Patent Write-ups, Patent Validation, Invalidation, Expert Reports and Testimony |

## PROFESSIONAL EXPERIENCE

### Entriq, Inc. • Carlsbad, CA • May 2004 – April 2007
Pay Media Solutions and Services

**Vice President Product Management**
As vice president of product management and a member of the executive management team, responsible for the entire product management team, all product management and system architecture for Entriq's products and services. These products encompassed broadband and mobile pay media applications (specializing in video), digital rights management (DRM) and security solutions, e-commerce and m-commerce systems as well as ad management and delivery solutions for both broadband and mobile media services. Responsibilities included system architecture, product requirements, network and protocol analysis, market segmentation and analysis, evaluation of third-party software and services, vendor contract negotiations, RFP responses and overall administrative responsibility for the entire product line. Also responsible for market strategy, network architecture and interconnectivity for Entriq's services. Responsible for directing and managing the technical writing department producing all of the user documentation associated with all of the products. Nominated for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique mobile technology designed, developed and commercially deployed as part of Entriq's services solution.

### m-Qube, Inc. (acquired by Verisign) • Boston, MA • February 2002 – November 2003
Mobile Marketing Solutions and Services

**Vice President Product Management and Carrier Marketing**
As vice president of product management and carrier marketing for m-Qube, responsible for the entire product management and carrier marketing teams, member of the executive management team and one of the founders. Responsible for all product management, system engineering and product strategy for all business conducted with the wireless industry and carriers. In charge of the market strategy and wireless network architecture for m-Qube's mobile marketing service, a value-added service offering mobile marketing solutions to wireless carriers using short message services (SMS) for GSM and CDMA networks. The service architecture enabled branded companies to deploy promotional marketing and messaging campaign dialogs with mobile subscribers via SMS. The network architecture required definition and design of all aspects of the overall network including SMS technology, interconnectivity to the wireless carriers, signaling, traffic management, market requirements for features and services, network equipment specifications and OA&M.

### Bitfone Corporation • Mountain View, CA • April 2001 – February 2002
Mobile Internet Solutions

**Vice President Product Management and Marketing**
As vice president of product marketing for Bitfone and a member of the executive management team, responsible for the entire product management team and all of the company's product definitions, strategies and positioning. Direct responsibility for market and product requirements, market research, competitive analysis, product strategy and sales strategy. Bitfone's products included the iBroker, a mobile Internet technology infrastructure platform to enhance WAP, MMS, mobile e-mail and wireless messaging. Also responsible for the mProve product (obtained via merger with Digital Transit, Inc.) providing over-the-air firmware and software update technology to mobile devices.

### Openwave Systems (via merger of Phone.com and Software.com) • Redwood City, CA • November 2000 – April 2001
Mobile SMS, MMS, WAP Solutions

**Executive Director Emerging Technologies**
As executive director of emerging technologies for Openwave Systems, responsible for new 3G technologies and providing market and product plans for those technologies for the entire product line. Primary responsibility for the 3GPP Multimedia Messaging Service (MMS), collecting market requirements from customers, developing corporate strategy for MMS and preparing the organization for

additional development of the product. In addition, taught wireless technology classes to the different departments at Openwave and educated them on wireless service provider strategies and network technologies.

## @Mobile and Software.com (via acquisition) • Santa Barbara, CA • March 2000 – November 2000
Mobile Messaging Solutions

### Director Wireless Product Management
As director in charge of Software.com's new wireless products group (via acquisition of @Mobile), responsible for the product managers and for all of the wireless internet infrastructure products. Responsibilities include the overall market and product strategy for Software.com's wireless e-mail, short message service, instant messaging and unified messaging products. Responsible for the overall revenues generated from these products based on detailed product plans and internal organizational planning. Much of his time was spent working with the executive management team and the sales directors on corporate market strategy.

## FreeSpace Communications, Inc. • Palo Alto, CA • December 1999 – March 2000
Wireless Network Architecture

### Consulting Network Systems Engineer
As an engineering consultant, responsible for the complete design of the backbone network architecture for a new broadband fixed wireless data network. This new architecture incorporates DSL as the backbone network technology. The network architecture requires definition and design of all aspects of the overall network plan including DSL technology, IP technology, ATM technology, interconnectivity to the PSTN, operations signaling, traffic engineering, market requirements for network features and services, network equipment specifications and OA&M.

## Synacom Technology, Inc. • San Jose, CA • December 1998 – December 1999
Mobile Network Infrastructure Solutions

### Executive Director Product Management and Marketing
As Executive Director of Product Management and Marketing for Synacom, responsible for managing the entire product management and marketing department of Synacom Technology, including market research and planning, product management and market communications. Lead the entire design, definition and product direction of all aspects of Synacom's products.

## Synacom Technology, Inc. • San Jose, CA • August 1997 – December 1998
Mobile Network Infrastructure Solutions

### Director Systems Engineering
As Director of Systems Engineering for Synacom, responsible for coordinating and managing the overall functional and requirements specifications for all Synacom's products as well as the detailed test plans used for alpha system testing of those products. Also responsible for directing and managing the technical writing department producing all of the user documentation associated with all of the products. Provided the primary sales engineering support for sales and marketing and was involved in nearly every aspect of the product lifecycle.

## Synacom Technology, Inc. • San Jose, CA • November 1996 – August 1997
Mobile Network Infrastructure Solutions

### Director Consulting Services and Principal Engineer
As Director of Consulting Services and Principal Engineer for Synacom Technology, Inc., responsible for obtaining, coordinating and managing all technical consulting projects performed by the company. These projects included wireless network architecture and design for both IS-41 and GSM networks for dozens of client companies (carriers and equipment manufacturers). In this role, continued as a member of both the ANSI/TIA TR45.2 Subcommittee for cellular radio intersystem operations standards and the ANSI/TIA

TR46 Committee for 1900 MHz GSM PCS standards. Major contributor to TR46 in the area of GSM-to-IS-41 network interworking. Also authored, edited and published TIA standard specification IS-93 for cellular network interconnections to the PSTN and ISDN.

### Synacom Technology, Inc. • San Jose, CA • April 1992 – November 1996
Mobile Network Infrastructure Solutions

**Principal Engineer**
As the principal engineer for Synacom Technology, was the lead engineer for many consulting projects. In this position, consulted for McCaw Cellular, AT&T Wireless, AirTouch Cellular, AirTouch Satellite Services, Globalstar, AT&T Bell Laboratories, Nokia, MCI, Sprint PCS, XYPoint, NextWave, NewNet American Personal Communications, CTIA and several other national and international wireless telecommunications companies.

Wrote many wireless network design and analysis papers including HLR specifications, Authentication Center (AC) specifications, PCS network design, short message service (SMS) design, intelligent network applications of wireless technology and comparative analyses of many signaling protocols. Extensive experience with Signaling System No. 7, including both protocol implementation and network design. Authored the Standard Requirements Document for the SS7-based A-interface between the base station and MSC used throughout the TIA. Also involved in the design of the Bellcore WACS/PACS technology, digital cellular network service and feature descriptions, SCPs and HLRs. Extensive experience developing the architecture and design of distributed intelligent networks including, SS7, cellular, PCS, AIN and WIN networks. Key member of the original Cellular Digital Packet Data (CDPD) architecture and design team. Designed the CDPD air interface protocol emulator developed and marketed by AirLink Communications, Inc.

### AT&T Bell Laboratories • Whippany, NJ • December 1990 – April 1992
Mobile Network Architecture Solutions

**Consulting Member of the Technical Staff**
As a consultant to AT&T Bell Laboratories, evaluated wireless technology services for the Wireless Systems Architecture group. Also participated as a system engineer on the design of the Global System for Mobile (GSM) communication architecture and a software engineer developing the base station controller (BSC) for GSM. Also responsible for planning, coordinating, designing and testing the SS7 protocol software for the GSM A-interface between the BSC, MSC and operations and maintenance center (OMC). High-level and detailed design specifications were developed to coordinate the protocol testing between two remote laboratories. Provided the traffic analysis and traffic engineering of call traffic for the BSC. Specifically designed and developed the dynamic traffic overload control subsystem for the BSC. Presentations were given to technical staffs at multiple Bell Laboratories facilities supporting this work.

### DGM&S, Inc. • Mt. Laurel, NJ • May 1987 – December 1990
Telecommunications Network Infrastructure Solutions

**Senior Staff Consultant**
As a Senior Staff Consultant, responsible for the design, development and test coordination of an advanced intelligent network applications platform for a service control point (SCP). Also spent several years as a consulting software engineer for Siemens AG, developing and testing SS7 and call control software for the EWSD digital switching system for international as well as U.S. national network implementations. This work involved extensive travel to both Frankfurt and Munich, Germany for software system design and testing. Also involved in the concept, design and technical marketing of proprietary enabling technology software products for SS7 and ISDN.

### ADP, Inc. • Mt. Laurel, NJ • May 1986 – May 1987
Financial and Brokerage Solutions and Services

**Senior Software Engineer and Analyst**

As a Senior Software Engineer for ADP, Inc., responsible for the design and development of data communications and real time database application software for a host data center that provided real time financial information to large brokerage houses. Data communication protocol expertise in HDLC, RS-232 and IBM BiSync.

### C3, Inc. • Cape May, NJ • June 1984 – May 1986
U.S. Coast Guard Shipboard Consulting Solutions

**Consulting Systems Analyst and Software Engineer**

As a civilian consulting systems analyst and engineer to the U.S. Coast Guard Electronics Engineering Center (EECEN) for C3, Inc., developed sophisticated user-friendly database software for shipboard use including inventory and law enforcement applications. The work included the follow-through of the entire project lifecycle including writing of requirements, functional, design and program specifications, coding, debugging, alpha and beta testing, release, shipboard installation and continuing technical support of the product. Received a personal commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, for successful efforts on these projects.

## EDUCATION

B.A. Mathematics (Astronomy Minor)
Franklin and Marshall College 1984

## PATENTS ISSUED

System and Method for Authenticating Cellular Telephonic Communication, US Patent #5799084, Issued August 25, 1998.

Authentication Key Management System and Method, US Patent #5850445, Issued December 15, 1998.

Secure Authentication-Key Management System and Method for Mobile Communications, US Patent #5970144, Issued October 19, 1999.

Authentication Key Management System and Method, US Patent #6128389, Issued October 3, 2000.

## PUBLICATIONS

Gallagher, Michael D. and Snyder, Randall A. Mobile Telecommunications Networking with IS-41; McGraw-Hill, New York, NY USA; Copyright 1997 Michael D. Gallagher and Randall A. Snyder.

Snyder, Randall A. and Gallagher, Michael D. Wireless Telecommunications Networking with ANSI-41 Second Edition; McGraw-Hill, New York, NY USA; Copyright 2001 Randall A. Snyder and Michael D. Gallagher.

What Workers Want from Wireless by Randall A. Snyder; April 15, 2004. America's Network, Advanstar Communications, Santa Ana, California USA.

Forecasting SS7 Traffic by Randall A. Snyder; November 1, 2000. Wireless Review, Volume 17, Number 21, Intertec Publishing, Overland Park, KS USA.

IS-41/GSM Interoperability by Randy Snyder; December, 1995, Cellular Networking Perspectives, Cellular Networking Perspectives, LTD, Calgary, Alberta, Canada.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHAEL CRISSWELL, individually and on
behalf of a class of similarly situated
individuals,

               Plaintiff,

v.

MYSPACE, INC., a Delaware corporation,

               Defendant.

No. 08 CV 01578

Judge Milton I. Shadur

Magistrate Judge Sidney I. Schenkier

## NOTICE OF FILING

TO:

Blaine C. Kimrey
David R. Geerdes
Sonnenschein, Nath & Rosenthal, LLP
233 South Wacker Drive
Sears Tower
Chicago, IL 60606
(312) 876-3175
bkimrey@sonnenschein.com
dgeerdes@sonnenschein.com

      PLEASE TAKE NOTICE that on the June 11, 2008, I e-filed with the Clerk of the United
States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn
Street, Chicago, IL, using the CM/ECF filing system, Plaintiff's Motion for Preliminary
Injunction and Class Certification, a copy of which is attached hereto and hereby served upon
you.

               Respectfully submitted,

               By /s/ Myles McGuire
               MYLES MCGUIRE One of the Attorneys
               for Plaintiff Michael Crisswell, individually
               and on behalf of a class of similarly situated
               individuals

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2008 the above referenced document was electronically filed with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern Division, using the CM/ECF system which will send notification of such filing via email to the following:

Blaine C. Kimrey
David R. Geerdes
Sonnenschein, Nath & Rosenthal, LLP
233 South Wacker Drive
Sears Tower
Chicago, IL 60606
(312) 876-3175
bkimrey@sonnenschein.com
dgeerdes@sonnenschein.com

Dated:  June 11, 2008


By: /s/ Myles McGuire
    MYLES MCGUIRE
    One of the Attorneys for Michael
    Crisswell, individually and on behalf of a
    class of similarly situated individuals

JAY EDELSON
MYLES MCGUIRE
ETHAN PRESTON
KAMBEREDELSON, LLC
53 West Jackson Boulevard, Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370